Milo Steven Marsden (Utah State Bar No. 4879)
Peggy Hunt (Utah State Bar No. 6060)
Nathan S. Seim (Utah State Bar No. 12654)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  hunt.peggy@dorsey.com
          marsden.steve@dorsey.com
          seim.nathan@dorsey.com

*Attorneys for Plaintiff D. Ray Strong, Liquidating Trustee*

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| D. RAY STRONG, as Liquidating Trustee of the Consolidated Legacy Debtors Liquidating Trust, the Castle Arch Opportunity Partners I, LLC Liquidating Trust and the Castle Arch Opportunity Partners II, LLC Liquidating Trust,<br><br>         Plaintiff,<br>v.<br><br>KIRBY D. COCHRAN; JEFF AUSTIN; AUSTIN CAPITAL SOLUTIONS; WILLIAM H. DAVIDSON; DOUGLAS W. CHILD; CHILD, VAN WAGONER & ASSOCIATES, PLLC, fka CHILD, SULLIVAN & ASSOCIATES, fka CHILD, VAN WAGONER & ASSOCIATES, LLC, fka CHILD VAN WAGONER & BRADSHAW, PLLC; ROBERT CLAWSON; HYBRID ADVISOR CROUP; and JOHN DOES 1-50,<br><br>         Defendants. | **COMPLAINT**<br><br>CASE NO. _____<br><br>JUDGE _____<br><br><br>Demand for Jury |

Plaintiff D. Ray Strong (the "<u>Trustee</u>"), as the (i) post-confirmation estate representative

of Castle Arch Real Estate Investment Company, LLC ("<u>CAREIC</u>"), CAOP Managers, LLC

("<u>CAOP Managers</u>"), Castle Arch Kingman, LLC ("<u>CAK</u>"), Castle Arch Smyrna, LLC ("<u>CAS</u>"),

Castle Arch Secured Development Fund, LLC ("CASDF"), Castle Arch Star Valley, LLC ("CASV"), Castle Arch Opportunity Partners I, LLC ("CAOP I") and Castle Arch Opportunity Partners II, LLC ("CAOP II") (collectively, the "Debtors"), and (ii) Liquidating Trustee of the Consolidated Legacy Debtors Liquidating Trust, Castle Arch Opportunity Partners I, LLC Liquidating Trust and the Castle Arch Opportunity Partners II, LLC Liquidating Trust (collectively, the "Trusts"), as appointed in such capacities in the bankruptcy case styled as *In re Castle Arch Real Estate Investment Company, LLC et al.*, Case No. 11-35082 (the "Bankruptcy Case"), filed in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court"), alleges as follows:

## I.      NATURE OF THE CASE

1.      This is a case brought by the Trustee on behalf of the Debtors and Trusts against certain former officers and directors of the Debtors (and their entities) to recover the tens of millions of dollars that investors and creditors have lost because of the Defendants' unlawful and fraudulent conduct and operation of the Debtors.

2.      Prior to filing their Chapter 11 bankruptcy petitions in October 2011, the Debtors had raised over $73 million from investors.  The Defendants told investors this money would be used to prudently acquire, entitle and develop real estate.  In fact, the money was not invested prudently.

3.      Indeed, CAREIC Management recklessly moved forward with accelerated investment in raw land long after it was clear that the real estate market was collapsing, and that most national production home builders had drastically curtailed, or entirely stopped land purchases. For instance, by October 25, 2006, Pulte Homes (a national home builder) had

announced that "the U.S. housing market was impacted by lack of consumer confidence, decreased housing affordability, and large supplies of resale and new home inventories and related pricing pressures."  As a result, Pulte said, it was "adjust[ing its] approach to land acquisition and construction practices, *continuing to shorten our land pipeline*, *reduce production volumes*, and balance home price and profitability with sales pace. We are slowing down planned land purchases and reducing our total number of controlled lots owned and under option."

4.      Similarly, on September 6, 2006, KB Homes (another national home builder) announced that it had experienced "an increasingly challenging housing market . . . [and] the supply of new and resale home inventories has built up in recent months. . . ." Further, KB Homes said that "further intensifying the unfavorable conditions in the housing market is the weaker than expected demand for new homes."  As a result, KB said it was taking action to reduce overhead, curtail land acquisitions, and "monetize non-strategic land positions."

5.      Notwithstanding these conditions, CAREIC Management continued to close substantial land purchases in, among other places, Kingman Arizona and Smyrna Tennessee. Not surprisingly, by the time the Debtors were forced to file bankruptcy, they had entirely failed to successfully entitle, develop, or sell – with the exception of one small parcel in Star Valley Wyoming – the real property they had acquired.

6.      Despite their abject failure as real estate developers, the Defendants had paid themselves handsomely throughout the course of the Debtors' existence.  It is now apparent that the Defendants brought no value to the Debtors, and were paid essentially for wasting investors' money on projects that the Defendants knew, or should have known, were either

completely infeasible or so high risk that a prudent real estate developer would never have pursued them.  Indeed, over the course of its existence, CAREIC generated almost no revenues from operations.  Rather, it was funded almost exclusively by money raised from investors.

7.      Investor funds were primarily raised through private placement memoranda ("PPMs") and other marketing materials.  These materials did not disclose the true facts about the Debtors' operations and financial results.  Nor did the Defendants otherwise adequately disclose the actual characteristics and risks of the real estate "projects" that investors were solicited to invest in.

8.      On information and belief, the Defendants also made numerous material misrepresentations and omissions in face-to-face investor solicitation meetings.  Additionally, the Defendants caused (or failed to stop) the Debtors from selling securities illegally through unlicensed brokers-dealers.

9.      To facilitate fundraising efforts, the Defendants caused several "investment-specific" entities to be created.  The Defendants represented to investors that their investment in one of these investment-specific entities  would be used to fund the project that entity had ostensibly been formed to pursue.  In fact, the Defendants co-mingled investment funds from all entities and treated these investment-specific entities as their private piggy banks, whose funds could be used at the whim of the Defendants.

10.     In short, while the Defendants controlled the Debtors, they raised money by defrauding investors, they operated the Debtors in a way that consistently breached their fiduciary duties of care, loyalty, and disclosure, and they failed to comply with basic standards

for operating, managing and monitoring the real estate development projects in which they were engaged.

## II.   PRIOR BANKRUPTCY PROCEEDINGS

11.    On October 17, 2011, a Receiver appointed by a Utah State Court filed a voluntary Chapter 11 bankruptcy petition for CAREIC in the Bankruptcy Court,[1] and on October 20, 2011, the Receiver also filed Chapter 11 petitions for each of the other Debtors,[2] other than CASV (collectively, these dates are referred to as the "Petition Date").

12.    On May 3, 2012, the Bankruptcy Court entered an Order appointing the Trustee as the Chapter 11 Trustee for CAREIC,[3] and in that capacity, the Trustee managed, either directly or indirectly, each of the other Debtors.

13.    On February 8, 2013, the Bankruptcy Court entered an Order substantively consolidating CAOP Managers, CAK, CAS, CASDF and CASV with CAREIC (the "Consolidation Order").[4]  These entities, as consolidated, are referred collectively herein as the "Consolidated Legacy Debtors."

14.    In conjunction with the Consolidation Order, the Bankruptcy Court entered detailed *Findings of Fact and Conclusions of Law*, a copy of which is attached hereto as **Exhibit 1** (the "Consolidation Findings and Conclusions"),[5] finding and concluding as follows:

---

[1] Bankr. Case No. 11-35082.

[2] Bankr. Case Nos. 11-35237 (CAOP Managers), 11-35242 (CAK), 11-35243 (CASDF), 11-35246 (CAS), 11-35240 (CAOP I) and 11-35241 (CAOP II).  These bankruptcy cases are being jointly administered or are substantively consolidated with CAREIC's bankruptcy case in Case No. 11-35082.

[3] Bankruptcy Case Docket No. 215 (Order of Appointment).

[4] *Id.* at Docket No. 590.

[5] *Id.* at Docket No. 591.

a.  The Consolidated Legacy Debtors were all managed by CAREIC's single management team – the individual Defendants herein – on a consolidated basis, and they had no corporate existence outside of the CAREIC corporate family.[6]

b.  Bank accounts opened for the Consolidated Legacy Debtors were controlled by CAREIC's management team.[7]

c.  The primary source of the Debtors' cash was not operations, but the total of $73.6 million in cash raised from investors through a series of public offerings.[8]

d.  The raising of cash fit a pattern—as cash was consumed and additional cash was needed, CAREIC—through Defendants—caused new securities offerings to be made, initially through CAREIC, and then later through the other Debtors.[9] Thus, the formation of the Debtors was "a vehicle by which to obtain additional investor funds[.]"[10]

e.  Cash raised from investors of each of the Consolidated Legacy Debtors was "used indiscriminately by the Debtors to fund whatever entity was in need of cash at any given time."[11]  Cash was used "as if part of one big 'piggy bank,' with funds from the account of whichever entity had cash on deposit being transferred, commingled, and used by the entity in need of cash at any given time."[12]

f.  The Consolidated Legacy Debtors' "assets and affairs are hopelessly commingled [and] it was not uncommon for funds obtained from investors in one of the Legacy Debtors to be deposited into a bank account of another one of the Legacy Debtors[.]"[13] Furthermore, "it was not uncommon for one Legacy Debtor's cash

---

[6] *See* Exh. 1 (Consolidation Findings and Conclusions, ¶¶ 17-32, & ¶ 107(c) – (f)).

[7] *Id*. ¶ 25 *see also id*. ¶¶ 47- 59 (discussing bank accounts and intermingling of cash).

[8] *See id.* ¶¶ 33-34 ("With the exception of relatively limited revenues from the sale of certain property holdings, neither CAREIC nor any of the Legacy Debtors had any operating revenue."), ¶ 46 (Consolidated Legacy Debtors "had relatively little revenues generated from operations, but rather operating costs . . .  were funded by monies raised from the sale of securities to investors."), & Consolidation Findings and Conclusions Exh B (Timeline of Castle Arch Entity Formations and Investment Offerings).

[9] *Id*. ¶ 35; *see id* ¶¶ 36-39 (providing detail of this pattern), ¶ 107(d), & Consolidation Findings and Conclusions, Bankruptcy Docket No. 591,  Exhs. E-G (showing use of cash and public offerings).

[10] *Id*. ¶ 107(d).

[11] *Id*. ¶ 25; *see also id*. ¶¶ 46-59 & ¶107(b).

[12] *Id*. ¶ 58.

[13] *Id*. ¶ 50.

to be used to directly pay the expenses of another Legacy Debtor."[14]  Finally, "in addition to significant commingling and intercompany transfers of cash . . . assets were purchased as part of very convoluted intercompany transactions.[15]

    g.    "A large portion of the Legacy Debtors' business focused on fundraising[,]"[16] with approximately 25% of all investor funds being used for executive compensation and fundraising expenses, such as finders' fees and commissions.[17]

    h.    Almost all of the real properties that the Consolidated Legacy Debtors purchased and owned as of the filing of the Bankruptcy Cases remained undeveloped, with no entitlements in place.[18]

    15.    On June 7, 2013, the Bankruptcy Court entered an *Order Confirming Chapter 11 Trustee's First Amended Plan of Liquidation Dated February 25, 2013 as Modified* (the "Confirmation Order")[19] which, among other things: (i) confirmed the *Second Amended Chapter 11 Trustee's Plan of Liquidation Dated February 25, 2013* (the "Confirmed Plan")[20]; (ii) approved the Liquidating Trust Agreements for each of the Liquidating Trusts; (iii) appointed the Trustee as the post-confirmation estate representative for each of the Debtors; and (iv) appointed the Trustee as the Liquidating Trustee for the Liquidating Trusts.

    16.    Pursuant to the Confirmed Plan and the Liquidating Trust Agreements: (i) the assets of the Consolidated Legacy Debtors, CAOP I and CAOP II were transferred to the respective Trusts, including all "Claims" and "Causes of Action" (as defined in Section 1.1 of

---

[14] *Id.* ¶ 53.

[15] *Id.* ¶ 61; *see id.* ¶¶ 64-91 (providing examples).

[16] *Id.* ¶ 41; *see id.* ¶¶40-45.

[17] *Id.* ¶ 42.

[18] *Id.* ¶ 45.

[19] Bankruptcy Case Docket No. 705.

[20] *Id* at Docket No. 701.

the Confirmed Plan), as well as all "Individual Claims" (i.e., individual claims of investors as defined in Section 6.4 of the Confirmed Plan).

17.     Through this Complaint, the Trustee, as the Liquidating Trustee of the Trusts, brings the Debtors' Claims and Causes of Action against Defendants, as well as the Individual Claims of investors, to assist in making a return to the Debtors' creditors and investors.

### III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1331 and 1334(b) because this Complaint states claims on behalf of the Liquidating Trusts arising under Title 11 of the United States Code, and this civil proceeding is a proceeding arising under Title 11, or arising in or related to the Debtors' Bankruptcy Case.

19.     Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails in connection with the transactions, acts, and courses of business alleged herein, certain of which have occurred within the District of Utah.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1409(a) because: (a) certain of the transactions, acts, practices and courses of business alleged in this Complaint took place in the District of Utah, and because certain of the Defendants reside in and transact business in the District of Utah; and (b) the Debtors' Bankruptcy Case is pending in the Bankruptcy Court for the District of Utah, and this is a proceeding arising under Title 11, or arising in or related to the Debtors' Bankruptcy Case under Title 11.

## IV.    PARTIES

21.     Plaintiff is the estate representative for the Debtors and the Liquidating Trustee for the Trusts.  Pursuant to this Complaint, the Trustee is bringing: (a) the Debtors' Claims and Causes of Action against Defendants; and (b) the Individual Claims and Causes of Action of the Debtors' investors against Defendants.

22.     Defendant Kirby Cochran ("Cochran") is a resident of the State of Utah.  Cochran served as CAREIC's CEO from its inception in 2004 until he resigned in about November, 2010.  Cochran also served as Chairman of CAREIC's Board of Directors from CAREIC's inception until approximately May, 2007.  Cochran continued to serve on CAREIC's Board until the appointment of a Receiver in July, 2011.

23.     Defendant Jeff Austin ("Austin") is a resident of the State of California.  Austin served as CAREIC's Senior Vice President of Business Development and was a member of CAREIC's Board of Directors.  Austin also served as CAREIC's CEO from November, 2010 until the appointment of a Receiver in July, 2011, and then from the Petition Date until the Trustee's appointment.  Austin was the person principally responsible for the Debtors' capital-raising activities, comprised of selling securities to the public through unlicensed broker-dealers by means of material misstatements and omissions.  Austin was not registered with the Securities & Exchange Commission ("SEC") as a broker-dealer or as being associated with a broker-dealer firm that was registered with the SEC.

24.     Upon information and belief, Austin Capital Solutions is a California entity that is solely owned and managed by Austin and which received transfers of cash from the Debtors.

25.     Defendant Douglas Child ("Child") is a resident of the State of Utah.  Child served as CAREIC's CFO and was a member of CAREIC's Board of Directors from its inception in 2004 until a Receiver was appointed in July, 2011, and then from the Petition Date until the Trustee's appointment.  Child was the person principally responsible for preparing and maintaining the Debtors' accounting and financial records, and for preparing and filing the Debtors' financial and other reports with the SEC.

26.     Defendant Child, Van Wagoner & Associates, PLLC, fka Child, Sullivan & Associates, fka Child, Van Wagoner & Associates, LLC, fka Child Van Wagoner & Bradshaw, PLLC (the "Child Firm") is a Utah professional limited liability company of which Child was a principal and which provided substantial accounting services for the Debtors.

27.     Defendant William Davidson ("Davidson") is a resident of the State of California.  Davidson became a member of CAREIC's Board of Directors in January, 2006, and was elected Chairman of the Board on May 15, 2007.  Davidson remained Chairman of the Board until he resigned in approximately November, 2010.  Davidson also served on CAREIC's Audit Committee, Compensation Committee, and Governance and Compliance Committee.

28.     Defendant Robert Clawson ("Clawson") was CAREIC's Managing Director of Business Development, an investor relations contact, and a de facto officer and member of CAREIC's Board from its inception in 2004 until appointment of a Receiver in 2011.

29.     Upon information and belief, Defendant Hybrid Advisor Group is a California entity that was solely owned and managed by Clawson, and which received transfers of cash from the Debtors.

30.     Defendant John Does 1-50 are persons or entities, whose names are currently unknown, and against whom the Trusts may have causes of action.

31.     Defendants Cochran, Austin, Child and Clawson are referred collectively herein as the "Officers."  The Officers, together with Davidson, are referred herein as the "Board,"  the "Directors," or "Management."

## V.     GENERAL ALLEGATIONS

### A.     The Company's Corporate and Capital Structure

32.     Defendants Cochran, Austin, Child, and one other party formed CAREIC on or about April 1, 2004.

33.     In addition, during CAREIC's existence, CAREIC Management formed several other entities (*e.g.*, CAS, CAK and CASDF), claiming that these entities were created to develop specific projects or to exploit specific investment opportunities.

34.     Over the course of CAREIC's existence, Management raised approximately $73 million from investors to fund the operations of CARIEC or one of its special purpose entities.

35.     At all times, CAREIC owned all or substantially all of the membership interests of each of these entities, and CAREIC and all of its affiliated entities were fully, completely and exclusively controlled by Management.

### B.     CAREIC Management's Breaches of Fiduciary Duty.

36.     CAREIC Management had fiduciary duties to all of the Debtors and their shareholders as a result of their positions as directors, officers, and agents of the Debtors.

37.     These duties required CAREIC Management to use an appropriate standard of care, skill and diligence in their work for CAREIC and the other Debtors, to remain loyal to the

Debtors, to prefer the interests of the Debtors over their own, and to fully and accurately disclose material facts to investors. During their tenure with CAREIC and the Debtors, CAREIC Management grossly breached their fiduciary duties.

38.     As a result, despite raising some $73 million from investors, CAREIC Management did not – with the exception of one small parcel in Star Valley, Wyoming – complete entitlement of any of its real estate projects, and CAREIC Management did not sell any substantial part of any of its real estate projects.

### 1.     Breaches of Fiduciary Duties Relating to Specific Real Estate Projects

39.     CAREIC Management breached their fiduciary duties of care, loyalty and disclosure in regards to the Debtors' real estate operations in Kingman, Arizona; Tooele, Utah; and Smyrna, Tennessee.

#### (a)     *Kingman Project*

40.     CAREIC Management breached their fiduciary duties with respect to the real estate project in Kingman, Arizona by, among other things: (a) using irrational sales assumptions and pro forma metrics that contradicted known data, and failing to disclose to investors accurate forecasts; (b) wasting corporate assets (investor money) on an infeasible project without sufficient funding and resources; and (c) engaging in co-mingled and self-dealing transactions that were not disclosed to investors.

41.     By contract dated August 31, 2005, CAREIC's President secured purchase rights to several thousand acres of undeveloped land in Kingman, Arizona for the purpose of developing a 2,100 acre master planned community with up to two 18-hole golf courses (the "Kingman Project").

42. On January 13, 2006, CAREIC Management closed on an initial 216 acres of land for $5,625,000; on February 2, 2006, CAREIC Management closed on an additional 21 acres for $454,405; on April 26, 2006, CAREIC Management closed on an additional 216 acres for $5,625,000; on March 9, 2007, CAREIC Management closed on an additional 40 acres for $1,100,000; and on March 27, 2008, CAREIC Management closed on an additional 380 acres for $9,857,371.

43. In conjunction with these land purchases, CAREIC Management also paid $202,000 to purchase mineral rights, and another $1,000,000 to Nicklaus Design, LLC relating to potential golf courses.

1.    *Irrational and Unsupported Pro Forma Assumptions in CAK PPM*

44. In May of 2006 – after spending nearly $13 million on the Kingman Project – CAREIC Management issued the CAK Series A Private Placement Memorandum (the "CAK PPM"), pursuant to which approximately $10 million was raised from investors.

45. Included in the CAK PPM was a pro forma model given to investors showing CAREIC Management's underwriting and projections for the Kingman Project (the "Kingman Pro Forma"). CAREIC Management's determination that investor funds should be spent on the Kingman Project was based on, among other things, the following assumptions: (a) a straight line 5% sales price escalator throughout the life of the Kingman Project; and (b) an absorption sales rate of approximately 992 finished lots per year.

46. CAREIC Management's straight line 5% sales inflation figure was irrational and optimistically high for the Kingman Project, which figure unrealistically inflated sales figures, expected profits and return on investment.

47.     Moreover, at the time of issuing the Kingman Pro Forma to investors, CAREIC Management knew, or should have known, that their projected absorption sales rate was unrealistic.  Indeed, in the five years prior to the CAK PPM, the average number of new single family home permits issued by the City of Kingman was 451 per year – less than half of the 992 projected by CAREIC Management.

48.     In other words, to reach the projections of CAREIC Management, Kingman City's new home demand had to rise more than 100% (from 451 permits per year to 992 permits per year), and CAREIC had to capture 100% of that increase in new home demand.

49.     CAREIC Management also received market studies from hired professionals showing that their sales absorption assumptions were illogical and not based on sound data, but CAREIC Management ignored such studies and failed to disclose the existence of the studies to investors.

50.     CAREIC Management had a fiduciary duty to use proper and accurate assumptions and forecasts in generating the Kingman Pro Forma.

51.     CAREIC Management also had a fiduciary duty to disclose to investors: (a) accurate projections relating to the Kingman Project; (b) the existence of sound reports contradicting the Kingman Pro Forma; and (c) updated and revised projections relating to the Kingman Project as the project deteriorated.

52.     By not taking these actions, CAREIC Management breached their fiduciary duties of care, loyalty and disclosure.

2.      *Wasting Corporate Assets on an Infeasible Project*

53.     The CAK PPM, which sought to raise $30 million for the Kingman Project, stated that the "project can be self-sustaining with the initial $30 million in equity and $15 million in debt financing in year two."

54.     CAREIC Management, however, was only successful in raising approximately $10 million from investors – only one-third of the amount that was needed to sustain the Kingman Project.

55.     Notwithstanding their failure to raise sufficient funds to take on a project that size, CAREIC Management continued to sink money into the Kingman Project doomed to fail. For instance, in March 2008 – after the unsuccessful CAK Series A offering – CAREIC Management decided to close on an additional 380 acres of land for $9.8 million.

56.     Presumably to assist in funding the land purchase "after the fact," CAREIC Management issued its Series B PPM in September 2008, which sought investor money in the amount of $15 million.  However, CAREIC Management was only successful in raising approximately $50,000.

57.     In the end, CAREIC Management never had sufficient funds or resources to develop the large Kingman Project, which utterly failed.

58.     CAREIC Management had a fiduciary duty to ensure that they had sufficient funds and resources to take on a project as large as the Kingman Project before committing millions of dollars of investor capital into land purchases and development.

59.     By the end of the May 2006 CAK Series A offering, CAREIC Management knew, or should have known, that they would not be able to raise the necessary $30 million from investors necessary to sustain the Kingman Project.

60.     Notwithstanding this fact, CAREIC Management continued to sink millions of dollars into the large Kingman Project – including the last purchase of land in March 2008 for $9.8 million – with no legitimate hope of the project being successful, and CAREIC Management failed to inform investors of, and update its projections based on, the lack of funding necessary to develop the Kingman Project.  Because of this, CAREIC Management breached their fiduciary duties of care, loyalty and disclosure.

> *3.*     *Engaging in Co-Mingled, Undisclosed, and Self-Dealing Transactions*

61.     Between March 2008 and May 2009, CAREIC Management caused CAK to enter into three separate promissory notes in favor of CASDF, purportedly secured by various tracts of land comprising the Kingman Property.

62.     The asserted purpose of the three notes was to allow CAK to obtain funds from CASDF to assist with the Kingman Project.

63.     In reality, however, CAREIC Management did not use the "loaned funds" from CASDF for the Kingman Project.  Instead, CAREIC Management used the funds for, among other purposes, CAREIC's general operations and obligations, as well as repayment of loans that CAREIC's President and Davidson made relating to CAS.

64.     CAREIC Management had a fiduciary duty not to encumber the Kingman Project with liens and debt that did not directly benefit the project.  At a minimum, CAREIC Management had a duty to disclose the unrelated debt to investors, and to update the Kingman

Pro Forma to account for the additional debt.  Because this was not done, CAREIC

Management breached their fiduciary duties of care, loyalty and disclosure to investors.

### *(b)      Tooele Property*

65.      CARIEC Management also breached their fiduciary duties with respect to the

real estate project in Tooele, Utah by, among other things: (a) failing to disclose known

annexation issues to investors; (b) wasting corporate assets (investor money) to purchase land

and water rights despite actual knowledge of annexation limitations that made the project

infeasible; (c) using irrational sales assumptions and pro forma metrics that contradicted

known data, and failing to disclose to investors accurate forecasts; and (d) encumbering the

project with millions of dollars of debt that solely benefitted a different project and entity, and

failing to disclose the unrelated project debt to investors.

### *1.      Carelessly Proceeding with Project Despite Insurmountable and Known Annexation Issues*

66.      As early as June 2005, CAREIC Management knew that it was highly unlikely

that they would be able to successfully annex their proposed real estate project into Tooele

City.  In particular, they knew that: (a) there would be multiple hurdles for *any annexation* into

Tooele City; (b) only lands west of Canyon Road were in Tooele City's 5–10 year annexation

plan at that time; (c) lands east of Canyon Road were not even identified as part of Tooele

City's annexation plan; and (d) the city was adverse to annexing any additional land due to a

large amount of existing undeveloped land within the city's boundaries.

67.      CAREIC Management had been informed that annexation was highly unlikely

by Tooele City staff, professional planning and design services firms, and other people

knowledgeable about the Tooele area, and the Tooele City Council.

68.     Indeed, by October of 2005, CAREIC Management knew that the very parcels they would seek to annex had been overwhelmingly turned down only 5 or 6 years before because of limited planning and no benefit to the City.

69.     By this time, CAREIC Management also knew that in the absence of annexation, the density of their proposed real estate project would be limited to one lot per every 5 acres which, upon information and belief, would make the project completely economically infeasible.

70.     Despite this knowledge, on September 1, 2005 and October 27, 2005, CAREIC Management closed on the purchase of about 264 acres of real property in Tooele, Utah (the "264 Acres") for approximately $7.2 million.

71.     In addition, in October 2005, CAREIC Management closed on the purchase of about 449 acre-feet of water to be used in connection with the development (the "449 Acre Water").

72.     CAREIC Management closed on the purchase of an additional 76 acres of real property in June of 2006 (the "76 Acres"), and in July 2006, CAREIC Management closed on the purchase of an additional 7 acres of real property in Tooele (the "7 Acres" and, collectively with the 264 Acres and the 76 Acres, the "Tooele Property").

73.     Within one month thereafter, CAREIC's President *admitted* to CAREIC's legal counsel that he knew Tooele City would not annex CAREIC's project into the City. Notwithstanding this, CAREIC Management continued to spend money to acquire real estate and water in the Tooele area.  For instance, in November 2008, CAREIC Management closed

on the purchase of an additional 167 acre-feet of water for the Tooele Property (collectively with the 449 Acre Water, the "Tooele Water").

74.     In total, CAREIC Management spent $13,352,192 of investor funds for the Tooele Property and Water, despite actual knowledge that annexation into Tooele City was highly unlikely which, upon information and belief, made the project economically infeasible.

75.     As a steward of third-party investor capital, and serving as professional real estate managers of that capital, CARIEC Management breached their fiduciary duties by carelessly spending over $13 million in investor funds on the Tooele project without first taking proper steps to resolve known annexation issues, even though these issues would directly affect lot yield, profits, and the economic viability of the project.

76.     CARIEC Management also breached their fiduciary duties by failing to disclose these facts to investors, by misrepresenting material information regarding the status of the Tooele project and by failing to disclose material information to investors regarding annexation issues and lot yield.

77.     CAREIC's May 25, 2007 PPM (the "CAREIC May 2007 PPM"), pursuant to which money was raised from investors for the Tooele project, never mentions any of these facts.  Instead, the PPM misrepresents material facts concerning the status of and prospects for annexation as follows:

> In the twelve month period ended December 31, 2006, we incurred $18,608 in entitlement costs in the form of government filing fees, engineering fees and legal fees in connection with planning and approvals, Tooele zoning entitlements, conceptual and master land use plan, noise assessment study, and annexation requests. We are currently attempting to induce Tooele's City council to approve annexation of our properties into the city of Tooele. If this occurs, we will have substantially completed the entitlement process.

78.     The CAREIC May 2007 PPM also misrepresents the facts concerning how many homes could be entitled, saying: "We expect to complete entitlements for 900 to 1,000 single-family homes on the properties, including multi-family residences, in the next two years."

79.     At the time this statement was made, CAREIC Management knew that no more than 700 units will be available over the entire property.

2.      *Irrational and Unsupported Sales Assumptions*

80.     In connection with the Tooele Project, CAREIC Management created a document entitled "*Tooele Pro Forma Assumptions*" (the "Tooele Pro Forma"), which sets forth CAREIC Management's financial underwriting related to the Tooele project.

81.     According to the Tooele Pro Forma, CAREIC Management's determination that investor funds should be spent on the project was based on, among other things, the following assumptions: (a) $9.4 million land purchase price for 347 acres; (b) lot densities of 4 dwelling units per acre, thereby generating 1,388 finished lots; (c) 1.1 million in entitlement expenses; and (d) sales forecasts of 58 finished lots per month commencing in April 2008, with project sellout in March 2010, *thereby suggesting an annual absorption rate of almost 700 finished lots per year*.

82.     However, as early as May 14, 2005 – *i.e.*, before the first dollar had been spent, CAREIC Management knew that the absorption rate its pro forma was based upon was unrealistically optimistic.

83.     An internal memorandum prepared by CAREIC personnel stated that in 2004, Tooele City had only issued 195 single family building permits for the entire year, and that as of May 2005, Tooele City had only issued permits for 52 single family units.

84.     Put another way, to economically justify the Tooele Project, CAREIC Management forecasted that: (a) Tooele City's new home demand was going to rise almost four fold (from 195 permits to 700 permits per year); and (b) CAREIC was going to capture 100% of that entire expansion in new home demand.

85.     CAREIC Management had a duty to use proper and accurate assumptions and forecasts in generating the Tooele Pro Forma and expectations for the project.  This assumption was unreasonable.

86.     CAREIC Management breached their fiduciary duties by using irrational sales assumptions that were not backed by any third-party market share or market study data.

87.     Additionally, the sales forecast was dependent upon the Tooele project being annexed into the City of Tooele, which Management knew from the outset was not likely.

88.     Yet, upon information and belief, no adjustments were made to the Tooele Pro Forma, and investors were never informed that CAREIC's forecasts were completely without a rational basis.

89.     CAREIC Management had a fiduciary duty to update project metrics, lot yield and sales forecasts as the project progressed, and to disclose such information to investors prior to sinking investor money into a project doomed to fail.  By not doing so, CAREIC Management breached their fiduciary duties of care, loyalty, and disclosure.

21

3.    *Encumbering the Tooele Property with $3.72 million in Debt Related to CAK*

90.    On March 27, 2006, CAREIC obtained a $5,380,295 loan from ANB Financial, which loan was secured by the 264 Acres (the "ANB Loan").

91.    However, not even half of the ANB Loan proceeds went to the Tooele project. Instead, CAREIC Management used virtually all of the ANB Loan proceeds to purchase land for the Kingman Project relating to CAK.

92.    CAREIC Management had a fiduciary duty not to encumber the Tooele project with millions of dollars of debt that did not benefit the project in any way.  At the very least, CAREIC Management had a fiduciary duty to update the Tooele Pro Forma relating to the Tooele property with the additional burdensome debt, and to disclose the new metrics and projections to investors.  By not doing so, CAREIC Management breached their fiduciary duty.

(c)    **Smyrna Property**

93.    CARIEC Management also breached their fiduciary duties with respect to the real estate project in Smyrna, TN by, among other things: (a) ignoring known land and development issues and proceeding with land purchases and development despite insurmountable obstacles, and failing to disclose such issues to investors; (b) using false and improper data to analyze the project's feasibility and profitability; (c) using false and fraudulent estimates for lot demand, and providing false information to investors; (d) proceeding with lot purchases and development despite insufficient funds and resources; and (e) engaging in self-dealing transactions.

1.      *Ignoring Pre-purchase Due Diligence*

94.     In September and October of 2006, CAREIC Management assigned to CAREIC two contracts into which Management had entered, to purchase a total of 643 acres of real property outside of Smyrna, Tennessee (the "Smyrna Property").  The contracts required the purchaser to pay, at Closing, approximately $7.4 million just to acquire the property.

a.      *Management's Knowledge of Insurmountable Obstacles to Development*

95.     Upon information and belief, no later than September 2006, CAREIC Management began investigating whether the Smyrna Property was viable for real estate development.

96.     No later than December 2006, CARIEC Management received a report from Ragan-Smith Engineers ("RSE").  CAREIC Management had commissioned the report to investigate various issues with the Smyrna Property (the "RSE Report").

97.     The RSE Report put CAREIC Management on notice that much of the Smyrna Property was undevelopable because of its geographic features, including the following:

    a.  the land was "moderately steep" with maximum slopes ranging from 15% to 25% and comprising 36.7 acres of the total;

    b.  there were two prominent streams on the property, and approximately 22.4 acres were within the FEMA recognized flood plain;

    c.  an additional 14.7 acres was required for stream buffers; and

    d.  an additional 120.79 acres were required for roads and detention ponds.

98.     Of the 643 acres CARIEC had under contract, only 316.5 were developable, and as a result, *the maximum number of lots theoretically possible on the entire property was no more than 1,295.*

23

99.     The RSE Report also put CARIEC Management on notice that there were

serious problems and expense with obtaining water and sanitary sewer services to the Smyrna

Property, including:

a.  The property had no sewer services at the time.  If a Septic Tank Effluent Pump
    system was used to address this problem, it would consume an additional 129.5
    acres, further reducing *the maximum possible number of lots to 919*;

b.  An alternative gravity sewer system would not be built by the Town of Smyrna
    for 5 to 10 years.  Constructing a portion of that system (excluding on site
    collection) would cost CAREIC at least $2,725,000 in 2006 dollars;

c.  A new water storage reservoir and booster pump would be required to meet
    domestic and fire flow demands, at a cost of an additional $1,500,000 to CAREIC
    in 2006 dollars.

100.    Finally, the RSE Report put CAREIC Management on notice that in order to

achieve minimum lot sizes (and maximum density), the Smyrna Property would have to be

annexed to the Town of Smyrna.  Since there were several parcels of land between the City

limits and the Smyrna Property, annexation was unlikely for at least 4-5 years.

101.    In February 2007, CARIEC Management received the results of a *Sinkhole

Review* its engineers had commissioned with regard to the Smyrna Property.

102.    The Sinkhole Review put CAREIC Management on notice of other problems

with the Smyrna Property, including:

a.  Several exposed joints and sinkholes were identified which, the Review
    concluded, "are not likely to support structural elements due to the need to accept
    water during storm events";

b.  Several karst features (caves) were found on the Smyrna Property.  The area
    covered by these features "would not feasibly support structural elements," and
    would require protection from trespassers;

c.  The majority of the 147 acre Simpson Parcel had essentially no onsite soil that
    would be acceptable for use as engineered fill.  As a result, utility placement and

landscaping would be difficult, and an off-site borrow source would be necessary in order to develop the property.

103.    The RSE Report had previously noted that finding suitable off-site soils of a magnitude to complete development was questionable.

104.    The issues raised in the Sinkhole Report further directly affected the residential lot yield for the Smyrna Property, and in turn the revenues and profits that could be generated from sales of lots from the project.

105.    By written report dated August 7, 2007, RSE advised CAREIC Management that the proposed off-site sewer extension needed for the Smyrna Property would cost $7.5 million, plus $775,700 in engineering fees, for a total sewer cost of $8.3 million.

106.    On August 13, 2007, RSE provided CAREIC Management with a Phase One Environmental Report (the "Phase One Report"), which put CAREIC Management on notice that the Smyrna Property had significant numbers of sink holes and karst features, and that a wetland delineation report needed to be conducted to assure compliance with regulatory wetland requirements.

*b.     Management Analysis Ignores Known Facts*

107.    On or about December 8, 2006, CARIEC Management performed its first complete internal analysis of the development of the Smyrna Property (the "December 2006 Analysis") and presented it to its Board of Directors.

108.    The December 2006 Analysis states that it "conservatively estimates" that the project would generate sales proceeds of approximately $64.8 million, with $43.5 million in acquisition and development costs, yielding a profit of $24.9 million. However, this conclusion assumed that:

25

    a.   annexation, rezoning, lot development, and off-site development work would require about 18-24 months (not the 4 to 5 years that Management's Engineers had advised);

    b.   lot sales would begin in the second year of the project (*i.e.,* 3 years before annexation was achieved);

    c.   the project would generate at least 1600 lots for sale (not the 919 that Management's Engineers had advised were possible).

109.    The assumptions contained in CARIEC Management's December 2006 Analysis are directly contradicted by facts known to CAREIC Management at the time. In violation of their fiduciary duty of care, CAREIC Management completely disregarded material information concerning the economic viability of the Smyrna Property for development that CAREIC Management knew about at the time, in performing their analysis, and in closing the purchase of the Smyrna Property.

110.    CAREIC Management formally revised its analysis of the Smyrna Property at least two times (February 2007 and June 2007) before closing the purchase of the property on August 15, 2007.

111.    In each of these revised analyses, CAREIC Management made further assumptions that were contradicted by facts CAREIC Management knew at the time.

112.    For instance, in the February 12, 2007 Revision, CAREIC Management assumed that off-site work would only require 12–18 months (rather than the 18-24 months stated in the December 2006 Analysis), and assumed that the Property would yield 2,000 lots for sale (rather than the 1,600 stated in the December 2006 Analysis).

113.    Both of these assumptions were directly contradicted by facts known to CAREIC Management at the time. In violation of their fiduciary duty of care, CAREIC

Management completely disregarded material information concerning the economic viability of the Smyrna Property for development that CAREIC Management knew about at the time, in generating the February 2007 Revision, and in proceeding to close the purchase of the Smyrna Property.

114.    Similarly, on June 5, 2007, CAREIC Management generated a further revision to the December 2006 Analysis (the "June 2007 Revision").  The June 2007 Revision assumed that:

a.   off-site sewer costs for the project would be no more than $5 million, and that CAREIC would receive $3 million in Smyrna Town sewer credits;

b.   CAREIC would deliver and sell 250 finished lots between September 2008 and September 2009; and

c.   CAREIC would thereafter deliver and sell 50 finished lots per quarter until 2017.

115.    Each of these assumption was unrealistic, or was contradicted by facts known to CAREIC Management at the time.

116.    For instance, no later than August 7, 2007, CAREIC Management knew that: (a) mandatory off-site sewer  improvements would cost  $8.3 million, as compared to the $5 million assumed in the June 2007 Revision, and represented to investors; (b)  the  Town  of Smyrna had  not  agreed to any binding sewer reimbursement credits; (c) on-site environmental conditions were present on the Smyrna Property, which could  materially impact developable acreage and substantially increase development costs; and (d) on-site streams and  wetlands needed  further analysis to determine lot yield and project  feasibility.

117.    Notwithstanding all these facts, on August 15, 2007, CAS closed the purchase of the Smyrna Property, rather than conducting further investigation to assure the viability of the Smyrna Project.

118.    In so doing, CAREIC Management breached their fiduciary duty of care in relation to the Smyrna Property.  Upon receiving information about the Smyrna Project, a prudent manager would have inquired further into these conditions to determine the likely impact on developable acreage, development cost increases, and potential no-build zones for on-site environmental conditions that could not be feasibly remediated.  Instead, of doing this, CAREIC Management purchased the Smyrna Property without conducting additional and basic due diligence, and continued to raise money from investors while misrepresenting, or failing to disclose, material facts relating to the project.

119.    As a result, CAREIC spent some $7.9 million of investor funds to acquire real estate that had no realistic prospect of being successfully developed.

2.    *False and Fraudulent Estimates of Demand for Lots*

120.    A material part of CAREIC Management's case for the acquisition, development, and further investment in the Smyrna Project was their assertion that major production builders were committed to make substantial purchases of production lots in the Smyrna Project.

121.    For instance, CAREIC Management's files contain three letters purportedly from Beazer Homes dated December 21, 2006, July 12, 2007, and July 30, 2008.  Each of these letters states that Beazer Homes is prepared to purchase 126 production lots each year.

122.    On information and belief, none of these letters is genuine.

123.    On information and belief, none of the letters represented an actual authorized expression of interest from Beazer, but each was instead the result of a conspiracy between CAREIC Management and a former officer of Beazer Homes who had been business associates prior to the Smyrna Project.

124.    Each of these letters reiterates exactly the same purchase commitment despite drastic deterioration changes in the condition of the housing market between December 2006 and July 2008.

125.    In addition, these alleged commitments to new purchases of production lots are directly contradicted by Beazer Homes' own statements in press releases and other public documents dated no later than November 2006, which stated that Beazer was not making commitments for new land acquisition.

### 3.    _Proceeding Despite Insufficient Capital and Resources_

126.    By August 2007, the purchase price for the real estate involved in the Smyrna Project was approximately $7.9 million.  In addition, by August of 2007, CAREIC Management knew that, before it could begin to develop the property, CAREIC would have to spend an additional $8.3 million to construct an off-site sewer improvement.

127.    At that time, however, CAREIC had been able to raise only $4.1 million for the Smyrna Project through CAS's Series A Private Placement Memorandum, so that additional funds had to be borrowed from third parties to close the purchase of the real estate.

128.    In fact, CAREIC was able to fund only $1.3 million of the $7.9 million purchase price for the real estate.  For the rest of the purchase price, CAREIC borrowed approximately $1.8 million from a hard-money lender on very unfavorable terms (12% interest, 6 month

maturity, 20% default rate) (the "<u>Hard Money Loan</u>"), and an additional $1.8 million from CAREIC Management insiders on the same terms (the "<u>Insider Loan</u>").

129.     The Hard Money Loan and the Insider Loan were both secured by Trust Deeds on the Smyrna Property.

130.     With these encumbrances on the property, there was insufficient collateral value to support financing of the $8.3 million off-site sewer improvement that was required before CAREIC could develop and sell lots from the Smyrna Project.

131.     Faced with these facts, a prudent real estate development professional would have abandoned the project as economically infeasible, and would have returned to investors the money raised for the project.

132.     Instead, in breach of their fiduciary duty of care, CAREIC Management proceeded to close on the Smyrna Project, CAREIC expended some $7.9 million of investor funds, the project could not be successfully developed, and ultimately CAREIC and CAS declared bankruptcy.

### 4.     *Self-dealing*

133.     CAREIC Management also breached their fiduciary duty of loyalty to CAREIC by acquiring rights to the Smyrna Project in their individual names, and  upon information and belief, assigned those rights to CAREIC in exchange for a fee of $150,000.00.

### 2.     **Lack of Board Oversight.**

134.     CAREIC's Board of Directors – and in particular Davidson who was CARIEC's Chairman for much of the relevant time period – breached their fiduciary duty by failing to devote sufficient time and attention to the Debtors, failing to properly inform themselves of the

activities of the Debtors and their Officers, and failing to implement or enforce clear and appropriate duties and responsibilities for CAREIC's Officers, or to set clear limits on executive authority.

135.    Members of the Board also breached their fiduciary duties by failing to properly oversee the activities of CAREIC, and by failing to exercise ordinary care in reviewing and assuring the accuracy of offering materials used to solicit investments in the Debtors, PPMs, and materials filed with the SEC.

136.    As a result, among other things: (a) CAREIC's President operated unchecked by the Board to pursue infeasible and risky development projects that were imprudent and not properly disclosed to investors; (b) CAREIC's Officers co-mingled money amongst the Debtors and misused investor funds as one big "piggy bank"; (c) CAREIC's Officers solicited investments in CAREIC and the other Debtors by means of offering documents that omitted material information; (d) the Debtors' securities were illegally sold by unlicensed finders and brokers; (e) the Debtors' securities were sold to unaccredited investors; (f) the Debtors' core business activities were not appropriately pursued; and (g) executives were allowed to waste corporate assets on activities that did not benefit the Debtors without check and without repercussion.

137.    In short, the Board and its Committees, including the Audit Committee and the Governance and Compliance Committee (on which Davidson served), failed at their basic duties to inform themselves of the actions of the Debtors and their Officers, and to properly monitor and provide an independent check on the Officers' actions.

### 3.       Lack of Officer Diligence.

138.     The Officers had a fiduciary duty to devote sufficient time and attention to the Debtors to allow them to supervise and control the Debtors with due care, skill, and diligence. The Officers failed to fulfill these basic duties.

139.     Although Cochran was CAREIC's CEO, Cochran acted as if CAREIC was a part-time job.  For example, while Cochran was CEO of CAREIC, Cochran was also an officer and/or director of several other companies, including: FloBridge; Western Credit; North Point Advisors; Clear Peak Energy; Caldera Energy Inc.; AquaGenus, L.L.C.; Broadcast International, Inc.; Zing Media Solutions; Mesa Medical; Angia Corporation; CDL Capital Corporation; Diversified Lenders, Inc.; Earth Marketing, Inc.; H20 Aquacare Salt Lake, LLC; Invest Linc Consulting Corp; K&R Capital, L.L.C.; K&R Consolidation Group, L.L.C.; KWLI, L.L.C.; and Napili Capital Ventures, Inc.  Cochran was also an adjunct professor at the University of Utah.

140.     Upon information and belief, while CEO of CAREIC, Cochran devoted more than half of his time to a company called Clear Peak Energy.

141.     Child, the CFO of CAREIC and the person responsible for all of the Debtors' financial and accounting reporting, did not give adequate attention to his responsibilities with the Debtors.  While nominally working as CAREIC's CFO, Child was a full-time employee and principal of his own public accounting firm.  Further, Child devoted a substantial amount of time to Cochran's Clear Peak company.

142.     Austin, CAREIC's Senior Vice President of Business Development, did not give adequate attention to his responsibilities with the Debtors.  While CARIEC's Senior Vice

President of Business Development, he continued to manage various other companies in which he had an interest, including Austin Capital Corp., Austin Construction, Inc., and Pacificor Construction, Inc.

143.    As a result of the Officers' failure to devote sufficient attention to the Debtors, the Debtors breached a variety of securities laws in connection with their capital raising activities, the Debtors operated in a way that was highly imprudent and did not protect investor capital, and the Debtors' core business—real estate entitlement and development—was not competently pursued.

### 4.    Lack of Internal Control and Reporting Procedures

144.    In May of 2008, CAREIC's auditors informed CAREIC's Audit Committee, as well as members of CAREIC's Board, that CAREIC's system of internal financial controls was deficient and suffered from several "reportable conditions," as that term is defined under the standards of the American Institute of Certified Public Accountants.

145.    CAREIC's auditors notified CAREIC's Audit Committee that, among other things, Management:

  a.   allowed inaccurate and inconsistent subscription agreements and offering documents;

  b.   allowed individuals to subscribe to and purchase investments offered as private placements to accredited investors, even though they had answered the Company's investor suitability questionnaire to indicate that they were not accredited;

  c.   did not have adequate policies and procedures related to significant functions, including back office, accounting, personnel, payroll, and executive functions;

  d.   allowed one Officer to hold ultimate control over multiple critical functions;

  e.   allowed CAREIC's President to negotiate contract terms related to property acquisitions and financing arrangements, independently and outside of CAREIC, with the

result that neither CAREIC nor any of its executives had any input on the terms, structure or purchase price;

f.   allowed expense reports without receipts or other adequate documentation to assure that the claimed expenses were actually incurred; and

g.   did not require pre-approval at the management level of significant expense reimbursement requests, including expense requests from non-employees.

146.   The Officers breached their fiduciary duties by allowing these conditions to occur, and the Directors breached their fiduciary duties by not assuring that effective remedial actions were taken after the Directors became aware of these conditions.

### 5.   Reckless Spending of Investor Funds.

147.   The Debtors' financial records show that through 2011, approximately $30 million—over 40% of the $73.6 million that the Debtors raised from investors—was spent on executive compensation, administrative costs, and "business development."

148.   This amount of compensation, administrative spending and "business development" costs were clearly excessive in light of the Debtors' complete lack of operating revenue, and Management's complete lack of success in achieving the Debtors' core business plans.

149.   CARIEC Management breached their fiduciary duty by paying themselves these excessive amounts of compensation, and Members of CAREIC's Board of Directors breached their fiduciary duty by approving these payments, without an adequate or sufficient basis for their decision.

### (a)  *Executive Compensation.*

150.    Even though the Debtors never generated substantial revenue from operations, let alone profits, Management paid themselves salaries that would only have been appropriate in a corporation that was generating operating revenue and achieving its business objectives.

151.    For example, Officers were paid between $15,000 and $25,000 per month in salary, despite the fact that CAREIC was not generating operating revenue, and these Officers were not devoting their full-time efforts to CAREIC.

152.    The Debtors also inappropriately "reimbursed" Officers for so-called office expenses that were excessive, and included costs that were not related to CAREIC's business or operations.

153.    CAREIC also inappropriately paid a number of people who either provided no services to CAREIC, or who should not otherwise have been involved in the Company.

154.    For instance, CAREIC paid nearly $21,000 per month in compensation to Clawson—a person with a lifetime securities ban.

155.    CAREIC continued to pay salaries to sales employees who had ceased producing for CAREIC, and who were in fact devoting their time to other ventures that are not directly related to CARIEC.

### (b)  *Inappropriate and Wasteful Retreats*

156.    Although the Debtors had no operating revenue, Management caused the Debtors to pay for "retreats" to destinations like Maui, Hawaii, Palm Springs, California, and Sun Valley, Idaho, for themselves and other employees of the Debtors.

157.     These retreats, and the amounts spent on them, were inappropriate and excessive in light of the Debtors' financial condition and business operations.  These retreats were, in essence, free personal vacations for CAREIC Officers and Directors at the Debtors' expense.

158.     The Officers and Directors breached their fiduciary duties to the Debtors and investors by wasting, or allowing the waste of, the Debtors' resources (investor money) on exuberant compensation and perks, lavish retreats, and personal endeavors, without providing reciprocal value to the Debtors in return.

### 6.     Operating CAOPs

159.     CCAREIC Management operated and managed the CAOP entities and had fiduciary obligations to the CAOP entities.

160.     CAREIC Management breached their fiduciary duties in operating and managing the CAOP entities.

161.     CAREIC Management breached their duty of care by using CAOP funds to joint venture or partner with other entities and to make speculative, high risk and foolish investment decisions without appropriate due diligence and oversight.

162.     CAREIC Management breach their duty of loyalty and disclosure by using CAOP funds in projects in which CAREIC Management had personal interests, without proper disclosure.

163.     CAREIC Management also breached their fiduciary duties of care, loyalty and disclosure by using CAOP funds to pay debts of the Legacy Debtors and CAREIC Management, in contradiction to disclosures made to CAOP investors.

164.    For instance, and as set forth above, CAREIC Management obtained a multi-million dollar loan from ANB Financial.  Though virtually all the proceeds from the ANB Loan were used to purchase property for the Kingman project, the loan was secured by certain parcels of the Tooele project, and by the personal guaranties of Cochran, Child and CAREIC's President.

165.    The ANB Loan went into default , and CAREIC's Management negotiated a settlement with the successor loan holder, pursuant to which the loan would be settled for approximately $3 million.

166.    CAREIC's Management caused CAOP I to pay the settlement amount directly to the new loan holder and effectively "loan" $2.9 million to CAREIC for the ANB Loan, which also released CAREIC Management from their personal guaranties.

167.    No loan documents or notes were executed to document this "loan" from CAOP I to CAREIC until months later, and CAOP I investors were not informed that their money – which was supposed to be used for investing in distressed properties – had been used to pay obligations of CAREIC and certain of its Management.

168.    As a result, CAREIC Management breached their fiduciary duties of care, loyalty and disclosure in operating the CAOPs.

### 7.    Involvement of Clawson in Sales of CAREIC Securities

169.    Since at least 2003, Clawson has been subject to a "statutory disqualification" within the meaning of 15 U.S.C. §78c(a)(39), and has been permanently barred from associating with any broker or dealer, or functioning as "a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the

issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock."

170.    CAREIC Officers and Directors knew that Clawson was subject to this statutory disqualification.

171.    Despite their knowledge that Clawson was banned, CAREIC Officers and Directors employed Clawson: (a) to be a de facto member of CAREIC's Board; (b) to be intimately involved with the Debtors' securities and offering materials; (c) to solicit investments from investors in the Debtors' securities; and (d) to be involved in many other facets of the Debtors' operations and money-raising scheme.

172.    CAREIC's Officers and Directors breached their fiduciary duty by involving Clawson in the Debtors' operations, including the sales of securities, and by concealing that information from the Debtors' investors.

**8.      Illegal Sales of the Debtors' Securities By Unlicensed Broker Dealers**

173.    CAREIC Officers and Directors also breached their fiduciary duty by allowing the Debtors' securities to be sold illegally through unlicensed finders and broker-dealers.

*(a)      Unlicensed Sales Employees.*

174.    The CAREIC Officer with principal responsibility for supervising and effecting the Debtors' sales of their securities was Austin.  Austin had no other significant responsibilities with the Debtors, and performed no other substantial duties for the Debtors prior to November of 2010, when he was appointed CEO.

175.    Austin regularly and actively solicited investors, routinely advised investors on the merits of investing in the Debtors, regularly effected transactions in securities for the

Debtors, and oversaw the Debtors' securities sales force, including the hiring and management of numerous unlicensed broker-dealers.

176.    Austin received significant compensation and bonuses from the Debtors for his fund-raising activities which, upon information and belief, were directly tied to Austin's personal sales of the Debtors' securities, as well as the sales of other persons he managed and/or hired, including numerous unlicensed broker-dealers.

177.    Despite this, Austin has never been licensed with the SEC or any state securities regulator as a broker or dealer.

178.    Similarly, CAREIC's Regional Vice President for Business Development (Eastern Region) was William Grundy ("Grundy").  In this position, Grundy regularly and actively solicited investors, routinely advised investors on the merits of investing in the Debtors, and regularly effected transactions in securities for the Debtors, for which he received transaction-based compensation, including but not limited to bonuses and incentive rewards.

179.    Grundy did become licensed as a securities broker until February of 2008.  He did not obtain his Series 62 securities license until February 1, 2008, and did not obtain his Series 63 securities license until June 30, 2008.

180.    CAREIC hired Keith Green ("Green") to be CAREIC's Regional Vice President for Business Development (Western Region).  In this position, Green regularly and actively solicited investors, routinely advised investors on the merits of investing in the Debtors, and regularly effected transactions in securities for the Debtors, for which he received transaction-based compensation, including but not limited to bonuses and incentive rewards.

181.    Although Green took the Series 62 or 63 license examinations, he did not pass. As a result, Green has never been licensed as a securities broker-dealer.

182.    CAREIC's Officers and Directors knew that Austin, Grundy and Green were unlicensed, that their principal duties and responsibilities were the sales of the Debtors' securities, and that they were paid compensation for these sales.  Despite this knowledge, CAREIC's Officers and Directors allowed Austin, Grundy, and Green to illegally sell the Debtors' securities.

### (b)    Sales By Other Non-Licensed Persons

183.    In addition to sales by unlicensed employees, CAREIC's Officers and Directors allowed significant sales of the Debtors' securities through unlicensed finders.

184.    Unlicensed finders regularly and actively solicited investors to purchase the Debtors' securities, routinely advised investors on the merits of investing in the Debtors, and regularly effected transactions in securities for the Debtors, for which they received transaction-based compensation.

185.    CAREIC's Officers and Directors knew that CAREIC's securities were being sold by unlicensed finders, and that CAREIC was paying transaction-based compensation for these  sales.

186.    Despite their knowledge, and in breach of their fiduciary duty, CAREIC's Officers and Directors did not take effective action to stop these illegal sales.

### 9.    Axis Insurance Policy

187.    Austin, Cochran and Child breached their fiduciary duties to CAREIC by: (a) failing to make a claim on a wasting $5 million liability insurance policy; (b) removing

CAREIC as an "Insured" under the policy; and (c) reducing the amount of the policy's coverage by $4 million, despite the existence of known claims under the policy.

188.    On December 20, 2010, AXIS Surplus Insurance Company ("AXIS") issued a wasting Liability Insurance Policy to CAREIC (the "Policy").

189.    The Policy is a claims-made policy, in that coverage was only provided if a "Claim" was made against an "Insured" during the "Policy Period."

190.    The initial "Policy Period" was December 20, 2010 to December 20, 2011, and the initial Limit of Liability was $5 million.

191.    The Policy originally named CAREIC as the Policyholder, and Management as "Insured(s)."

192.    The Policy defined "Claim" as, among other things, "a written demand against any Insured for monetary damages."

193.    An Endorsement to the Policy specifically stated that AXIS could only cancel the Policy upon non-payment of the insurance premium.

194.    On March 23, 2012—after the Petition Date and after Austin, Child and Cochran were operating the Debtors as debtors-in-possession—CAREIC, through the above Officers, entered into Endorsement No. 17 to the Policy, which removed CAREIC as an "Insured" under the Policy, and reduced the Policy's coverage from $5 million to $1 million.

195.    The Trustee made a demand on AXIS under the $5 million Policy, but AXIS denied the demand on the basis that no "Claims" were ever made on the $5 million Policy during the specific Policy Period.

196.   At the time these Officers removed CAREIC from the Policy and decreased coverage by $4 million, they were aware, or should have been aware, of "Claims" made against them under the Policy.  Specifically, during the Policy Period, CAREIC received numerous oral and written requests, demands and expressions of concern relating to the Debtors' operations and Management.  Many of these communications included allegations of mismanagement, breaches of fiduciary duties, and material misrepresentations in the solicitation of investments.

197.   Austin, Cochran and Child breached their fiduciary duties to CAREIC by: (a) failing to make a "Claim" under the Policy prior to the Policy's coverage being reduced by $4 million; and (b) removing CAREIC as a named "Insured" under the Policy.

**C.     Material Misrepresentations and Omissions In Securities Offerings and Documents Filed with the SEC**

**1.     The Company's Securities Offerings**

198.   In May 2004—one month after it was organized—CAREIC's Management began raising money from investors.  Over the course of CAREIC's existence, Management raised approximately $73 million through a series of so-called "private placements."

*(a)     CARIEC Securities*

199.   CAREIC Management offered and sold investors approximately $38.4 million in the securities in CAREIC itself.  CAREIC offered and sold the securities in Series A, B, C, D and E.

200.   The PPMs for each of these offerings contained material misrepresentations and omissions.  However, this Complaint focuses on and asserts claims solely relating to CAREIC's $7.1 million Series E offering, which began no earlier than June 1, 2008.

### (b)    Securities of Special Purpose Entities

201.    In addition to offering and selling securities in CAREIC itself, CAREIC Management also offered and sold to the public the securities of several purportedly "single-purpose" or "project-specific" entities.

202.    The offering materials for each of these special purpose entities contained numerous material misrepresentations and omissions.  However, this Complaint focuses on and asserts claims solely relating to the following offerings and offering documents:

    a.   CAS PPM, dated June 25, 2007, pursuant to which CAREIC Management raised $4.1 million; and

    b.   CASDF PPM, dated February 1, 2008, pursuant to which CAREIC Management raised $8.4 million.

### 2.    Material Omissions Common to All Relevant Securities Offerings

203.    In CAREIC's $7.1 million Series E offering, the CAS PPM, and the CASDF PPM (collectively, the "Relevant Securities Offerings"), CAREIC Management failed to disclose, among other things, the following adverse material facts:

### (a)    Management's Lack of Success or Experience.

204.    None of the Relevant Securities Offerings disclosed that:

    a.   Over the course of its existence, CAREIC had – with the exception of one small parcel in Star Valley, Wyoming – failed to successfully develop, entitle, or sell a single piece of real estate, let alone "thousands of acres."

    b.   CAREIC had no track record of real estate development, much less a record of success.

    c.   In reality, no member of CAREIC's Management, other than CAREIC's President, had any real estate entitlement or development experience prior to joining Castle Arch.

### (b)      *Management's Breaches of Fiduciary Duty*

205.    The Relevant Securities Offerings also failed to disclose that CAREIC Management had breached and were breaching their fiduciary duties by pursuing real estate projects that were (as described more fully above) known to be infeasible, based on irrational and unsupported assumptions, and based on false and fraudulent estimates of demand.

206.    The Relevant Securities Offerings failed to disclose that the CAREIC Board was failing to properly oversee the activities of CAREIC, failing to exercise ordinary care in reviewing and assuring the accuracy of offering materials used to solicit investments in the Debtors, PPMs, and materials filed with the SEC, all as more fully described above.

207.    The Relevant Securities Offerings failed to disclose that: (a) CAREIC's President operated unchecked by the Board to pursue infeasible and risky development projects; and (b) CAREIC's Officers failed to properly segregate and account for the funds of the Debtors resulting in co-mingling and misuse of investor funds.

208.    The Relevant Securities Offerings failed to disclose that CAREIC Officers were not devoting sufficient attention to the Debtors, and that the CAREIC Officers were otherwise breaching their fiduciary duties, all as set forth in greater detail above.

### (c)      *Involvement of a Statutorily Banned Person in Debtors' Business and Securities*

209.    The Relevant Securities Offerings failed to disclose that Clawson, CAREIC's Managing Director of Business Development, and a de facto officer and member of CAREIC's Board, had been permanently banned by the SEC from dealing in securities such as those sold by the Debtors.

210.    At the time of the Relevant Securities Offerings, all of these material adverse

facts were known to, or recklessly disregarded by, CAREIC Management

### 3.    CAS PPM

211.    In the CAS PPM, CAREIC Management made, among other things, the

following misrepresentations or omissions of material facts:

#### *(a)    Use of Investment Proceeds*

212.    In the CAS PPM, CAREIC Management represented to investors that

investment in CAS would be used to fund and support the business operations of the Smyrna

Project.  In particular, the CAS Series A PPM states:

> [CAS] was organized . . . as a residential and commercial land development company to develop approximately 1,700 residential lots on approximately 640 acres of land located in the Greater Nashville area of middle Tennessee.
>
> *    *    *    *
>
> Our principal activity is exploitation of the acquisition rights to approximately 640 acres of property in the Smyrna Tennessee area, obtaining zoning and other entitlements for the property, securing financing for the purchase of the property, improving the property's infrastructure and amenities, and selling the property.
>
> *    *    *    *
>
> <u>*We intend to use the net sale proceeds of this offering for land acquisition.*</u>

213.    The CAS PPM failed to disclose that CAREIC Management had previously

used funds raised for similar single-purpose entities indiscriminately to fund whatever entity

was in need of cash at the time, rather than to advance the business operations of the subject

entity.

214.    The CAS PPM failed to disclose that funds invested in CAS would in fact be

used for purposes unrelated to CAS's business operations, as need might arise.

215.    In fact, proceeds from the CAS PPM were used by CAREIC to close on the

purchase of the Tooele Water, a purpose unrelated to the business operations of CAS.

### (b)        *Infeasibility of the Smyrna Project*

216.    The CAS PPM represents that CAREIC Management's "conservative sales targets are estimated to be approximately $88.2 million with an estimated $50.3 million in acquisition, development, and selling costs."

217.    The CAS PPM fails to disclose that Management's "conservative" sales targets are based on the assumption that the property would yield 1700 saleable lots, despite the fact that CAREIC's engineers had advised CAREIC that no more than 1,295 were theoretically possible on the property.

218.    At the time the CAS PPM was published, all of these adverse material facts were known to, or recklessly disregarded by, CAREIC Management.

### 4.        CASDF PPM

219.    In the CASDF PPM, CAREIC Management made, among other things, the following misrepresentations or omissions of material facts:

### (a)        *Omission of Involvement of Clawson in Offering Materials.*

220.     The CASDF PPM does not disclose that CASDF was designed by Clawson, or that Clawson drafted and oversaw the drafting of the CASDF PPM.

### (b)        *Omissions Regarding CAREIC's Inability to Backstop Losses.*

221.    In the CASDF PPM, CAREIC Management represents that as CASDF's Manager, CAREIC "*intends to back the Fund's investment and allocate its assets to cover Fund losses, if any*."

222.    However, the CASDF PPM fails to disclose that CAREIC's own financial condition was so precarious at the time of the CASDF offering, that CAREIC did not have any practical ability to backstop CASDF losses.

223.    The CASDF PPM failed to disclose that in early 2008, CAREIC's financial statements reflected that CAREIC had only $3.2 million in current assets, as compared to $8.7 million in current liabilities.

*(c)*    ***Misrepresentations and Omissions Concerning Properties.***

224.    The CASDF PPM fails to disclose that the Kingman Project was infeasible and based on irrational forecasts.

225.    The CASDF PPM fails to disclose that the Debtors had insufficient funding and resources to tackle a project as large as Kingman.

226.    The CASDF PPM falsely represents that the Smyrna property is in "the final stages of the entitlement process."

227.    In fact, at the time of the CASDF PPM, the Smyrna property had not been annexed into the Town of Smyrna; no zoning applications had been approved to increase lot yield; no sewer or water services were available, and such services required several million dollars to complete; and no substantial entitlement work had been completed.

228.    The CASDF PPM describes the Tooele Property as one of the projects to which CASDF might allocate funds "secured with senior lien positions using the land as collateral."

229.    However, the CASDF PPM fails to disclose that: (a) the Tooele Property was already encumbered with a $5.3 million ANB Loan, which was secured by the 264 Acres of Tooele Property; (b) CAREIC Management used virtually all of the ANB Loan proceeds to

purchase land for the Kingman Project relating to CAK, as opposed to improving Tooele; and

(c) as a result, funds allocated to the Tooele Property could not be secured with a senior lien.

230.    At the time the CASDF PPM was published, all of these adverse material facts were known to, or recklessly disregarded by, CAREIC Management.

### 5.    CAREIC Series E PPM.

231.    In the CAREIC Series E PPM, CAREIC Management made, among other things, the following misrepresentations or omissions of material facts:

#### *(a)    Omissions Concerning Lack of Internal Controls and Reliability of Financial Statements.*

232.    In May of 2008, CAREIC's auditors formally informed CAREIC that its system of internal financial controls was deficient and suffered from several "reportable conditions," as that term is defined under the standards of the American Institute of Certified Public Accountants.

233.    CAREIC's auditors notified CAREIC's Audit Committee that, among other things, Management:

a.   allowed inaccurate and inconsistent subscription agreements and offering documents;

b.   allowed individuals to subscribe to and purchase investments offered as private placements to accredited investors, even though they had answered the Company's investor suitability questionnaire to indicate that they were not accredited;

c.   did not have adequate policies and procedures related to significant functions, including back office, accounting, personnel, payroll, and executive functions;

d.   allowed one Officer to hold ultimate control over multiple critical functions;

e.   allowed CAREIC's President to negotiate contract terms related to property acquisitions and financing arrangements, independently and outside of CAREIC, with the result that neither CAREIC nor any of its executives had any input on the terms, structure or purchase price;

f.   allowed expense reports without receipts or other adequate documentation to assure that the claimed expenses were actually incurred; and

g.   did not require pre-approval at the management level of significant expense reimbursement requests, including expense requests from non-employees.

234.   The CAREIC Series E PPM failed to disclose that CAREIC's auditors believed that CAREIC's system of internal financial controls was deficient and suffered from several "reportable conditions."

235.   Nor did CAREIC otherwise disclose this material adverse fact.  To the contrary, in its next two quarterly reports on Form 10-Q, CAREIC reported that it had evaluated the effectiveness and design of its system of internal control and had concluded that the system was effective "as of the end of the period covered by [each] report."

### (b)   *Misrepresentations and Omissions Concerning Properties.*

236.   The CAREIC Series E PPM represents that since its inception, CAREIC has "purchased or [has] purchase rights to land parcels located in California, Arizona, Tennessee, Texas, Wyoming and Utah."

237.   The PPM fails to state, however, that at the time of the Series E PPM, CAREIC had lost all of CAREIC's previous properties and purchase rights to the land parcels in California and Texas as a result of poor management, breaches of fiduciary duty, and/or lack of funds and resources.

238.   With respect to the Smyrna Project, the CAREIC Series E PPM states: "We have three letters of commitment from major production builders in the area to move forward in purchasing the finished lots from Castle Arch."

239.     Upon information and belief, this statement is false.  CAREIC did not have letters of commitment from separate home builders to purchase finished lots, and the letters it had purportedly from Beazer Homes were, on information and belief, not genuine.

240.     The CAREIC Series E PPM falsely represents that the Smyrna property is in "the final stages of the entitlement process."

241.     In fact, at the time of the CAREIC Series E PPM, the Smyrna property had not been annexed into the Town of Smyrna; no zoning applications had been approved to increase lot yield; no sewer or water services were available, and such services required several million dollars to complete; and no substantial entitlement work had been completed.

242.     The CAREIC Series E PPM fails to disclose that the Tooele Property is encumbered with a $5.3 million ANB Loan, which was secured by the 264 Acres of Tooele Property, and that CAREIC Management used virtually all of the ANB Loan proceeds to purchase land for the Kingman Project relating to CAK, as opposed to improving Tooele.

243.     At the time the CAREIC Series E PPM was published, all of these adverse material facts were known to, or recklessly disregarded by, CAREIC Management.

**D.     Fraudulent Transfers**

244.     Prior to the Petition Date, the Debtors made significant transfers of funds to the Defendants.

245.     Attached hereto as **Exhibits 2–7** are summaries prepared from the Debtors' books and records in the Trustee's custody and control of transfers of cash made by the Debtors noted thereon to the Defendants prior to the Petition Date (collectively, these transfers as to each Defendant are referred herein as the "Transfers").

246.     Upon information and belief, the noted Debtors made the Transfers to Defendants as compensation, including as applicable, salary, consulting fees, expenses, and bonuses or commissions.  The amount of the Transfers for each Defendant is set forth on **Exhibits 2–7**, which are incorporated herein.

247.     Each of the Transfers is a transfer of an interest of the named Debtors in property.

248.     Upon information and belief, the Transfers were made by the Debtors, or the obligations of the Debtors to make the Transfers to the Defendants, were made with actual intent to hinder, delay or defraud the Debtors' creditors and investors.

249.     Upon information and belief, the Transfers were made by the Debtors, or the obligations of the Debtors to make the Transfers to the Defendants, were for services for which the Debtors received less than a reasonably equivalent value in exchange for such Transfers or obligations.

250.     Each of the Defendants is an insider of the Debtors.

251.     At all relevant times, the Debtors were insolvent.

252.     At all applicable times, the relevant Debtors had at least one unsecured creditor.

**E.     Preferential Transfers**

253.     Each of the Defendants is an insider of the Debtors.

254.     The Debtors made some of the Transfers within one year of the Petition Date.

255.     At all relevant times, the Debtors were insolvent.

256.     Upon information and belief, it is possible that creditors of the Debtors will not be paid in full under the Confirmed Plan.

**F.     Claims Asserted By Defendants**

257.    Defendant Child filed a Proof of Claim in CAREIC's Bankruptcy Case, asserting a general unsecured claim in the total amount of $597,251.13 (the "Child Claim"). The Child Claim has neither been allowed nor disallowed at this time, and the Trustee's time for objecting to the Child Claim has not expired.

258.    Defendant Austin filed a Proof of Claim in CAREIC's Bankruptcy Case, asserting a general unsecured claim in the total amount of $300,000.00 (the "Austin Claim"). The Austin Claim has neither been allowed nor disallowed at this time, and the Trustee's time for objecting to the Austin Claim has not expired.

259.    Defendant Davidson filed a Proof of Claim in CAREIC's Bankruptcy Case, asserting a general unsecured claim in the amount of $154,354.30 (the "Davidson Claim"). The Trustee objected to the Davidson Claim, preserving all rights and claims asserted herein, and the Bankruptcy Court entered an Order allowing the Davidson Claim as a general unsecured claim against CAREIC in the total amount of $103,243.29.

260.    The Child Claim, the Austin Claim, and the Davidson Claim are referred collectively herein as the "Insider Claims."

## VI.     CLAIMS AGAINST DEFENDANTS

### FIRST CLAIM FOR RELIEF
*(Breach of Fiduciary Duty)—All Management Defendants*

261.    The Trustee incorporates each of the preceding allegations by reference.

262.    As Officers and/or Directors of CAREIC, Management owed fiduciary duties of care, loyalty and disclosure to CAREIC, the Debtors, and their shareholders, which required Management to: (a) exercise sound business judgment, in good faith, with the care that an

ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of CAREIC and the Debtors; (b) use their ingenuity, influence, and energy, and to employ all the resources of the Debtors, to preserve and enhance the property and earning power of the Debtors, even if the interests of the Debtors are in conflict with their own personal interests, as well as to disclose all conflicts of interest that might affect their duties and responsibilities to CAREIC, the Debtors, and their shareholders; and (c) fully and accurately disclose all material facts to investors relating to the Debtors, their operations, management and real estate projects, as well as any other material fact that may influence an investor's decision to invest in the Debtors.

263.    As set forth in Part V.B.1.(a), Management breached their fiduciary duties of care, loyalty and disclosure relating to the Kingman Project by, among other things: (a) using irrational sales assumptions and pro forma metrics that contradicted known data, and failing to disclose to investors accurate forecasts; (b) wasting corporate assets (investor money) on an infeasible project without sufficient funding and resources; and (c) engaging in co-mingled and self-dealing transactions that were not disclosed to investors.

264.    As set forth  in Part V.B.1.(b), Management breached their fiduciary duties of care, loyalty and disclosure relating to the Tooele Property and project by, among other things: (a) failing to disclose known annexation issues to investors; (b) wasting corporate assets (investor money) to purchase land and water rights despite actual knowledge of annexation limitations that made the project infeasible; (c) using irrational sales assumptions and pro forma metrics that contradicted known data, and failing to disclose to investors accurate

forecasts; and (d) encumbering the project with millions of dollars of debt that solely benefitted a different project and entity, and failing to disclose the unrelated project debt to investors.

265.    As set forth in Part V.B.1.(c), Management breached their fiduciary duties of care and disclosure relating to the Smyrna Property and project by, among other things: (a) ignoring known land and development issues and proceeding with land purchases and development despite insurmountable obstacles, and failing to disclose such issues to investors; (b) using false and improper data to analyze the project's feasibility and profitability; (c) using false and fraudulent estimates for lot demand, and providing false information to investors; (d) proceeding with lot purchases and development despite insufficient funds and resources; and (e) engaging in self-dealing transactions.

266.    As stated in Part V.B.2. and V.B.3., CAREIC Management breached their fiduciary duties of care by, among other things: (a) failing to devote sufficient time and attention to the Debtors; (b) failing to properly inform themselves of the activities of the Debtors and their Officers; (c) failing to implement or enforce clear and appropriate duties and responsibilities for CAREIC's Officers, or to set clear limits on executive authority; and (d) failing to exercise ordinary care in reviewing and assuring the accuracy of offering materials used to solicit investments in the Debtors, PPMs, and materials filed with the SEC.

267.    CAREIC Management breached their fiduciary duties of care, loyalty, and disclosure by causing or allowing the "reportable conditions" in the Bouwhuis Letter to occur, and failing to disclose and remedy such conditions thereafter, as set forth in Part V.B.4.

268.    As set forth in Part V.B.5., CAREIC Management breached their fiduciary duties of care and loyalty by causing, or allowing the Debtors to: (a) pay Management salaries

and perks in excess of industry norms, without an adequate or sufficient basis, especially since the Debtors achieved no profits, and Management did not provide the Debtors with commensurate time and value for the payments; (b) pay persons as employees of the Debtors, even though such persons were hired to assist Management in their personal endeavors; and (c) waste money (investor funds) on lavish retreats for Management and others, even though the Debtors did not have sufficient funds to pay for the retreats.

269.    As set forth in Part V.B.6., CAREIC Management breached their fiduciary duties of care, loyalty and disclosure relating to the CAOP entities by, among other things: (a) using CAOP funds to joint venture or partner with other entities and to make speculative, high risk and foolish investment decisions without appropriate due diligence and oversight; (b) using CAOP funds in projects in which CAREIC Management had personal interests, without proper disclosure; and (c) using CAOP funds to pay debts of the Legacy Debtors and CAREIC Management, in contradiction to disclosures made to CAOP investors.

270.    CAREIC Management breached their fiduciary duties of care and disclosure by allowing Clawson to be heavily involved in the Debtors' operations and the origination and sales of the Debtors' securities, as set forth in Part V.B.7.

271.    CAREIC Management breached their fiduciary duties of care and disclosure by causing, or allowing the bulk of the Debtors' securities to be illegally sold to the public, including to unaccredited investors, by unlicensed brokers-dealers using materially misleading information, as set forth in Part V.B.8.

272.    Austin, Cochran and Child breached their fiduciary duty of care and loyalty by: (a) failing to make a claim under the AXIS Policy prior to the Policy's coverage being reduced

by $4 million; and (b) removing CAREIC as a named "Insured" under the Policy, as set forth in Part V.B.9.

273.    CAREIC Management's above conduct constitutes gross negligence, and violates their fiduciary duties.

274.    The Trustee, on behalf of the Trusts, is entitled to an award of damages in an amount to be proven at trial.  The Trustee is further entitled to attorneys' fees, costs, and interest to the extent allowed by law.

275.    Because CAREIC Management's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

## SECOND CLAIM FOR RELIEF
*(Violation of Utah, Nevada and California Securities Law—Utah Code Ann. § 61-1-22, NRS § 90.660 and California Corporations Code § 25504)—All Management Defendants*

276.    The Trustee incorporates each of the preceding allegations by reference.

277.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Management had a duty to fully and accurately disclose all material facts that a reasonable investor would deem important in making the decision to invest in the Debtors' securities.

278.    Management did not fulfill this duty, but instead have made, disseminated, approved, and/or allowed false statements or omissions of material fact in connection with investors' purchases of the Debtors' securities pursuant to the Relevant Securities Offerings.

279.    Each of the Relevant Securities Offerings failed to disclose, among other things, the following adverse material facts: (a) Management's lack of experience and success in real estate entitlement and development, as set forth in Part V.C.2.(a); (b) Management's breaches

of fiduciary duty, as set forth in Part V.C.2.(b); and (c) Clawson's involvement with the Debtors and their securities, as set forth in Part V.C.2.(c) (collectively, the "<u>Relevant Securities Offerings Material Omissions</u>").

280.    The CAS Series A PPM made material misrepresentations and omissions concerning, among other things: (a) use of investment funds, as set forth in Part V.C.3.(a); the infeasibility of the Smyrna project, as set forth in Part V.C.3.(b) (collectively, the "<u>CAS Series A Material Misrepresentations and Omissions</u>").

281.    The CASDF PPM made material misrepresentations and omissions concerning, among other things: (a) omissions of Clawson's involvement in the offering materials, as set forth in Part V.C.4.(a); omissions of CAREIC's inability to backstop losses, as set forth in Part V.C.4.(b); and misrepresentations and omissions concerning the Debtors' properties and projects, as set forth in Part V.C.4.(c) (collectively, the "<u>CASDF Material Misrepresentations and Omissions</u>").

282.    The CAREIC Series E PPM made material misrepresentations and omissions concerning, among other things: (a) omissions of lack of internal controls and reliability of financial statements, as set forth in Part V.C.5.(a); and (b) misrepresentations and omissions concerning the Debtors' properties and projects, as set forth in Part V.C.5.(b) (collectively, the "<u>CAREIC Series E Material Misrepresentations and Omissions</u>").

283.    Management are control persons of the Debtors, as set forth in the applicable statutes and, therefore, are jointly and severally liable for the damages sustained by the Debtors' investors in purchasing the securities in the three above-mentioned offerings.

284. Management: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that operated as a fraud or deceit upon the Debtors' investors in the above offerings.

285. Management acted with scienter, either with an actual intent to defraud or in reckless disregard of the truth or falsity of the statements in the above offerings.

286. The Debtors' investors reasonably relied upon the accuracy of Management's representations in making their decisions to invest, and would not have made the investments at the price paid, if at all, had they known the truth of the material misrepresentations and omissions in the above offerings.

287. As the result of the material misrepresentations and omissions in the above offerings, the investors in such offerings have been damaged.

288. Accordingly, the Trustee is entitled to an award of damages on behalf of the investors of the relevant offerings in an amount to be proven at trial. The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by the applicable statutes.

289. Because Management's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

### THIRD CLAIM FOR RELIEF
*(Securities Fraud Under Section 10(b) of the Securities Act of 1934 (15 U.S.C. § 78j) and Rule 10b-5 (17 CFR 240.10b-5))—All Management Defendants*

290. The Trustee incorporates each of the preceding allegations by reference.

291.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Management had a duty to fully and accurately disclose all material facts that a reasonable investor would deem important in deciding whether to buy the Debtors' securities.

292.    Management made, or permitted to be made, material misrepresentations, and omitted to make material statements in connection with investors' purchases of securities pursuant to the Relevant Securities Offerings.  Such material misrepresentations and omissions include:

   a.   the Relevant Securities Offerings Material Omissions;

   b.   the CAS Series A Material Misrepresentations and Omissions;

   c.   the CASDF Material Misrepresentations and Omissions; and

   d.   the CAREIC Series E Material Misrepresentations and Omissions.

293.    Management, as control persons of the Debtors, are responsible for the above material misrepresentations and omissions, and such statements and omissions are attributed to each Defendant.

294.    With respect to the above material misrepresentations and omissions, Management: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that operated as a fraud or deceit upon investors in such offerings.

295.    Management acted with scienter, either with an actual intent to defraud or in reckless disregard of the truth or falsity of the above material misrepresentations and omissions.

296.    The investors in the relevant offerings reasonably relied upon the accuracy of Management's representations in making their decisions to invest, and would not have made the investments at the price paid, if at all, had they known the truth of the material misrepresentations and omissions.

297.    As the result of Management's material misrepresentations and omission of material facts, the investors in the above offerings have been damaged.

298.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

299.    Because Management's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**
*(Control Person Liability Under Section 20(a) of the Exchange Act of 1934 (15 U.S.C. § 78t(a)) – All Management Defendants*

300.    The Trustee incorporates each of the preceding allegations by reference.

301.    As set forth above, Management violated Section 10(b) of the Securities Act of 1934 (15 U.S.C. § 78j) and Rule 10b-5 (17 CFR 240.10b-5), or permitted persons over whom they had control to violate those provisions.

302.    At all material times, Management acted as controlling persons within the meaning of Section 20(a) of the Exchange Act.

303.    By virtue of their executive positions with each of the Debtors, Management

had possession, direct or indirect, of the power to direct or cause the direction of the

management and policies of CAREIC and the Debtors:

    a.   Cochran was CAREIC's CEO from 2004 until 2010 and was responsible for the day-to-day management of the Debtors.  Cochran further served as Chairman of CAREIC's Board of Directors until 2007 and an on the board until 2011.

    b.   Austin was CAREIC's Senior Vice President of Business Development from 2004 until November, 2010, when he became CAREIC's CEO.  Austin was responsible for CAREIC's capital-raising strategy and day-to-day capital raising activities.

    c.   Child was CAREIC's CFO and a member of CAREIC's Board of Directors from 2004 until July 2011.  Child was responsible for managing the day-to-day financial affairs of the Debtors and for all of CAREIC's filings with the SEC.

    d.   Davidson was a member of CAREIC's Board of Directors from January of 2006, becoming Chairman of the Board on May 16, 2007.  Davidson served on the Board's Audit Committee, Compensation Committee, and Governance and Compliance Committee, setting policy for CAREIC.

    e.   Clawson was CAREIC's Managing Director of Business Development, and investor relations contact, and a *de facto* officer and member of CAREIC's Board of Dirctors from 2004 until 2011.  Clawson designed CASDF and drafted and oversaw the drafting of the CASDF PPM, notwithstanding his status as a prohibited person.

304.    Accordingly, the Trustee is entitled to an award of damages in an amount to be

proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent

allowed by law.

305.    Because Management's conduct was sufficiently willful and malicious, the

Trustee is further entitled to an award of punitive damages.

### FIFTH CLAIM FOR RELIEF
*(Common Law Fraud)—All Management Defendants*

306.    The Trustee incorporates each of the preceding allegations by reference.

308.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Management made, disseminated, approved and/or allowed false statements or omissions of material fact in connection with the investors' purchase of the Debtors' securities.

321.    As control persons of the Debtors, such material misrepresentations and omissions are attributed to each Management Defendant.

327.    Such material misrepresentations and omissions include:

    a.  the Relevant Securities Offerings Material Omissions;

    b.  the CAS Series A Material Misrepresentations and Omissions;

    c.  the CASDF Material Misrepresentations and Omissions; and

    d.  the CAREIC Series E Material Misrepresentations and Omissions.

328.    At the time Management made or allowed these misrepresentations, Management knew that the statements were false, or at a minimum, made or allowed the statements recklessly and without regard for the truth.

329.    Management intended that the Debtors' investors would rely upon the statements, and made the misrepresentations with the intent of inducing the investors to purchase the Debtors' securities and invest funds.

330.    The investors in the relevant offerings reasonably relied upon the statement and have made substantial payments to the Debtors as a result of the misrepresentations.

331.    The investors suffered damages as a result of the misrepresentations.

332.   Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

333.   Because the Management's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

### SIXTH CLAIM FOR RELIEF
*(Negligent Misrepresentation)—All Management Defendants*

334.   The Trustee incorporates each of the preceding allegations by reference.

335.   With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Defendants have made, disseminated, approved and/or allowed false statements or omissions of material fact in connection with the investors' purchase of the Debtors' securities.

348.   As control persons of the Debtors, such material misrepresentations are attributed to each Management Defendant.

354.   Such false statements include:

   a.  the Relevant Securities Offerings Material Omissions;

   b.  the CAS Series A Material Misrepresentations and Omissions;

   c.  the CASDF Material Misrepresentations and Omissions; and

   d.  the CAREIC Series E Material Misrepresentations and Omissions.

355.   At the time the material representations were made, the statements were untrue.

356.   Management failed to use reasonable care in making these representations, and were in a better position than the investors to know the true facts.

357.     Management intended that the investors would rely upon the statements, and made the representations with the intent of inducing the investors to purchase the Debtors' securities and invest funds.

358.     The relevant investors reasonably relied upon the statements and invested substantial sums of money in the Debtors as a result of the misrepresentations.

359.     The investors suffered damages as a result of the misrepresentations.

360.     Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

361.     Because Management's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

### SEVENTH CLAIM FOR RELIEF
*(Civil Conspiracy)—All Management Defendants*

362.     The Trustee incorporates each of the preceding allegations by reference.

363.     With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Management Defendants constitute a combination of two or more persons, who acted together to defraud investors.

364.     Management Defendants agreed to a course of action to cover up the true nature of their scheme to defraud.

365.     As an overt act in furtherance of the conspiracy, Management intentionally misrepresented the true state of the Debtors' business affairs to investors, or allowed such misrepresentations to occur.

366.     Management Defendants' false statements include:

    a.  the Relevant Securities Offerings Material Omissions;

    b.  the CAS Series A Material Misrepresentations and Omissions;

    c.  the CASDF Material Misrepresentations and Omissions; and

    d.  the CAREIC Series E Material Misrepresentations and Omissions.

368.    The Trustee is entitled to an award of damages in an amount to be proven at trial. The Trustee is also entitled to attorneys' fees, costs, and interest to the extent allowed.

369.    Because Management's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

## EIGTH CLAIM FOR RELIEF
*(Violation of State RICO Laws—Utah Code Ann. § 76-10-1605(1)–(2) and NRS § 207.470)—All Management Defendants*

370.    The Trustee incorporates each of the preceding allegations by reference.

371.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Management engaged in a repeated pattern of unlawful activity by fraudulently and illegally selling securities to investors through unlicensed brokers and by means of material misrepresentations and omissions.

372.    Under the veil of a legitimate business, Management used the Debtors to defraud investors and engage in broader misconduct.

373.    The common purpose of Management in engaging in such repeated and fraudulent conduct was to induce investors to place monies into the Debtor enterprise so that Management could profit from the scheme.

374.    Specifically, Management engaged in a scheme or artifice to defraud money from investors by means of false or fraudulent pretenses, representations, and promises, including but not limited to:

    a.   the Relevant Securities Offerings Material Omissions;

    b.   the CAS Series A Material Misrepresentations and Omissions;

    c.   the CASDF Material Misrepresentations and Omissions; and

    d.   the CAREIC Series E Material Misrepresentations and Omissions.

375.    Management also sold, or allowed the Debtors' securities to be illegally sold to investors through unlicensed broker-dealers.

376.    The acts of fraud and racketeering activity identified herein constitute a "pattern of racketeering activity" because the acts alleged were related to each other by virtue of a common purpose and common result of fraudulently and illegally soliciting investments in the Debtor enterprise from investors.

377.    Management committed and caused to be committed a series of overt acts in furtherance of the Debtor enterprise and the conspiracy to affect the objects thereof, including but not limited to defrauding, and causing or allowing the Debtors' securities to be illegally sold by unlicensed broker-dealers to investors.

378.    As the result of Management's acts, investors have been damaged.

379.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial, including treble damages as allowed by the applicable statutes.

## NINTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A))—Cochran, Child, Austin, Davidson, Clawson, Austin Capital Solutions and the Child Firm*

380.    The Trustee incorporates each of the preceding allegations by reference.

381.    The Transfers to Cochran, Child, Austin, Davidson, Clawson, Austin Capital Solutions and the Child Firm (collectively, the "Two-Year Transferees"), as set forth on

**Exhibits 2–7**, made within two years of the Petition Date (the "Two-Year Transfers") were transfers of an interest of the relevant Debtors in property.

382.    The Two-Year Transfers or any obligation of the Debtors to make the Two-Year Transfers were made or incurred with actual intent to hinder, delay or defraud the relevant Debtors' creditors.

383.    Each of the Two-Year Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 548(a)(1)(A).

## TENTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B))—Cochran, Child, Austin, Davidson, Clawson, Austin Capital Solutions and the Child Firm*

384.    The Trustee incorporates each of the preceding allegations by reference.

385.    Each of the Two-Year Transfers to the respective Two-Year Transferees was a transfer of an interest of the Debtors in property.

386.    The relevant Debtors did not receive reasonably equivalent value in exchange for the Two-Year Transfers or any obligation of the Debtors to make the Two-Year Transfers.

387.    At the time the Two-Year Transfers were made to each of the Two Year Transferees, as set forth on **Exhibits 2–7**, or the obligations to the Two-Year Transferees were incurred, the relevant Debtors: (a) were insolvent or became insolvent as a result of the Two-Transfers or the obligations incurred; (b) were engaged in a business or transaction, or were about to engage in a business or transaction for which any property remaining with the Debtors was unreasonably small capital; or (c) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

388.   Alternatively, the Debtors made such Two-Year Transfers to benefit the Two-Year Transferees, or incurred obligations to the Two-Year Transferees for the benefit of such Defendants, under employment contracts not in the ordinary course of the Debtors' business.

389.   Each of the Two-Year Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 548(a)(1)(B).

## ELEVENTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544(b) and Utah Code Annotated §§ 25-6-5(1)(a) and 25-6-8)—All Defendants*

390.   The Trustee incorporates each of the preceding allegations by reference.

391.   At all times hereto, the relevant Debtors had at least one unsecured creditor.

392.   Each of the Transfers was a transfer of an interest of the Debtors in property.

393.   The Transfers to each Defendant as set forth on **Exhibits 2–7** were made or were based on obligations incurred with actual intent to hinder, delay or defraud the relevant Debtors' creditors.

394.   Each of the Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-5(1)(a) and 25-6-8.

## TWELFTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544(b) and Utah Code Annotated §§ 25-6-5(1)(b) and 25-6-8)—All Defendants*

395.   The Trustee incorporates each of the preceding allegations by reference.

396.   At all times hereto, the relevant Debtors had at least one unsecured creditor.

397.   Each of the Transfers was a transfer of an interest of the Debtors in property.

398.    The relevant Debtors did not receive reasonably equivalent value in exchange for each of the Transfers to each Defendant as set forth on **Exhibits 2–7**, or any obligation of the Debtors to make the Transfers.

399.    At the time the Transfers were made or the obligations were incurred, the relevant Debtors: (a) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

400.    Each of the Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-5(1)(b) and 25-6-8.

## THIRTEENTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. §544(b) and*
*Utah Code Ann. §§ 25-6-6(1) and 25-6-8)—All Defendants*

401.    The Trustee incorporates each of the preceding allegations by reference.

402.    At all times hereto, the relevant Debtors had at least one unsecured creditor.

403.    Each of the Transfers was a transfer of an interest of the Debtors in property.

404.    The relevant Debtors did not receive reasonably equivalent value in exchange for each of the Transfers to each Defendant as set forth on **Exhibits 2–7**, or any obligation of the Debtors to make the Transfers.

405.    The relevant Debtors were insolvent at the time the Transfers or any obligations to make the Transfers were made, or became insolvent as a result of the Transfers.

406.    Each of the Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-6(1) and 25-6-8.

## FOURTEENTH CLAIM FOR RELIEF
*(Avoidance of Preferential Transfers Under 11 U.S.C. § 547(b))—Austin*

407.    The Trustee incorporates each of the preceding allegations by reference.

408.    Each of the Transfers made to Austin, as set forth on **Exhibit 3**, made within one-year of the Petition Date (the "Preferential Transfers") was a transfer of an interest of the Debtors in property.

409.    To the extent Austin is found to be a creditor, which is denied, each of the Preferential Transfers were made to or for the benefit of a creditor.

410.    To the extent Austin is found to be a creditor, which is denied, each of the Preferential Transfers made by the  Debtors was made for or on account of an antecedent debt owed by the Debtors before such Preferential Transfers were made.

411.    Each of the Preferential Transfers was made while the Debtors were insolvent.

412.    Each of the Preferential Transfers made by the Debtors to Austin enabled him to receive more than he would receive if the bankruptcy cases were filed under Chapter 7, the Preferential Transfers had not been made, and Austin received payment of any debt he was entitled to under the Confirmed Plan.

413.    Each of the Preferential Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 547(b).

## FIFTEENTH CLAIM FOR RELIEF
*(Recovery of Avoided Transfers Under 11 U.S.C. §§ 550 and 551)—All Defendants*

414.    The Trustee incorporates each of the preceding allegations by reference.

415.    Each of the Two-Year Transfers is avoidable under 11 U.S.C. §548(a)(1)(A) and/or (B).

416.     Each of the Transfers is avoidable under 11 U.S.C. § 544(b) and Utah Code

Ann. §§ 25-6-5, 25-6-6, and 25-6-8.

417.     Each of the Preferential Transfers is avoidable under 11 U.S.C. § 547(b).

418.     The Trustee may recover from each of the Defendants and preserve for the

benefit of the respective Trusts each of the Transfers as relating to each of the Defendants

under 11 U.S.C. §§ 550 and 551.

## SIXTEENTH CLAIM FOR RELIEF
### *(Disallowance of Claims—11 U.S.C. § 502)—All Defendants*

419.     The Trustee incorporates each of the preceding allegations by reference.

420.     To the extent any of the Defendants assert a claim against the Debtors, such

claims, to the extent not asserted in the Insider Claims, cannot be asserted and are barred under

applicable law, the Confirmed Plan and Confirmation Order.

421.     The Child Claim and the Austin Claim have not been allowed by the

Bankruptcy Court, and the Trustee hereby objects to them pursuant to 11 U.S.C. § 502(b)

because, for all of the reasons set forth herein, they are not allowable claims, or alternatively,

they are not enforceable against the Debtors.

422.     Each of the Transfers made to each of the Defendants are avoidable by the

Trustee under 11 U.S.C. §§ 544, 547 and/or 548(a).

423.     The Insider Claims, to the extent that they have been or are allowed, must be

disallowed under 11 U.S.C. § 502(d), unless the applicable Defendants asserting an Insider

Claim has paid the amount for which he is liable for the avoidable Transfers made to him.

## SEVENTEENTH CLAIM FOR RELIEF
*(Subordination – 11 U.S.C. § 510(c))—All Defendants*

424.   The Trustee incorporates each of the preceding allegations by reference.

425.   As set forth in all of the facts stated herein, the Defendants have engaged in wrongful behavior and acted in bad faith in relation to the Debtors.

426.   The Defendants' actions have harmed the Debtors' creditors and investors, all of whom are beneficiaries under the Trusts.

427.   To the extent that the Insider Claims have been or are held to be allowed claims of any of the Defendants, or if any of the Defendants assert additional claims that are determined to be allowed claims, such claims must be subordinated pursuant to 11 U.S.C. § 510(c) and all applicable principles of equitable subordination incorporated by that section to all beneficiaries of the Trusts.

## EIGHTEENTH CLAIM FOR RELIEF
*(Constructive Trust)—All Defendants*

428.   The Trustee incorporates each of the preceding allegations by reference.

429.   Each of the Transfers to Defendants was comprised of property of the Debtors and was made by the respective Debtors improperly or was based on illegal or fraudulent obligations or actions.

430.   Each of the Transfers can be traced to the wrongful behavior of the Debtors, through Management.

431.   Allowing Defendants to retain any of the Transfers would unjustly enrich the Defendants and would be inequitable.

432.    An injustice would result if the Defendants were allowed to keep their respective Transfers.

433.    A constructive trust for the benefit of the respective Trusts must be imposed in the amount of the Transfers made to each of the Defendants.

<u>**NINETEENTH CLAIM FOR RELIEF**</u>
*(Unjust Enrichment and Disgorgement)—All Defendants*

434.    The Trustee incorporates each of the preceding allegations by reference.

435.    Each of the Transfers to the Defendants were comprised of property of the Debtors.

436.    The Transfers to each of the Defendants conferred a benefit upon the relevant Defendant.

437.    Upon information and belief, each Defendant knowingly benefited from the Transfers made.

438.    Allowing Defendants to retain the Transfers made to each of them would unjustly enrich the Defendants and would be inequitable.

439.    Absent return of the Transfers, the Trusts will be damaged by Defendants' unjust enrichment and may have no adequate remedy at law.

440.    Defendants must disgorge the total amount of the Transfers applicable to them for the benefit of the respective Trusts.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Trustee respectfully prays for relief as follows:

A.    On the First Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

B.      On the Second Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial, plus interest as set forth in the applicable statutes.

C.      On the Third Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

D.      On the Fourth Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

E.      On the Fifth Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

F.      On the Sixth Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

G.      On the Seventh Claim for Relief, an award of actual and treble damages in an amount to be proven at trial.

H.      On the Eighth Claim for Relief, an award of actual and treble damages in an amount to be proven at trial.

I.      On the Ninth Claim for Relief, avoidance of the Two-Year Transfers.

J.      On the Tenth Claim for Relief, avoidance of the Two-Year Transfers.

K.      On the Eleventh Claim for Relief, avoidance of the Transfers.

L.      On the Twelfth Claim for Relief, avoidance of the Transfers.

M.      On the Thirteenth Claim for Relief, avoidance of the Transfers.

N.      On the Fourteenth Claim for Relief, avoidance of the Preferential Transfers.

O.      On the Fifteenth Claim for Relief, recovery of the avoided Transfers.

74

P.      On the Sixteenth Claim for Relief, disallowance of the Insider Claims and any other Claims asserted by the Defendants.

Q.      On the Seventeenth Claim for Relief, subordination of the Insider Claims and any other Claim of the Defendants that has been or may be determined to be an allowed Claim.

R.      On the Eighteenth Claim for Relief, the imposition of a constructive trust on the Transfers made to Defendants.

S.      On the Nineteenth Claim for Relief, a judgment for unjust enrichment and a judgment ordering the disgorgement of the Transfers.

T.      For pre-judgment interest, attorneys' fees, and costs of suit to the extent allowed by applicable federal or state law.

U.      For any other relief as the Court deems appropriate.

### VIII.   <u>JURY DEMAND</u>

Plaintiff requests a jury for all issues and causes of action that are triable by a jury.

DATED this 30th day of October, 2014.

**DORSEY & WHITNEY LLP**

_/s/ Milo Steven Marsden_
Milo Steven Marsden
Peggy Hunt
Nathan S. Seim
*Attorneys for D. Ray Strong, Liquidating Trustee*