IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| D. RAY STRONG, as Liquidating Trustee of the Consolidated Legacy Debtors Liquidating Trust, the Castle Arch Opportunity Partners I, LLC Liquidating Trust, and the Castle Arch Opportunity Partners II, LLC Liquidating Trust,<br><br>Plaintiff,<br><br>vs.<br><br>KIRBY D. COCHRAN; JEFF AUSTIN; AUSTIN CAPITAL SOLUTIONS; WILLIAM H. DAVIDSON; ROBERT CLAWSON; HYBRID ADVISOR GROUP; ROBERT D. GERINGER, ROBERT D. GERINGER, P.C.; FINE ARTS ENTERTAINMENT; and DOES 1-50,<br><br>Defendants. | ORDER AND<br>MEMORANDUM OF DECISION<br><br><br>Case No. 2:14-cv-00788-TC-EJF |

Castle Arch Real Estate Investment Company (CAREIC) declared bankruptcy in 2011. In 2013, the bankruptcy court appointed Plaintiff Ray D. Strong as trustee of multiple liquidation trusts, and the trusts were then assigned all claims that CAREIC had against its former officers and directors, as well as the claims that third-party investors had against those same officers and directors. Mr. Strong brought this action to pursue those claims.

Two cross-motions for partial summary judgment are now before the court, which address six of the complaint's nine claims.[1]

Mr. Strong moves for summary judgment on his second claim. (See ECF No. 221.)[2] In the second claim, Mr. Strong argues that Defendants Jeff Austin, Robert Clawson, William Davidson, and Robert Geringer[3] violated the securities fraud laws of California and Utah by selling securities that contained material misrepresentations or omissions. Defendants oppose the motion on the merits and argue alternatively that Mr. Strong's claims are time barred.

Mr. Geringer, on the other hand, moves for summary judgment on Mr. Strong's claims for breach of fiduciary duty (first claim), violations of securities laws (second claim), civil conspiracy (fourth claim), RICO violations (fifth claim), constructive trust (eighth claim), and unjust enrichment (ninth claim). (See ECF No. 244.) He contends that each of these claims are barred by the statute of limitations.

For the reasons stated below, Mr. Strong's motion is denied because triable issues of fact exist. The court grants Mr. Geringer's motion in part on portions of the second and fourth claims, denies the motion on the first, eighth, and ninth claims, and reserves ruling on the fifth claim.

---

[1] A third motion for summary judgment has also been filed and briefed. (See ECF No. 225.) The court reserves ruling on that motion to a later date.

[2] References to the Electronic Case Filing System (ECF) are generally to Case No. 2:14-cv-00788. In certain instances, the court also refers to documents from Case No. 15-cv-00837, which was consolidated into this action on February 28, 2017. (See ECF No. 100.) In those instances, the court refers to the docket as "837 ECF."

[3] When referring to Mr. Austin, the court is referring to both Jeff Austin and Austin Capital Solutions. When referring to Mr. Clawson, the court is referring to both Robert Clawson and Hybrid Advising Group. When referring to Mr. Geringer, the court is referring to Robert Geringer, Robert Geringer, P.C., and Fine Arts Entertainment, Inc.

## I.       Background

CAREIC was formed in 2004 with Mr. Kirby Cochran as its CEO and initial member. (SAppx. v.2 at 367 (Ex. 6).)[4]  Eventually, Mr. Geringer became CAREIC's president and a member of the board of directors; Mr. Davidson became chairman of the board of directors; and Mr. Austin became president of worldwide development and a member of the board of directors. (SAppx. v.2 at 048 (Ex. 2).)  Additionally, Mr. Clawson—who initially introduced Mr. Cochran and Mr. Geringer, which led to CAREIC's founding—became "Managing Director [for] Business Development."  (SAppx. v.2 at 495 (Ex. 35); CAppx. Op. v.1 at 021 (Ex. 3), Clawson Decl. ¶ 43).)

CAREIC was created to "invest in several real estate market segments, including land development, property development, residential, multifamily, and commercial."  (SAppx. v.2 at 30 (Ex. 2).)  In the course of its operation, CAREIC formed a number of purpose- and project-specific entities, two of which are relevant here.  CAREIC formed Castle Arch Smyrna (CAS) in 2007 "to purchase and develop approximately 615 out of 640 acres of land in the Smyrna, Tennessee area into a residential community."  (SAppx. v.2 at 176 (Ex. 3).)  In 2008, it formed an investment fund, Castle Arch Secured Development Fund (CASDF), "to invest money into projects involving raw land, distressed properties and other valuable opportunities with underdeveloped real estate assets."  (SAppx. v.2 at 281 (Ex. 4).)  Except where necessary to

---

[4] Because of the voluminous evidence filed by the parties, the court notes the use of the following abbreviations: References to the Appendix of Evidence filed in support of Mr. Strong's motion for summary judgment (ECF No. 221) is referred to as "SAppx."  References to the Appendix of Evidence filed in support of Mr. Geringer's motion for summary judgment (ECF No. 246) is referred to as "GAppx."  References to any of the appendices of evidence submitted by Defendants in opposition to Mr. Strong's motion (ECF Nos. 245, 248, 250, & 254) are referred to by the defendant's last initial, followed by "Appx. Op." (e.g. the Appendix of Evidence submitted by Mr. Clawson is referred to as "CAppx. Op.").  The Appendix of Evidence filed by Mr. Strong in support of his opposition to Mr. Geringer's motion (ECF No. 265) is referred to as "SAppx. Op."

distinguish between them, the court refers to CAREIC, CAS, and CASDF collectively as CAREIC.

CAREIC raised capital by selling securities through private security offerings. Three of those offerings (also referred to as "Private Placement Memoranda" or "PPMs") are relevant here: (1) an offering of investment units by and in CAS (CAS PPM); (2) an offering of 12% Series A redeemable preferred units by and in CASDF (CASDF PPM); and (3) an offering of Series E member units by and in CAREIC (Series E PPM). (SAppx. v.2 at 023, 173, 363 (Exs. 2-4).)

In 2011, CAREIC declared bankruptcy. In 2013, the bankruptcy court entered its Order Confirming Chapter 11 Trustee's First Amended Plan of Liquidation Dated February 25, 2013 as Modified (see SAppx. v.1 at 1229 (No. 13)[5]), which, among other things, assigned to Mr. Strong, as trustee, all claims that either CAREIC itself, or investors in CAREIC, had against Mr. Austin, Mr. Clawson, Mr. Davidson, and Mr. Geringer. In October 2013, the parties agreed to toll the relevant statutes of limitation so that the parties could engage in settlement negotiations. After those efforts failed, Mr. Strong filed the complaint against Mr. Austin, Mr. Clawson and Mr. Davidson on October 30, 2014 (see ECF No. 2), and filed the complaint against Mr. Geringer on November 24, 2015 (see 837 ECF No. 2).[6]

## II.    Objections to Evidence

In their oppositions, Defendants raise numerous objections to the evidence relied upon by Mr. Strong. (See ECF No. 254 at 4-9; ECF No. 248 at 9-17; ECF No. 250 at 8-34; and ECF No.

---

[5] Documents in Mr. Strong's Appendix of Evidence volume 2 are labelled as exhibits. Documents in Mr. Strong's Appendix of Evidence volume 1 are numbered, but not referred to as exhibits, so the court uses "Ex." to refer to the former, and "No." to refer to the latter.
[6] Over the course of the action, Defendants Kirby Cochran, Douglas Child, and Child Van Wagoner & Associates settled the claims against them and are no longer in the suit.

254 at 4-22.) Similarly, Mr. Strong, in opposition to Mr. Geringer's motion, objects to some of Mr. Geringer's evidence. (See ECF No. 265 at 12-15.) Additionally, Mr. Clawson and Mr. Geringer filed objections to evidence offered in support of Mr. Strong's reply. (See ECF Nos. 293-294.)

In most instances, these objections are simply argument (such as an objection that a statement was taken out of context, that the proponent of the statement gives too much weight to it, or that the inferences drawn from the evidence are wrong). Such objections are overruled as improper, though the court considers the parties' arguments as it addresses the evidence below. Additionally, some of the objections—most notably, Mr. Clawson and Mr. Geringer's objections to new evidence submitted in support of Mr. Strong's reply—relate to evidence that ultimately proved unnecessary to the court's conclusions, and so the objections are moot.

But because the court does rely on two documents to which Defendants object—a letter from CAREIC's auditors (SAppx. v.2 at 528 (Ex. 43)) and the SEC's order against Mr. Clawson (SAppx. v.1 at 1248-53 (Exs. 14-15))—the court explicitly overrules those objections for the reasons stated below in footnotes 13 and 16.

### III.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (internal quotation omitted). Should the nonmovant bear the burden of persuasion at trial, "[t]hese facts must establish, at a minimum, an inference of the presence of each element essential to the case." Id. (quoting Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d 1215. But this is only true insofar as "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

### IV.    Mr. Strong's Partial Motion for Summary Judgment

On March 13, 2018, Mr. Strong filed a motion for summary judgment on his second claim against Defendants. Mr. Strong argues that Defendants violated the securities fraud laws of California and Utah[7] by making material misrepresentations or omissions in the CAS, CASDF, and Series E PPMs.

Defendants raise four arguments in opposition to the motion: (1) the transactions are not subject to California or Utah law; (2) there were no misrepresentations or omissions and, even if there were, they were not material; (3) Defendants may not be held personally liable for the alleged misrepresentations; and (4) affirmative defenses preclude summary judgment.

---

[7] The complaint additionally asserts violations of the laws of Arizona and Nevada, but Mr. Strong's motion for summary judgment is explicitly limited to the laws of California and Utah. (See ECF No. 221 at 1.)

A.   Applicability of California and Utah Securities Laws

1.   California

Mr. Strong argues that the investments were subject to California law because the offers originated from California.  The court agrees.

Under the relevant California statute, "It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."  Cal. Corp. Code § 25401 (West 2019).  "An offer to sell or to buy is made in this state when the offer either originates from this state or is directed by the offeror to this state and received at the place to which it is directed."  Cal. Corp. Code § 25008(b) (West 2019).

The California Supreme Court has affirmed the breadth of this definition:

Section 25008 provides, inter alia, that a sale of a security is made in California when the offer to sell is made "in this state" or an offer to buy is accepted in California.  (§ 25008, subd. (a).)  An offer to sell is made "in this state" if the offer originates from California.  (§ 25008, subd. (b).)  Thus, a sale occurs "in this state" even if the purchaser is in, and communicates acceptance of the offer to sell from, New York.  Thus, while aftermarket out-of-state purchases and sales might not qualify as purchases and sales induced "in this state," a California corporation which offered its shares for sale on a nationwide basis would be liable to out-of-state purchasers who accepted the offer.  This follows because under section 25008, a sale occurs in California if the offer emanates from this state.

Diamond Multimedia Sys., Inc. v. Super. Ct., 19 Cal. 4th 1036, 1050-51 (1999) (emphasis added).

CAREIC is a California limited liability company.  (SAppx. v.2 at 367 (Ex. 6).)  As such, it is "a California corporation which offered its shares for sale on a nationwide basis" (Diamond Multimedia, 19 Cal.4th at 1051), and the Series E PPM would be subject to California law.

The rule is not as clear-cut for CAS and CASDF, which by contrast, are Nevada limited liability companies.  (SAppx. v.2 at 173, 281 (Exs. 3-4).)  Still, in those PPMs, the only business address identified for either CAS or CASDF is in Beverly Hills, California (the same address as CAREIC).  (Id. at 173, 274 (Exs. 3-4).)  The PPMs identify CAREIC as the manager of CAS and CASDF, and request that all communications with CAS and CASDF be directed to CAREIC at its office in California.  (Id. at 185, 276, 281, 285 (Exs. 3-4).)  The PPMs also indicate that CAREIC was, at the outset, the sole member of CAS and CASDF and that, even after units were sold through the PPMs, CAREIC would continue to hold the majority interest.  (Id. at 185, 285 (Exs. 3-4).)  Given CAREIC's apparent total control over the CAS and CASDF PPMs, in its role as manager, in its role as sole member, and through the information provided to investors in the PPMs, the court concludes the offers to sell these securities also "originate[d] in California" for purposes of Section 24501.

Mr. Austin[8] argues California law does not apply, based on jurisdictional requirements included in other provisions of California law, such as Section 25004 and 25505.1.  But these provisions, and their requirements, are irrelevant, as neither section is part of Mr. Strong's second claim.

---

[8] Defendants do not all make the same arguments in opposing Mr. Strong's motion.  But each does explicitly incorporate one another's arguments into their own oppositions pursuant to DUCivR 7-1(a)(4).  (See ECF No. 245 at 22; ECF No. 248 at 37; ECF No. 250 at 59; and ECF No. 254 at 53).)  For ease of reference only, the court occasionally refers to the individual Defendant that makes an argument, rather than to Defendants as a whole.  Notwithstanding such references, the court accepts that the arguments of each Defendant should be construed as applying to all four Defendants for purposes of opposing Mr. Strong's motion.

Mr. Clawson asserts that California law does not apply because the position of the investors here is significantly different from the position of the plaintiffs in <u>Diamond Multimedia</u>. But that is to be expected: The <u>Diamond Multimedia</u> plaintiffs were suing under Section 25400, which addresses the use of securities fraud to manipulate the market, while Mr. Strong here is suing under Section 25401, which addresses fraudulent misrepresentations made to the purchasers of securities themselves. But both statutes apply to conduct arising "in this state [California]." <u>Diamond Multimedia</u> is relevant because the California Supreme Court defined this phrase for purposes of its securities fraud law. Mr. Clawson does not explain why the phrase "in this state" in Section 25400 should be interpreted differently in Section 25401, even if the type of plaintiff suing under each statute has been harmed by the alleged fraud in different ways.

Next, Mr. Clawson says there are issues of fact as to whether the PPMs originated in California, because although CAREIC was registered in California, CAREIC's CEO, CFO, and general counsel were all actually based in Utah. (<u>See</u> ECF No. 177, Declaration of Mr. Strong in Opposition to Motion to Dismiss, at 2-3.) In support of this argument, Mr. Clawson cites two Ninth Circuit cases, two interpretive opinions from the California Department of Corporations, and one district court opinion. <u>See</u> <u>Parvin v. Davis Oil Co.</u>, 524 F.2d 112 (9th Cir. 1975); <u>Robinson v. Cupples Container Co.</u>, 513 F.2d 1274 (9th Cir. 1975); Cal. Dep't of Corp., Interpretive Opinion No. 69/122, 1969 WL 1939 (Nov. 21, 1969); Cal. Dep't of Corp., Commissioner's Opinion 81/10C, 1981 WL 15161 (Nov. 12, 1981); <u>Siegal v. Gamble</u>, No. 13-cv-03570-RS, 2016 WL 1085787 (N.D. Cal. March 21, 2016).

As an initial matter, the court notes that four of these five sources predate the California Supreme Court's decision in Diamond Multimedia, so their continued applicability is questionable. More importantly, two of the sources cited actually support Mr. Strong's position. In Parvin v. Davis Oil Company, the Ninth Circuit stated that California securities laws applied "where any statutory element of a sale takes place in California," and held that where a sale was completely negotiated in Denver, but a check was then mailed to California as payment, the standard was satisfied. Parvin, 524 F.2d at 116. And in the 1981 Commissioner's Opinion, after agreeing that certain other conduct did not constitute an offer originating in California, the Commissioner warned that inviting "potential subscriber[s] . . . [to] telephone the individual general partner in California to obtain responses to questions" would likely be an offer under California securities law, because "California courts have extended the concept of 'offer' to encompass any activity of persons aiding in the sale of a security." Commissioner's Opinion 81/10C, supra, 1981 WL 15161 at *2-3. Here, as noted above, the PPMs explicitly indicated that the entities were principally headquartered in California, and urged potential investors to contact their California offices with questions. The court concludes that under both Parvin and the Commissioner's Opinion, the PPMs would constitute offers originating from California.

Finally, the court concludes that the only post-Diamond Multimedia case put forward by Mr. Clawson is distinguishable. In Siegal v. Gamble, the district court dismissed a complaint where a plaintiff alleged that two people had failed to register as broker-dealers under California's security laws. The court held that the plaintiff had failed to allege that any of the broker-dealers' conduct had occurred in California, and that the fact that they were citizens of California, without more, was insufficient. Siegal, 2016 WL 1085787 at *7. But the evidence

here goes beyond the allegations in <u>Siegal</u>, because CAREIC was registered in California, sent out PPMs that identified California as its headquarters, and urged interested buyers to contact its offices in California. That conduct is sufficient to apply California's securities laws to these PPMs, even if many of the leaders of CAREIC were actually situated outside of California.

2. Utah

Mr. Strong also argues the investments were subject to Utah law because the offers were both made and accepted in Utah. The court concludes triable issues of fact exist on this issue.

In Utah, "[i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to: . . . (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Utah Code Ann. § 61-1-1 (West 2019). This section applies "to persons who sell or offer to sell [securities] when: . . . (b) an offer to buy is made and accepted in this state." Utah Code Ann. § 61-1-26(1)(b) (West 2019). The statute defines when an offer to sell or buy is made and accepted in Utah:

> (3) For the purposes of this section, an offer to sell or to buy is made in this state whether or not either party is then present in this state, when the offer:
> (a) originates from this state; or
> (b) is directed by the offeror to this state and received at the place to which it is directed, or at any post office in this state in the case of a mailed offer.
>
> (4) For the purposes of this section, an offer to sell or to buy is accepted in this state when acceptance:
> (a) is communicated to the offeror in this state; and
> (b) has not previously been communicated to the offeror, orally or in writing, outside this state, and acceptance is communicated to the offeror in this state, whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received at the place to which it is directed or at any post office in this state in the case of a mailed acceptance.

Utah Code Ann. § 61-1-26(3)-(4) (West 2019).

The court briefly notes that the PPMs, as sent out by the entities, were not actually "offers." Rather, they were solicitations for offers. It was the investors who were making offers to purchase securities when they signed and returned the PPMs, and these offers were then accepted by CAREIC when it countersigned the offers.[9]

Mr. Strong argues that the investors made offers to buy securities by signing purchase agreements and returning them to CAREIC's office in Kaysville Utah.[10] This means the offers to buy securities were "made" in Utah because the offer was "directed by the offeror to this state and received at the place to which it is directed." Utah Ann. Code § 61-1-26(3)(b) (West 2019).

But for Utah law to apply, the offers must also have been accepted in Utah. Under the terms of the agreement, the offers were accepted once an authorized agent of CAREIC cross-signed the agreement. (SAppx. v.2 at 116, 254, 352 (Exs. 2-4).) Mr. Strong argues that each agreement was cross-signed in Kaysville, Utah, by CAREIC's CFO, Doug Child, and that this means the agreements were also accepted in Utah.

Mr. Clawson responds that this is insufficient because the statute is not concerned with where <u>acceptance</u> occurs, but rather with where <u>communication</u> of the acceptance occurs. <u>See</u> Utah Code Ann. § 61-1-26(4)(a) (West 2019) (acceptance must be "communicated to the offeror in this state."). Mr. Strong points out that the parties contractually agreed for acceptance to occur as soon as Mr. Child cross-signed the agreements so the acceptance was immediately finalized in Utah, and any subsequent communication of that acceptance is irrelevant.

---

[9] This distinction has no effect on the California law analysis because California explicitly defines solicitations for offers as offers for purposes of its securities fraud laws. <u>See</u> Cal. Corp. Code § 25017(b) (West 2019). The distinction matters only for purposes of Utah law, because correctly identifying the offering party and accepting party is essential to determining whether Utah law applies.
[10] Copies of all relevant agreements are included in SAppx. v.3 – v.5 (Ex. 58).

Neither party cites any clearly applicable case law, and it does not appear the Tenth Circuit has squarely addressed the issue. But this provision was adopted by Utah as part of its adoption of the Uniform Securities Act, and an identical provision has been enacted by Missouri. In analyzing Missouri's statute, the Eighth Circuit has addressed this specific question.

In Kreis v. Mates Investment Fund, Inc., 473 F.2d 1308 (8th Cir. 1973), the plaintiff in Missouri mailed an offer to buy securities, along with a check, to a firm in New York. The firm registered the sale in its books and mailed the plaintiff a confirmation letter in Missouri. The plaintiff subsequently sought to rescind his purchase under Missouri law. The firm defended on the ground the securities were not subject to Missouri law because the plaintiff's offer had not been accepted in Missouri. Rather, the firm maintained that under common law contract principles, acceptance occurred in New York when the firm entered the plaintiff's purchase on its books.

The Eighth Circuit disagreed on the ground the Uniform Securities Act had displaced such common law contract principles.

> With regard to acceptance, again it is to be stressed that the Act does not speak in terms of general contract law, with all of the complexities and subtleties acquired over years of classroom hypothetical questions . . ., but solely as to "acceptance in this state" . . . . In the subsection devoted to acceptance, Section 409.415(d), the stress is upon communication. Substantially, an offer is accepted here in Missouri when it is "communicated to the offeror in this state" (and has not theretofore been communicated outside the state). And it is "communicated to the offeror in this state" when the offeree directs it to him here and it is received where directed. At that point, for the purpose of the new Act, the offer has been accepted in Missouri.
>
> . . .
>
> [W]hether there has been a prior acceptance under orthodox contracts principles in New York, or whether acceptance is accomplished by the precise contents of some communication relating thereto, is not material to the resolution of the

applicability of the new Act to the transaction. For, in either event, it is communication to the Missouri offeror that is the critical requirement. When that takes place the offer "is accepted in this state[.]"

Id. at 1312-13.

The Eighth Circuit's reading of the statute is persuasive. Mr. Strong may well be correct that, for purposes of general contract law, acceptance of the offers occurred as soon Mr. Child signed the agreements. But for Utah's securities laws to apply, that acceptance had to be communicated to the offerors in Utah. Mr. Strong has submitted no evidence regarding whether or how Mr. Child communicated his acceptance of the agreements to the investors after he signed them. Absent such evidence, Mr. Strong has not carried his burden to show that Utah securities law applies to these claims.

Accordingly, in the following subsections, the court only addresses Mr. Strong's claim that Defendants violated California's securities laws.

B.   Alleged Misrepresentations and Omissions

Mr. Strong argues that Defendants violated California law by issuing PPMs that "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Cal. Corp. Code § 25401 (West 2019). Mr. Strong focuses on four issues: (1) CAREIC management's real estate experience; (2) concerns voiced in an internal audit; (3) Mr. Clawson's previous federal securities law violations; and (4) the use of unregistered brokers to sell securities. Defendants argue that there were no misrepresentations or omissions and that, even if there were any, they were not material.

"Under both state and federal securities law, a fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision." People v. Butler, 151 Cal. Rptr. 3d 352, 367 (Cal. Ct. App. 2012) (internal quotations omitted). Although the analysis frequently involves disputed facts, "[t]he issue of materiality may be characterized as a mixed question of law and fact." TSC Ind., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976).

> The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

Id. (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970)).

1.  Misrepresentation Regarding CAREIC Management Experience

Mr. Strong first argues that the PPMs materially misrepresented the real estate experience of three of CAREIC's four managers: Mr. Cochran, Mr. Austin, and Mr. Child.[11]

Two of the PPMs make representations about the experience of the management team in general. The Series E PPM represents that CAREIC is a "real estate investment company that employs several managers experienced in land development and property management." (SAppx. v.2 at 026 (Ex. 2).) It also states, "We have a skilled management team to seek out properties to finance, purchase, entitle, and resale." (Id. at 067 (Ex. 2).) The CAS PPM says, "Our manager CAREIC retains a group of officers and consultants experienced in land

---

[11] Mr. Strong does not dispute that the fourth manager, Mr. Geringer, did in fact have significant real estate experience.

development who are able to direct each development project from beginning to end." (Id. at 176 (Ex. 3).)[12]

The PPMs also make representations about the experience of the three individually named managers.

The Series E PPM states that Mr. Cochran has "invested in and developed many real estate projects, and has focused largely upon projects involving raw land." (Id. at 049 (Ex. 2).) The CASDF PPM contains the identical statement. (Id. at 303 (Ex. 4).) And the CAS PPM claims that he has "bought and sold millions of dollars of real estate throughout his career, with a primary focus on raw land including a 70-acre development in Wyoming." (Id. at 193 (Ex. 3).)

The PPMs also tout Mr. Austin. The Series E PPM states that he "has over 27 years of experience in real estate, sales, marketing and business infrastructure. His industry experience ranges from real estate to high-tech hardware and software services corporations." It then details his efforts to develop software to manage real estate portfolios. (Id. at 050 (Ex. 2).) The CASDF PPM makes the identical representation. (Id. at 304 (Ex. 4).) On the other hand, the CAS PPM notably omits any reference to Mr. Austin working in real estate, stating only that he has "over 25 years of experience in sales and marketing," before detailing his work developing real estate portfolio software. (Id. at 194 (Ex. 3).)

Finally, the Series E PPM describes Mr. Child as "the managing member of two other real estate and holding company LLC's, he is experienced in a broad array of real estate areas, including residential development and real estate taxation." (Id. at 050 (Ex. 2).) The CASDF

---

[12] The CASDF PPM, by contrast, does not refer specifically to the management team's real estate experience, instead stating only that it included "highly skilled managerial, operational and marketing personnel." (Id. at 315 (Ex. 4).)

PPM makes the same statement.  (Id. at 304 (Ex. 4).)  And the CAS PPM states that he "is experienced in a broad array of real estate areas including: residential development, residential foreclosures of both conventional and HUD mortgages and real estate taxation."  (Id. at 194 (Ex. 3).)

Mr. Strong argues that Mr. Austin, Mr. Child, and Mr. Cochran did not have as much real estate experience as these PPMs would have led a reasonable investor to believe.  But Mr. Strong has submitted insufficient evidence to demonstrate that these statements were misrepresentations at all, let alone that they were material as a matter of law.

First, as noted by Defendants, the date at which the PPMs were issued is highly relevant. Mr. Strong's argument is based primarily on depositions and trial transcripts from the bankruptcy proceeding in which Mr. Cochran, Mr. Austin, Mr. Child, and Mr. Geringer all affirmed that, at the time CAREIC was founded in 2004, only Mr. Geringer had significant real estate experience. (SAppx. v.1 at 251-52, 276, 485, 718, 938-39, and 995-96 (Nos. 5, 7, 9, & 10).)  But the CAS PPM was not issued until June 2007, the CASDF PPM was not issued until February 2008, and the Series E PPM was not issued until June 2008.  (SAppx. v.2 at 023, 173 & 274 (Exs. 2-4).) Even if Mr. Austin, Mr. Child, and Mr. Cochran had no real estate experience in 2004, when CAREIC was founded, there is at least an issue of fact about whether it would be appropriate to represent themselves as having real estate experience in 2007 and 2008, after three years of working in real estate development through CAREIC.

Second, the words used in the PPMs are sufficiently vague and ambiguous that a trier of fact, rather than the court, should resolve whether they were misrepresentations.  For example, is it misleading to say that Mr. Austin had twenty-seven years of real estate experience, when, to be

more precise, he actually had twenty-seven years of real estate <u>software</u> experience?  Is it

misleading to say Mr. Child had real estate experience, when he actually had real estate <u>tax</u>

experience?  Is it misleading to say that the management team, as a whole, had significant real

estate experience, when in fact, one member was experienced in real estate procurement and

development, while the other members were experienced in more ancillary roles such as

marketing, portfolio management, business management, and taxes?  While it is certainly

possible that a reasonable trier of fact could answer "yes" to the foregoing questions, it is equally

possible that a reasonable trier of fact would answer "no."  The court simply cannot determine

whether a reasonable investor would view these statements as misrepresentations.

Assuming they were misrepresentations, the court also cannot resolve the issue of

materiality as a matter of law.  The court agrees with Mr. Strong that, generally,

misrepresentations about a firm's experience would be a material misrepresentation.  <u>See, e.g.,</u>

<u>Schaffer Family Inv'rs LLC v. Sonnier</u>, No. 2:13-cv-05814-SVW-JEM, 2016 WL 6917269 at

*5-6 (C.D. Cal. July 5, 2016) (misrepresentation that defendant was a retired attorney was

material as a matter of law); <u>Commodity Futures Trading Comm'n v. Int'l Fin. Serv. (New</u>

<u>York), Inc.</u>, 323 F. Supp. 2d 482, 500-501 (S.D.N.Y. 2004) ("Without question, reasonable

investors would consider the experience and training of the [independent contractors] . . .

important in making an investment decision.").  But the court also agrees with Mr. Strong that

materiality must be determined based on reviewing the PPM as a whole, rather than viewing

piecemeal excerpts.  <u>See</u> <u>McMahan & Co. v. Wherehouse Entm't, Inc.</u>, 900 F.2d 576, 579 (2d

Cir. 1990) ("The central issue . . . is not whether the particular statements, taken separately, were

literally true, but whether defendants' representations, taken together and in context, would have

mislead a reasonable investor about the nature of the debentures.")  The court is faced with the possibility that a trier of fact could conclude that some statements were misrepresentations and some were not.  Depending on which statements were misrepresentations, a reasonable trier of fact could reach different conclusions about materiality.  For example, a misrepresentation about a single manager's experience might not be material if the trier of fact otherwise concludes that, on the whole, investors had obtained an accurate approximation of the overall management team's level of experience.

Accordingly, the court concludes there are genuine issues of material fact about whether the PPMs contained material misrepresentations regarding the real estate experience of CAREIC's management.

2.  Omission Regarding an Audit of Internal Controls

On May 12, 2008, CAREIC's auditors submitted a report to CAREIC management identifying a single "reportable condition":

> During our audit we noted instances where ultimate control over multiple critical functions such as accounting, finance, legal, operational, and executive approval are held by only one individual in material transactions including financing arrangements and property acquisitions.  Of particular notability is the way property is tied up and acquired by the Company.  Specifically, Robert D. Geringer, the Company's President, appears to negotiate contract terms independently and outside of the Company.  The result is that neither the Company nor its other executives have significant, if any, input on the terms or the structure of certain deals or their purchase price. . . .
>
> Also noted in relation to this point is the way the property closings are structured.  There appears to be no review of HUD closing documents and disclosures by parties other tha[n] Mr. Geringer prior to closing.
>
> The Company should thoughtfully design and implement processes and procedures that ensure the involvement and approval of all members of the executive team in all significant transactions. . . .  This will ensure that the Company's best interests are always addressed and not the interests of any other

parties. Such limited oversight and executive concentration is not appropriate and is not conducive to investor confidence.

(SAppx. v.2 at 528 (Ex. 43).)[13]

According to Mr. Strong, the Series E PPM should have disclosed the auditors' concerns because this information would have been material to potential investors.[14] Mr. Strong cites only one case for the proposition that failing to disclose this information was a material omission. See Spatz v. Borenstein, 513 F. Supp. 571 (N.D. Ill. 1981). But that case is not analogous. In Spatz, the defendant sold security interests in a single apartment complex, but misrepresented the number of occupants and the cost of upkeep, while also failing to inform investors that twenty-five of the units were uninhabitable. The court found these misrepresentations and omissions to be material because they had "a direct bearing on the value, profitability and risk which could be assumed and expected by the investors." Id. at 581.

The omissions in Spatz were directly related to the value of the sole object of the investment. The omission here, by contrast, involves more abstract risks relating to the existence of checks and balances within corporate management. Whether these risks would have a "direct bearing" on investors' willingness to invest, in the same way omissions about the value of the property would, is a question for the trier of fact.

Additionally, in its summary of potential risks, the Series E PPM does state:

[M]embers of our management team are required to devote only as much time to our operations as they, in their sole discretion, deem necessary in carrying [out]

---

[13] Mr. Geringer objects to this letter on the ground it is inadmissible hearsay. Fed. R. Evid. 801-802. The court disagrees. Mr. Strong is arguing that CAREIC, upon receiving this letter, had an obligation to disclose the identified reportable condition in their PPM. He is not offering the letter to prove the truth of the matter asserted; the issue of whether the accountants' statements about Mr. Geringer's conduct was truthful does not alter CAREIC's obligation to disclose its auditors' findings.
[14] The CAS and CASDF PPMs were issued before the auditors completed their report, and so could not have included its findings.

> our operations effectively. Any or all of the members of our management team,
> including Robert Geringer, Kirby D. Cochran and Jeff Austin and Douglas Child,
> may fail to divide their time efficiency (sic) in operating our business given their
> outside obligations.

(SAppx. v.2 at 044 (Ex. 2).)  It is not clear that there is a significant difference between disclosing that Mr. Geringer operated unchecked and disclosing that some members of the management team might be so distracted by other projects that they would not pay attention to what other managers were doing.

Because the materiality of the omission is legitimately disputed, the court concludes there are genuine issues of material fact regarding whether Defendants made material omissions regarding the auditor's report.[15]

### 3. Omission Regarding Mr. Clawson's History of Securities Fraud

In 2001, an SEC administrative law judge (ALJ) found that Mr. Clawson "willfully perpetrate[d] securities fraud and, thus, the severest sanction is warranted. Clawson will be barred from participating in any penny stock offerings and from associating with any broker or dealer." (SAppx. v.1 at 1248 (No. 14).)  The ALJ also imposed a $100,000 fine. (Id. at 1249 (No. 14).)  Mr. Clawson appealed this decision to the SEC, which found that his "conduct was egregious" and affirmed the bar on associating with any broker-dealer, the bar on participating in penny stock offerings, and the $100,000 fine. (Id. at 1257-58 (No. 15).)[16]

---

[15] Defendants also argue that the reportable condition identified by the auditor could not have been material because they were not required to include such information on reports filed with the SEC. (Defendants were only required to report "material weaknesses," not "reportable conditions.")  But the court is persuaded by the authorities cited by Mr. Strong that this argument is largely irrelevant. See, e.g., SEC v. Brown, 740 F. Supp. 2d 148, 159 (D.D.C. 2010) ("'[N]o authority suggests that Regulation S–K is preemptive of the materiality requirement.' Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1314 (S.D.N.Y.1996). The SEC is therefore correct that the fact that Regulation S–K does not require disclosure of particular information does not answer whether the information is material to investors under the securities laws.").

[16] Mr. Clawson objects to any evidence related to, or discussion of, the SEC's order, on the ground it is inadmissible character evidence. See Fed. R. Evid. 404. The court disagrees. This evidence is not submitted to show Mr.

This information was not disclosed to investors. The court agrees that this was a material omission. See, e.g., Beard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir. 1991) ("[F]ailure to mention [a guarantor's earlier] conviction in the initial offering memorandum could be considered reckless as a matter of law."); SEC v. Paro, 468 F. Supp. 635, 646 (N.D.N.Y. 1979) ("[I]nvestors would have been especially dubious of the . . . venture if they had been apprised of the cease and desist orders and injunctions which had been issued against [defendant] . . . by the state and federal courts. The materiality of these omissions is therefore manifest."); SEC v. Empire Dev. Group, LLC, No. 07 Civ. 3896 (PKC), 2008 WL 2276629 at *11 (S.D.N.Y. May 30, 2008) ("[F]ailing to disclose [the partner's] prior status as a defendant in a lawsuit filed by the New York State Attorney General for fraud and misappropriation in connection with the sale of stock . . . [which led to the] signing of consent judgment enjoining him from engaging in fraudulent practices and from offering, selling or promoting securities in New York . . . was reckless as a matter of law."); SEC v. Alliance Leasing Corp., No. 98-CV-1810-J (CGA), 2000 WL 35612001 at *8 (S.D. Cal. March 20, 2000) ("Glaringly absent from the materials were relevant disclosures regarding . . . the Browne's previous cease-and-desist orders related to the fraudulent sale of unregistered securities in California, Wisconsin, and Mississippi.").

Defendants' primary argument in opposition is that Mr. Clawson was not actually important enough, within CAREIC's operations, for investors to care about his past. Mr. Strong's evidence strongly rebuts this argument.

---

Clawson's propensity to violate securities fraud laws again, or to show that he acted in conformity with his earlier conduct in violating securities fraud laws. Mr. Strong submits it to prove the fact that Mr. Clawson had previously been found guilty of violating federal securities laws, and to argue that such information had to be disclosed to potential investors.

Mr. Strong submits evidence that Mr. Clawson regularly attended and participated in board meetings, where his participation appeared to be directly related to CAREIC's investments. At one meeting, for example, Mr. Clawson "provided a report on financial institutions, including an update on FBR, GFA, the New York office and other money raising activities." (SAppx. v.2 at 416 (Ex. 12).) At another meeting, he "led a discussion of the development fund, and projections. A discussion ensued regarding the benefit of primarily expanding fund investments into structures without senior lien positions in order to allow third party mezzanine financing. A second fund was mentioned." (Id. at 419 (Ex. 13).) Moreover, Mr. Clawson's title at CAREIC was "Managing Director Business Development." (Id. at 495, 550 (Exs. 36, 50).)

Additionally, Mr. Strong submits twenty-three different email chains showing that Mr. Clawson was involved at the highest levels of CAREIC. (See SAppx. v.2 (Exs. 20-35, 39-41, 45-46, 49, 51).) Defendants argue that Mr. Clawson was copied on various emails solely because he was Mr. Cochran's assistant and that being copied on emails was insignificant given his passive role. But in most instances, the only people included in the emails were members of CAREIC's board of directors and Mr. Clawson. The emails include planning for upcoming board meetings, which Mr. Clawson was apparently invited to attend regularly (id. at 460, 462, 464, 466, 535, 550 (Exs. 22-25, 45, 49), planning a "monthly management call" (id. at 472 (Ex. 27)), discussing employee compensation rates (id. at 458 (Ex. 21)), reviewing company financial statements (id. at 469 (Ex. 26)), and discussing the status of outstanding loans (id. at 474, 516 (Ex. 28, 39)).

And at least one email shows that other employees of CAREIC viewed Mr. Clawson as an officer and recommended providing him with an expense account in light of that position. An email to Mr. Cochran from Jad Howell (whom Mr. Clawson identifies as a part of "senior management," see CAppx. Op. v.1 at 025 (Ex. 3), Clawson Decl. ¶ 46(c)) states, "I've attached an approval hierarchy for your review. . . . Effectively, the attached provides that officers (R. Geringer, J. Austin, D. Child, and R. Clawson) will be given the ability to incur expenses totaling $10,000." (SAppx. v.2 at 456 (Ex. 20).) Minutes from a later board of directors meeting also identified Mr. Clawson as a member of the board. At the meeting, the board adopted salaries for all employees based on an attached spreadsheet. The spreadsheet identifies seven departments within CAREIC (Business Development, Legal, Marketing, Accounting, Administrative, Board, and Projects), and Mr. Clawson is included as a board member. (CAppx. Op. v.1 at 087-88 (Ex. 4).) Of the forty-two employees (or entities receiving payments) included on the spreadsheet, Mr. Clawson's salary was the sixth highest (as of January 2009), higher than the general counsel (Mr. Hunt), the CFO (Mr. Child), and two other board members (Mr. Davidson and William Warwick). (Id.)[17]

Other emails show Mr. Clawson's involvement in one of CAREIC's first projects, the Kingman investment. Regarding that project, the general counsel, Mr. David Hunt, wrote, "I discussed several of these items [how to structure an investment] this morning with [Mr. Clawson]. He, as usual, had very good, investor oriented input." (SAppx. v.2 at 477 (Ex. 29).) Mr. Clawson was emailed a PowerPoint presentation summarizing the Kingman investment, and

---

[17] Beginning in February 2009, in light of the economic crisis in the United States, most employees' salaries, including Mr. Clawson's, were reduced. Following that reduction, Mr. Clawson, along with five other employees, including Mr. Hunt and Mr. Child, became the eighth highest-paid employees. He continued to earn more than Mr. Davidson and Mr. Warwick. (CAppx. Op. v.1 at 087-88 (Ex. 4).)

provided slide-by-slide comments.  (Id. at 479 (Ex. 30).)  He was later given the job of drafting an email to "investors who are currently on the fence about the Kingman investment," to encourage them to invest.  (Id. at 521 (Ex. 41).)

Mr. Clawson then became involved in developing a project in Smyrna, Tennessee, which was the subject of the CAS PPM.  When Mr. Hunt emailed the board a summary of the proposed project, he stated, "I have relied upon the email exchanges of Robert Geringer and Clawson to detail the proposed structure."  (Id. at 481 (Ex. 31).)  Mr. Clawson responded, urging the parties to structure the deal so that CAREIC's efforts to secure U.S. investors could be easily shutdown if Chinese investors were found instead.  (Id.)  He later provided comments on how the deal should be structured, including page-by-page edits of the proposal.  (Id. at 486, 488 (Exs. 32-33).)

Mr. Clawson was also intimately involved in the CASDF PPM.  The CASDF PPM was Mr. Clawson's idea.  (Id. at 491 (Ex. 34).)  He created the executive summary for the CASDF PPM.  (Id. at 495 (Ex. 35).)  He sent detailed emails to the board to apprise them of his progress on the project.  (Id. at 518, 554 (Exs. 40, 51).)  And he was the one who ultimately provided a final proposal to the board, likening it to "a birth announcement."  (Id. at 540 (Ex. 46).)

Finally, Mr. Clawson's own declaration supports the conclusion that he was an integral part of CAREIC.  Mr. Clawson declares "I would consider myself involved in some capacity with CAREIC since its formation in approximately April 2004 through my resignation in approximately May 2009."  (CAppx. Op. v.1 at 021 (Ex. 3), Clawson Decl. ¶ 43.)  And Mr. Clawson is the one who introduced Mr. Geringer and Mr. Cochran to one another.  (Id.)  He declares that, "[b]ased on my approximate sixteen years as an associated person of a broker-

dealer . . . I used such insight to provide investor commentary where requested by Cochran or Hunt, reviewed material for typographical errors, and presented sample PPMs for investment offerings." (Id. at 026, Clawson Decl. ¶ 47).) Lastly, Mr. Clawson referred to himself as "an assistant or right hand" to the CEO, Mr. Cochran. (Id. at 032, Clawson Decl. ¶ 57).)

In sum, Mr. Strong's evidence shows that CAREIC's principals viewed Mr. Clawson as an officer, and that Mr. Clawson, by seeking to create new ventures for CAREIC, acted like an officer.

The bulk of Defendants' evidence in opposition is dedicated to demonstrating all the things Mr. Clawson did not do, such as the number of board meetings he did not attend, the number of ideas he raised that were rejected, or the fact that all of his work, including on the CASDF PPM, still had to be approved by Mr. Hunt and Mr. Cochran. But the fact that Mr. Clawson did not have unlimited, unchecked powers does not counter Mr. Strong's evidence that he played an integral role in the operation of CAREIC. Indeed, as Mr. Strong argues, many of the cited examples (such as opening bank accounts or filing articles of incorporation) are things the legal department or accounting department—not board members or other key figures—would be expected to perform. Defendants' evidence does not raise triable issues of fact about the importance of Mr. Clawson's role at CAREIC.

The court briefly addresses three other arguments raised by Defendants.

First, Mr. Davidson and Mr. Geringer both note that the SEC order only prohibited Mr. Clawson from participating in penny stock offerings, and that CAREIC did not engage in penny stock offerings. But Mr. Strong has never asserted that CAREIC engaged in penny stock offerings, and has never claimed Mr. Clawson violated the SEC order by being involved in

CAREIC.  The issue is whether CAREIC should have disclosed that someone banned from penny stock offerings due to a finding of willful fraud was heavily involved in CAREIC's operations, not whether such involvement was actually prohibited by the SEC.

Second, Mr. Davidson, Mr. Geringer, and Mr. Austin argue that Mr. Clawson was not a "significant employee" under certain SEC regulations, and so his involvement in CAREIC did not need to be disclosed.  See generally 17 C.F.R. § 229.401 (requiring that information regarding directors, executive officers, and certain "significant employees" such as "production managers, sales managers, or research scientists who . . . are expected to make significant contributions to the business of the registrant" be disclosed).  But, as the court earlier noted, the question whether a disclosure is required under the SEC regulations is irrelevant to determining whether a disclosure should have been made under securities fraud laws.  See SEC v. Brown, 740 F. Supp. 2d 148, 159 (D.D.C. 2010) ("The SEC is . . . correct that the fact that Regulation S–K does not require disclosure of particular information does not answer whether the information is material to investors under the securities laws.").  In any event, given the evidence discussed above, it appears that Mr. Clawson was, in all but name, a director or officer of CAREIC.  It also appears he was a "significant employee" as that term is defined, so even under the applicable SEC regulations, his involvement should have been disclosed.

Third, Mr. Clawson briefly notes that the validity of the underlying ALJ order is now in question, given the Supreme Court's recent holding in Lucia v. SEC, 138 S. Ct. 2044 (2018), which held that SEC ALJs were not properly appointed under the Appointments Clause of the U.S. Constitution.  But this argument is irrelevant because at the time the PPMs were issued, the

validity of the order was not in question. CAREIC could not refuse to disclose Mr. Clawson's earlier conduct based on a vague hope that the ALJ order might be erased ten years in the future.

For all of these reasons, the court concludes that, as a matter of law, CAREIC violated California's securities fraud laws when it issued PPMs that failed to disclose the significant involvement of a person with a history of securities fraud.

### 4. Omission Regarding the Use of Finders as Broker-Dealers

In four earlier PPMs not directly at issue here (offering units in Series A, B, C, and D, in CAREIC), CAREIC used approximately forty-four unregistered "finders"—individuals hired to locate potential investors—to sell the securities. (SAppx. v.1 at 1408-10 (No. 22).) Mr. Strong estimates that about $30 million, or half of all the money raised as part of the Series A through D PPMs, was raised through the efforts of these finders. (Id. at 1400-01, 1407 (Nos. 21-22).)

The use of such unregistered finders is legal, so long as they are, in fact, finders, and not unregistered brokers masquerading as finders. Mr. Strong argues the finders in these transactions were actually unregistered brokers.

A "broker," under federal law, is "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Brokers engaged in interstate commerce are required to register with the SEC. 15 U.S.C. § 78o(a). Sales by unlicensed brokers are voidable, so an investor who purchases securities from an unlicensed broker has the right to rescind that purchase. 15 U.S.C. § 78cc(b); see also Eastside Church of Christ v. Nat'l Plan, Inc., 391 F.2d 357, 361 (5th Cir. 1968).

The SEC has repeatedly indicated in advisory letters that paying finders a commission based on the size of the investment obtained (as opposed to a flat rate per investor or some other

form of compensation) was a "key factor" in determining whether an individual was acting as a broker rather than a finder.  See, e.g., Birchtree Fin. Serv., Inc., SEC No-Action Letter, 1998 WL 652147 (Aug. 17, 1998); Request for Interpretation, SEC No-Action Letter, 1999 WL 80255 (Feb. 17, 1999); Wolff Juall Invs., LLC, SEC No-Action Letter, 2005 WL 5394659 (May 17, 2005).  Here, Mr. Strong submits largely undisputed evidence that the forty-four unregistered finders were consistently paid commissions for finding investors.  (SAppx. v.1 at 1400-01, 1407 (Nos. 21-22).)  Mr. Strong also submits an email that demonstrates that CAREIC was aware of the risk of paying such commissions.  In mid-2007, CAREIC's general counsel, Mr. Hunt, warned that "many state regulators are increasingly taking the position that transaction based compensation bumps [finders] out of any exemption from registration as a broker dealer." (SAppx. v.2 at 546 (Ex. 48).)

Mr. Strong argues this created a risk for CAREIC, as a significant portion of its investments could be rescinded if any investors wanted to do so.  He further argues that this risk should have been disclosed to investors in the CAS, CASDF, and Series E PPMs, but was not, and that this omission was material.

The court concludes that it cannot resolve this issue as a matter of law, given the significant number of variables involved.

First, it is unclear whether this issue was not disclosed to investors.  The CAS, CASDF, and Series E PPMs all disclosed that CAREIC used both registered brokers and unregistered finders to obtain its investments.  (SAppx. v.2 at 30, 180, 281 (Exs. 2-4).)  As Mr. Strong notes, the language does not mention that finders are paid commissions.  But the question here is what a reasonable investor would need to know.  In the court's view, a trier of fact could reasonably

conclude that simply disclosing the existence of unregistered finders would be sufficient to alert a reasonable investor to the risk of those finders later being identified by the SEC or a court as brokers who should have been registered.

Second, assuming these disclosures were insufficient, the court would have to determine how likely it was that these finders would be deemed brokers. SEC guidance at the time indicated only that commission-based pay was a "key factor" in determining whether a finder was actually a broker. But it is not a dispositive factor. Notably, the SEC later attempted to go further, describing the receipt of commissions as "a hallmark of broker-dealer activity," and suggesting that any person receiving such commissions "must" register as a broker. See Brumberg, Mackey & Wall, P.L.C., SEC No-Action Letter, 2010 WL 1976174 (May 17, 2010). But at least one court, even after reviewing the Brumberg no-action letter, still held that the defendant finder was not a broker, even though he was paid a commission, because obtaining commissions was just one factor for the court to consider. See SEC v. Kramer, 778 F. Supp. 2d 1320, 1336-39 (M.D. Fla 2011) ("The distinction between a finder and a broker, however, remains largely unexplored, and both the case law and the Commission's informal, 'no-action' letter advice is highly dependent upon the facts of a particular arrangement."); see also Moss v. Kroner, 129 Cal. Rptr. 3d 220, 226 n.4 (Cal. Ct. App. 2011) ("Whether a person acted as a finder or a broker . . . is a question of fact."). The court concludes a trier of fact must determine the likelihood that the finders should have registered as brokers.

Third, assuming the disclosures were insufficient and the finders should have registered as brokers, the court would then have to determine what level of risk was posed by such a finding. Mr. Strong suggests that the entire $30 million in investments obtained by the finders

could have been rescinded.  While that is possible, it does not seem particularly probable, given that there is no evidence that any investor sought to rescind its investment.[18]  This is not determinative, of course.  The question is whether CAREIC should have foreseen and disclosed the risk, not whether, in hindsight, there was no risk.  But the fact that no rescission was ever sought suggests there is at least a triable issue of fact about how likely, and by extension how material a risk, rescission was at the time of the CAS, CASDF, and Series E PPMs.

Finally, assuming all of the foregoing was decided in Mr. Strong's favor, the court would still have to determine whether this risk was material to the relevant investors.  Mr. Strong contends that CAREIC failed to disclose its use of finders in the Series A through D offerings to investors investing in the CAS, CASDF, and Series E offerings.  The identified risk is that rescission of separate, earlier investments could negatively affect the viability of later investments.  Certainly, a reasonable trier of fact could conclude that this omission was material, and that a reasonable investor in Series E units, for example, would want to know whether the company he was investing in had a high chance of losing $30 million in other investments, even if technically separate from the Series E investment.  But a reasonable trier of fact could also conclude that this omission was not material, because a reasonable investor would believe each investment was sufficiently insulated from another so that the risks of rescission of an earlier investment would not negatively affect a later investment.  The issue cannot be resolved as a matter of law.

---

[18] As Mr. Geringer notes in his opposition to the motion, "Mr. Strong purportedly took assignments from all of the investors, which would include those who had the apocalyptic rescission rights, but he has not brought any claims for rescission based on the involvement of unlicensed broker-dealers.  Instead, he has only brought claims for failure to disclose potential rescissionary rights that he did not value enough to pursue."  (ECF No. 48 at 33 n.5.)

Accordingly, the court concludes genuine issues of material fact exist about whether Defendants made material omissions regarding their use of unregistered finders.

C. Individual Liability for Misrepresentations and Omissions Made by Entities

Mr. Strong asks the court to find Defendants individually liable for violating the California securities law. Defendants respond that even if the misrepresentation or omissions were material as a matter of law—as one is, for the reasons stated above—they cannot be held personally liable for them.

Mr. Strong does not allege that any individual defendant was personally responsible for the misrepresentation and omissions discussed above. Rather, it is only CAREIC that would be primarily liable for engaging in securities fraud. But California law also imposes secondary liability on certain individuals affiliated with a primarily liable entity. See Cal. Corp. Code § 25504 (West 2019).

Defendants argue they are not liable under this provision for three reasons.

1. Defendants' Control or Leadership of Primarily Liable Entities

California law creates secondary liability for (1) "every principal executive officer or director of a [primarily liable] corporation" and (2) "every person occupying a similar status or performing similar functions." Cal. Corp. Code § 25504 (West 2019).[19] Mr. Strong argues that

---

[19] Individuals can also be liable if they "directly or indirectly control[led]" the primarily liable entity, or if they were employed by the entity and "materially aid[ed] in the act or transaction constituting the violation." Cal. Corp. Code § 25504 (West 2019). Much of Defendants' argument is directed at showing they do not fall within either of these categories because only Mr. Cochran (not Defendants) exercised total control over the entities, and because Defendants were not involved in drafting the CAS, CASDF, or Series E PPMs. But the issues of control and material aid are irrelevant, because Mr. Strong's argument focuses on the other prongs of the statute. See, e.g., Hellum v. Breyer, 123 Cal. Rptr. 3d 803, 809 (Cal. Ct. App. 2011) ("[T]he plain language of section 25504 means that principal executive officers and directors are presumptively liable for their corporation's issuance of unqualified securities, regardless of whether they participated in the transactions at issue, or controlled the issuer. . . . Thus, unlike its federal law counterpart, the plain language of section 25504 reveals that imposition of joint and several

each Defendant was an executive officer or director of CAREIC, or filled a position of similar status and function. The court agrees. Each PPM identifies Mr. Geringer as a member of the board of directors and president of CAREIC, Mr. Davidson as chairman of the board of directors, and Mr. Austin as a member of the board of directors and either the president of worldwide development or senior vice president. (SAppx. v.2 at 048, 193, 303 (Exs. 2-4).) And as the evidence discussed above shows, Mr. Clawson was a member of the board in all but name.

Defendants contend that their positions are irrelevant because the board was not actually a functioning board of directors with real power, as one finds in a corporation. Rather, they say, because CAREIC and the other entities are LLCs, the so-called board of directors was actually nothing more than a powerless advisory board. According to Defendants, such a powerless board falls beyond the scope of California's securities laws.

Defendants have not submitted enough evidence to raise a genuine issue of material fact on this argument. Indeed, Defendants' argument rests almost entirely on the text of CAREIC's amended operating agreement, which states that the CEO, Mr. Cochran

> shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things which the chief executive officer shall deem to be reasonably required to accomplish the business and objectives of the Company. No Member, other than the chief executive officer, shall have the authority to bind the Company, unless given that authority by the chief executive officer.

(SAppx. v.2 at 078 (Ex. 2).) But the plain language of the California statute—which focuses on individuals performing functions analogous to a board of directors—makes clear that

---

liability under its provisions is not limited to persons who 'control' others who have sold securities in violation of section 25503.").

California's securities fraud laws are broadly directed at the actual, day-to-day functioning of the entity, not legal formalities.

So even though the operating agreement vested all power in Mr. Cochran as a legal matter, there is substantial evidence that, as a practical matter, CAREIC's board of directors operated precisely as a corporate board of directors would operate. For instance, CAREIC's general counsel, Mr. Hunt, testified at trial that although, officially, Mr. Cochran could act independently,

> in corporations, there are a lot of policies that are not actually written. And there was [a] policy that there would be a consensus among board members before significant acts occurred. . . . [A]nd the manager would not act without board approval. So as a matter of policy, as a matter of practice, board approval was required for significant decisions.

(CAppx. Op. v.3 at 1122 (Ex. 38).)

Also, the minutes of board of director meetings provide numerous examples of the significant level of control exercised by the board. At one board meeting, the board passed a resolution regarding what type of insurance to obtain, approved compensation levels for two independent directors, and passed a resolution "authorizing the company lead by Mr. Cochran to continue to move forward with exploration of an arrangement between the Company and Great Eastern Securities." (SAppx. v.2 at 417 (Ex. 12).) At another meeting, the board voted on whether to extend the deadline to repay certain loans and voted to approve opening a new entity in China. (SAppx. v.2 at 420 (Ex. 13).)

During its operation, the board (1) voted to approve new appointments to the board and created an audit and compensation committee (CAppx. Op. v.1 at 047 (Ex. 4)); (2) voted to approve the purchase of additional land (Id. at 053 (Ex. 4)); (3) approved compensation packages

(Id. at 054 (Ex. 4)); (4) authorized directors to purchase property directly from CAREIC in the event of loan defaults (Id. at 057 (Ex. 4)); (5) approved the hiring of auditors (Id. at 059 (Ex. 4)); (6) voted to prevent CAREIC from owning or directly affiliating with any broker-dealer entity (Id. at 062 (Ex. 4)); (7) created governance, compliance, and investment committees (Id. at 068 (Ex. 4)); (8) altered Mr. Austin's title and awarded him 500,000 additional units in CAREIC (Id. at 070 (Ex. 4)); (9) voted on raises and allowances (Id. at 071 (Ex. 4)); (10) voted to obtain disability insurance (Id. at 074 (Ex. 4)); (11) voted to purchase additional water rights (Id. at 078 (Ex. 4)); and (12) voted to issue further securities offerings (Id. at 078 (Ex. 4)).  Another occasion further demonstrates that Mr. Cochran was not as all-powerful as Defendants suggest based on the operating agreement: the board of directors authorized the transfer of certain property "subject to the written, signed approval of the Company's CEO and at least one additional executive officer."  (Id. at 078 (Ex. 4) (emphasis added).)

Between the four oppositions, only a single concrete example is cited to demonstrate Mr. Cochran's supposedly unlimited powers: Mr. Clawson argues that "Cochran could approve major contracts (such as [Andrew] Feola's $1.05 million compensation) without board approval."  (ECF No. 254 at 22.)  It is not entirely clear to what Mr. Clawson is referring, as the evidence cited by Mr. Clawson does not demonstrate any such unfettered power.  But the minutes of the board of director meetings indicate they at least discussed Mr. Feola's compensation on numerous occasions.  (See, e.g., CAppx. v.1 at 060, 061, 064, 068, and 087 (Ex. 4).)  If Mr. Cochran in some manner went beyond the desires of the board on this issue, it is not disclosed by the record.  In any event, a single example of Mr. Cochran disobeying the board

would not be enough to counteract the overwhelming evidence that the board of directors operated in the same manner, and with generally the same powers, as a typical corporate board.

In sum, the record makes clear that CAREIC's board operated as a true board of directors, not as a superfluous advisory board. Accordingly, the court concludes that Mr. Strong has carried his burden to demonstrate that Defendants were principal officers or directors of CAREIC, or filled similar roles, within the meaning of Section 25504.

2. Privity

There is no dispute that privity is required to establish primary liability (e.g. there must be privity between CAREIC and the investors). Defendants argue that Section 25504 also requires privity between the investors and Defendants before secondary liability can be imposed.

Defendants urge the court to adopt the reasoning of Viterbi v. Wasserman, 123 Cal. Rptr. 3d 231 (Cal. Ct. App. 2011), which held that privity is also required to establish secondary liability.

The court declines to do so. Six months after the Viterbi decision was issued, another panel of the California Court of Appeal issued a decision expressly disagreeing with Viterbi and reiterating that no privity was required for secondary liability. See Moss v. Kroner, 129 Cal. Rptr. 3d 220, 231-32 (Cal. Ct. App. 2011) ("We read sections 25504 and 25504.1 for their plain meaning: actors liable under this statute are jointly and severally liable with the primary actor for the primary actor's violation of section 24501. . . . [W]e respectfully disagree with [Viterbi], and hold that for secondary actors strict privity is not required to state a cause of action for violation of section 25401 by means of sections 25504 and 25504.1.").

Every federal court to address this split in authority has agreed with <u>Moss</u>.  <u>See</u> <u>Jackson v. Fischer</u>, 931 F. Supp. 2d 1049, 1066 (N.D. Cal. 2013)  ("<u>Moss</u> appears to be the better-reasoned decision on this issue, as the result in <u>Viterbi</u> is inequitable and actually reads § 25504 and § 25504.1 out of the Corporate Securities Law insofar as they apply to secondary violators."); <u>Siegal v. Gamble</u>, No. 13-cv-03570-RS, 2016 WL 1085787 at *6 (N.D. Cal. March 21, 2016) ("As long as plaintiffs show they were in privity with the primary violator, as section 25401 requires, they need not show that they were in privity with the secondary violators under sections 25504 and 25504.1."); <u>Hanson v. Berthel Fisher & Co. Fin. Servs., Inc.</u>, No. 13-cv-67-LRR, 2014 WL 2434000 at *21 (N.D. Iowa May 29, 2014) ("The court finds that privity between Berthel Fisher and Plaintiffs is not required for Plaintiffs to state a claim pursuant to section 25504.").  The court agrees that the analysis in <u>Moss</u> is better than <u>Viterbi</u>'s: <u>Viterbi</u>'s reading renders the secondary liability language of the statute surplusage, as the distinction between primary liability and secondary liability essentially vanishes.

Accordingly, the court concludes Defendants are subject to Section 25504 even though they were not in privity with the investors who (through Mr. Strong) have brought these claims.

3.   Defendants' Reasonable Knowledge of the Misrepresentations

Finally, under Section 25504, a defendant cannot be held liable if he "had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  Cal. Corp. Code § 25504 (West 2019).

The sole inquiry, at this stage, is whether Defendants did not know, and with reasonable effort, could not have known, that Mr. Clawson had previously violated securities fraud laws.

(Because triable issues of fact exist about the other misrepresentation and omissions, the court

does not address Defendants' knowledge of those issues.)

Clearly, Mr. Clawson, as a matter of law, was aware of his own violations. Similarly, the

court concludes that, as a matter of law, Mr. Geringer, Mr. Austin, and Mr. Davidson should also

have been aware of Mr. Clawson's past.[20] Mr. Clawson confirms that the information was

widely available:

> As is the custom of the SEC, . . . the SEC publicly disclosed the [accusations] on
> its website and through the former NASD Public Disclosure Program (now
> known as FINRA's BrokerCheck), on the same day, December 23, 1996. As a
> former broker, this information was available to my clients, prospective clients,
> my broker-dealer and any individual that called NASD, or beginning in 1998,
> searched my name on BrokerCheck. Further, anyone searching my name on the
> internet (such as Yahoo or AltaVista as this was before Google), would
> immediately find the [accusations] and subsequent ALJ finding and Commission
> opinion. Thus, since 1996, this information was publicly available and as a result,
> I am accustomed to discussing the matter, although it will never become ordinary,
> whether with first time introductions or long-time colleagues.
>
> . . .
>
> I never concealed my prior securities administrative proceeding, but also freely
> disclosed and discussed my prior SEC enforcement action. During introductions,
> I always introduced myself as a former broker, which generally led to questions as
> such qualifier ("former").

(CAppx. v.1 at 034-35 (Ex. 3), Clawson Decl. ¶¶ 62-63.)

In addition to being widely available, Defendants had a clear motive to research Mr.

Clawson. He was a key part of the management team, particularly regarding the CASDF PPM,

---

[20] It is unclear when these Defendants actually became aware of Mr. Clawson's past. Mr. Davidson declares, "I did
not know about the SEC case against Clawson at the time I joined CAREIC's board. I am uncertain exactly when
and how I heard about it, but once it became known, the outside directors requested that Clawson no longer be a
participant in CAREIC activities, and we saw little or nothing of him from that time forward." (ECF No. 245-1,
Davidson Decl. ¶ 22.) Mr. Geringer declares, "I did not become aware of the SEC order [against Mr. Clawson] until
sometime after my resignation." (GAppx. Op. at 006 (Ex. 1), Geringer Decl. ¶ 8.) Mr. Austin does not address the
issue in his declaration. Because the issue is whether Defendants reasonably should have discovered Mr. Clawson's
past, their actual knowledge, or lack thereof, is irrelevant.

and he was one of the highest paid individuals at CAREIC. Accordingly, the court concludes that, as a matter of law, Mr. Austin, Mr. Geringer, and Mr. Davidson reasonably should have known about Mr. Clawson's past.[21]

### D. Affirmative Defenses

Finally, Mr. Geringer argues that triable issues of fact exist about three affirmative defenses. First, Mr. Geringer contends the bankruptcy court's assignment of investor claims to Mr. Strong was invalid. The court rejected that argument three years ago. See Strong v. Geringer, 2:15-cv-837-TC, 2016 WL 4926175 *3 (D. Utah Sept. 15, 2016) (holding "[the] assignment of claims from the creditors and investors is valid, and Mr. Strong is authorized to prosecute these claims.")

Second, Mr. Geringer maintains that the investor claims are barred by a settlement agreement he previously entered into with Mr. Strong. The validity of that agreement was the subject of a separate lawsuit where the court found the agreement in question unenforceable. Geringer v. Strong, No. 2:16-cv-391-TC, 2017 WL 5176339 (D. Utah Nov. 7, 2017). Mr. Geringer claims that the court should conclude that triable issues of fact exist about the validity of the agreement because Mr. Geringer has appealed that order. But several months after Mr. Geringer filed his opposition, the Tenth Circuit affirmed the court's finding that the agreement was invalid (see Geringer v. Strong, 766 F. App'x 620 (10th Cir. 2019)), so this argument is now moot.

---

[21] Defendants argue that, because they relied on the advice of their general counsel, Mr. Hunt, and their CFO, Mr. Child, to prepare the PPMs, they should be insulated from a finding that they reasonably should have known about Mr. Clawson's past. Defendants cite no legal authority for the proposition that reliance on their attorney or their accountant relieved them of any independent obligation to conduct even cursory due diligence into one of their key coworker's background. This appears to be simply a reinstatement of their argument that they did not materially aid in the creation of the PPMs, which, as discussed in footnote 17, does not protect them from liability.

Third, Mr. Geringer argues Mr. Strong's claims are barred by the relevant statutes of repose and statutes of limitation. This argument also provides the basis of Mr. Geringer's separate motion for summary judgment. (<u>See</u> ECF No. 244.) Accordingly, the court addresses these arguments in the next section. For the reasons stated below, some of Mr. Strong's claims are barred by the relevant statutes of repose and others raise triable issues of material fact regarding the application of the relevant statutes of limitations.

E. <u>Conclusion</u>

Based on the foregoing, the court concludes the following:

1. California law applies to Mr. Strong's claims. Triable issues of fact exist about whether Utah law also applies.

2. CAREIC violated California's securities fraud statute when it failed to disclose Mr. Clawson's past SEC violations in the CAS, CASDF, and Series E PPMs. Triable issues of fact exist about whether other misrepresentation or omissions violated California's securities fraud statute.

3. Mr. Austin, Mr. Clawson, Mr. Davidson, and Mr. Geringer are all liable for the failure to disclose Mr. Clawson's past, because (a) they are all directors of, or filled similar roles with, CAREIC; (b) privity is not required to establish liability; and (c) there are no triable issues of fact about whether they reasonably should have been aware of Mr. Clawson's past.

4. Although Mr. Strong has shown that Defendants are liable for at least one omission in their securities offerings, triable issues of material fact remain regarding whether claims arising from these securities offerings are barred by the statute of limitations.

Accordingly, Mr. Strong's motion for summary judgment is DENIED.

## V.    Mr. Geringer's Motion for Partial Summary Judgment

Mr. Geringer moves for summary judgment on the first, second, fourth, fifth, eighth, and ninth causes of action, arguing that each claim is barred by the relevant statutes of limitations.[22]

Mr. Geringer argues that the first, eighth, and ninth claims are subject to four-year statutes of limitations and that the statutes began to run by mid-2009.  Therefore, all of these claims were untimely when the complaints were filed in October 2014 (against Mr. Austin, Mr. Clawson, and Mr. Davidson) and November 2015 (against Mr. Geringer).  (See ECF No. 2; 837 ECF No. 2.)  Regarding the second and fourth claims, Mr. Geringer takes the position that five-year statutes of repose and two-year statutes of limitations apply.  He maintains that the statute of repose began to run (at the latest) in June 2009, and that the statute of limitations began to run (at the latest) in September 2011.  Again, this would mean theses claims were untimely by the time the complaints were filed in October 2014 and November 2015.

Mr. Strong disagrees, arguing instead that all of his claims are timely because the statutes identified by Mr. Geringer were extended by both § 108 of the Bankruptcy Code and the parties' tolling agreement.

### A.    Interpreting § 108 and the Parties' Tolling Agreement

Mr. Strong asserts that he need only show that all of his claims were viable as of October 17, 2011, the date CAREIC filed its petition for bankruptcy.  He argues that so long as a claim was viable on that date, § 108 of the Bankruptcy Code extended the time in which to bring suit by two years, to October 17, 2013.  See 11 U.S.C. § 108(a).  Then, on October 14, 2013 (before

---

[22] For the reasons stated below, the court does not address the fifth claim at this time.

the § 108 extension expired), a tolling agreement—amended eleven times—further extended the filing deadline by more than three years, to November 27, 2015. Accordingly, because Mr. Strong filed the complaints before November 27, 2015, the claims are timely.

Mr. Geringer argues this timeline is incorrect for three reasons. First, he concludes that § 108 does not apply to claims brought on behalf of the investors (claims two and four). Second, he argues that the tolling agreement excludes any claim that was not timely as of August 11, 2015, the date of the tenth amendment to the tolling agreement. So even if a claim was extended by § 108, to October 17, 2013, the claims would have expired before the tolling agreement went into effect on August 11, 2015. Finally, Mr. Geringer argues that even if the start date of the tolling agreement was October 14, 2013 (the date of the original agreement), it does not apply to § 108, so whether the time to bring a given claim was tolled should be calculated without regard to § 108.

    1.  Applicability of 11 U.S.C. § 108(a)

Section 108(a) of the Bankruptcy Code allows bankruptcy trustees an additional two years to bring lawsuits on behalf of the bankruptcy estate if the relevant statute of limitations would otherwise expire during that time. Subsection (a) states,

> If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) two years after the order for relief.

11 U.S.C. § 108(a).

Mr. Strong's first, eighth, and ninth claims are brought on behalf of CAREIC. Mr. Strong's second, fourth, and fifth claims are brought on behalf of CAREIC's investors. Mr. Strong argues that § 108 applies to both sets of claims. Mr. Geringer disagrees and says that § 108 applies only to the CAREIC claims, and not the third-party claims, because only the CAREIC claims were actually held by the bankruptcy debtor at the time the bankruptcy petition was filed. The court agrees with Mr. Geringer.

First, the statute's plain language only refers to claims held by "the debtor," not claims held by third parties such as investors. Second, the legislative history of § 108 supports a narrow interpretation of the two-year extension. A year after § 108 was enacted, Congress considered an amendment that would have added, after the word "debtor," the words "or any person to whose rights the trustee succeeds." Bankruptcy Technical Amendments Act, S. 658, 96th Cong. (1980). Congress rejected the amendment, suggesting an intent that the provision remain limited to claims of debtors. Cf. In re Ozark Rest. Equip. Co., Inc., 816 F.2d 1222, 1227 (8th Cir. 1987) (examining similar proposed amendments to 11 U.S.C. § 544, and concluding that "based on congressional intent, as evidenced by the failure to expressly give the trustee standing to bring creditors' causes of action," the trustee lacked certain powers).

Only a handful of cases discuss the scope of § 108, and none address investor claims assigned to a trustee. Still, most of the cases follow the plain language of the provision, and restrict its application to claims the debtor held when it petitioned for bankruptcy. See, e.g., Sender v. Mann, 423 F. Supp. 2d 1155 (D. Colo. 2006); In re Everfresh Beverages, Inc., 238 B.R. 558 (Bankr. S.D.N.Y. 1999).

Mr. Strong cites to <u>Quilling v. Compass Bank</u>, No. 3:03-CV-2180-R, 2004 WL 2093117, at *5–6 (N.D. Tex. Sept. 17, 2004), in which a court applied § 108 to claims assigned to a liquidating trustee by a third party. In that case, the court applied the statute to extend the statute of limitations for claims of defrauded investors against a third-party bank.

But, as Mr. Geringer notes, <u>Quilling</u> was a civil action brought under the Securities Investor Protection Act (SIPA), not a bankruptcy proceeding. SIPA statutorily subrogates the claims of securities customers to a liquidating trustee. <u>See</u> 15 U.S.C. §§ 78fff-1(a), 78fff-3(a). The case says nothing of assigned claims in non-SIPA post-bankruptcy liquidations. Moreover, the court in <u>Quilling</u> cites with approval to <u>In re Ward</u>, 42 B.R. 946 (Bankr. M.D. Tenn. 1984), which follows the weight of authority and holds that § 108 does not extend to creditor claims acquired by a trustee after the filing of a bankruptcy petition. <u>Id.</u> at 950 ("Causes of action unrelated to debtor claims acquired by the trustee postpetition are not protected by § 108.")

Based on the plain language of § 108, its legislative history, and the weight of case law, the court concludes that § 108 did not extend the time for Mr. Strong to bring claims on behalf of third-party investors.

2. The Tolling Agreement

On October 14, 2013, the parties agreed to toll "any time-based bars including, but not limited to statutes of limitations and statutes of repose, in any action or proceeding arising from or related in any way to the Tolled Claims." (GAppx. at 358 (Ex. 28).) The tolling agreement applied to "[t]he period between the date of this Agreement and . . . April 15, 2014." (<u>Id.</u>)

The agreement was then amended eleven times. The first eight amendments used the same phrasing as the original agreement, changing only the relevant end date. (<u>Id.</u> at 360-85

(Exs. 29-36).) For example, the first amendment states that the agreement applied to "[t]he period between the date of this Agreement and . . . May 30, 2014." (Id. at 361 (Ex. 29).

But the ninth amendment changed the phrasing slightly because the parties anticipated bankruptcy court approval of the proposed settlement of the claims. The ninth amendment reflected this change of events, stating that the tolling applied to "[t]he period between the date of this Amendment [May 19, 2015] and ten (10) days after entry of a Final Order on the Approval Motion." (Id. at 387 (Ex. 37).)

On August 11, 2015, while the motion for approval was pending, the parties signed a tenth amendment to the agreement. (Id. at 390 (Ex. 38).) Mr. Strong, in opposition to Mr. Geringer's motion, submits evidence that the parties desired a new amendment because the bankruptcy court had vacated, but not rescheduled, the motion hearing. So the tolling agreement had effectively become open-ended (lasting until the date a new hearing was set and an order entered). Accordingly, the parties agreed to sign a new tolling agreement with a definite end date. (SAppx. Op. at 759-70 (Exs. 25-29).) The tenth amendment states that the tolling agreement was amended to apply to "[t]he period between the date of this Amendment and October 8, 2015." (GAppx. at 390 (Ex. 38).)

Mr. Geringer argues that while the first eight amendments extended the original tolling period, the ninth amendment, and later, the tenth amendment, started new tolling periods. Consequently, he says, the only statutes of limitations tolled by the ninth amendment were ones that had not lapsed as of May 19, 2015, the date of the ninth amendment. He then asserts that

this period was replaced by the tenth amendment, and the only statutes of limitations tolled were ones that had not lapsed as of August 11, 2015 (the start date of the tenth amendment).[23]

To support his position, Mr. Geringer focuses on a slight variation in the text of the ninth and tenth amendments. The first eight amendments recite that the tolling period began as of "the date of this <u>Agreement</u>," while the ninth and tenth amendments state that the tolling period began as of "the date of this <u>Amendment</u>." Mr. Geringer argues that this language is "subject to only one interpretation as a matter of law," (ECF No. 244 at 30), namely that the tolling period for the first eight amendments ended when the last amendment expired: As of May 20, 2015, the end date of the eighth amendment, the statutes of limitations that had been tolled since October 2013 ceased being tolled. An entirely new tolling period began with the ninth amendment, on May 19, 2015, that had no connection to the tolling period provided by the first eight amendments.

Mr. Geringer cites no case law to support his argument. Moreover, reading the agreements as Mr. Geringer proposes, placing great emphasis on the shift in wording from "this Agreement" to "this Amendment," makes no substantive difference. Assume Mr. Strong had a claim that would have expired on November 1, 2013, because of the relevant statute of limitations. Beginning on October 14, 2013, that statute of limitations was tolled by the parties' initial tolling agreement. It was tolled by the next eight amendments to May 20, 2015, the end date of the eighth amendment. Under Mr. Geringer's interpretation, on May 19, 2015, the parties began a new tolling period, rather than an extension of the old period, which would toll only

---

[23] Mr. Geringer briefly argues that the eleventh amendment between the parties (GAppx. at 392 (Ex. 39)) was improperly executed because after Mr. Strong signed the agreement, it was never returned to Mr. Geringer. But he also states that for purposes of his motion for summary judgment, he will "assume that the Eleventh Amendments (sic) did not advance the start date from August 11, 2015 (as provided in the Tenth Amendment . . .), to sometime in October. This concession for the purposes of this motion benefits Mr. Strong." (<u>See</u> ECF No. 244 at 30.) Accordingly, the court does not address whether the eleventh amendment changed the start date of the tolling period.

those statutes of limitation still pending as of the date of the amendment, rather than as of the date of the original agreement. But as of May 19, 2015, that original statute of limitations was still pending, by virtue of the earlier tolling agreements. The only reasonable reading of the ninth amendment is that this original statute of limitations would also be covered by the new tolling agreement, and would continue to be tolled going forward. The same is true of the tenth amendment: that original November 2013 statute of limitations was still on hold as of August 11, 2015, when the tenth amendment began a new tolling period, and so would be covered by the tenth amendment. Nothing in the plain language of the amendments supports Mr. Geringer's conclusion regarding the impact of the ninth and tenth amendments.

Accordingly, the court concludes that any statute of limitations that had not yet lapsed as of October 14, 2013, the date of the original tolling agreement, was tolled through November 24, 2015, when Mr. Strong filed his complaint against Mr. Geringer.

In any event, the court agrees with Mr. Strong that Mr. Geringer should be estopped from raising this argument in the first place. In <u>National Credit Union Administrative Board v. Barclays Capital, Inc.</u>, 785 F.3d 387 (10th Cir. 2015), a particular statute of limitations stated that it applied "notwithstanding any provision of any contract." The parties nevertheless attempted to toll the statute of limitations by agreement. The Tenth Circuit held that, although the contract was invalid and the statute of limitations had not been tolled, the defendant would still be barred from relying on the statute of limitations.

> The [plaintiff] relied upon the tolling promises by [the defendant] in continuing settlement negotiations rather than breaking off negotiations and suing within the limitations period, and it is appropriate to hold [the defendant] to its promise. We therefore hold that, even though the [plaintiff's] claims are outside the limitations period of the Extender Statute and that period cannot be tolled by contract, [the defendant] is estopped from raising this statute of limitations defense.

Id. at 393.  Similarly, in this case, the ninth and tenth amendments were related to ongoing

settlement negotiations.  Indeed, the only reason the language changed in the agreements was,

apparently, because the parties believed they had obtained a settlement, and had submitted that

settlement to the bankruptcy court for approval.  Given the clear intent of the parties to continue

tolling the relevant statutes of limitation until the matter settled, the court concludes Mr.

Geringer is estopped from asserting that the agreement did not toll the statute of limitations.

      3.  Applicability of Tolling Agreement to § 108 Extension

      Mr. Strong argues the tolling agreement applied not only to statutes of limitation, but also

to the § 108 extension.  So if § 108 extended the time to bring a claim to October 17, 2013, the

tolling agreement (signed on October 14, 2013) would further extend the time to bring the claim.

Mr. Geringer, on the other hand, contends that the tolling agreement does not apply to § 108.

Rather, the only time limits tolled by agreement are the original, underlying statutes of

limitations.  He asserts that any claims subject to a statute of limitations that had already run

before October 14, 2013, would not be covered by the tolling agreement, even if it would be

covered by § 108.

      The court agrees with Mr. Strong.  The tolling agreement applies to "any time-based bars

including, but not limited to statutes of limitations and statutes of repose."  (GAppx. at 358 (Ex.

28).)  Mr. Geringer's position is that § 108 is not a "time-based bar," because it extends, rather

than limits, the time in which a claim can be brought.  But even if § 108 extends the time to bring

a claim, it is still a time-based bar, because it also prevents a claim from being filed after a

certain date, just like any other statute of limitations.  In this case, § 108 barred CAREIC from

bringing its claims after October 17, 2013.  But three days earlier, the parties had agreed to toll

all time-based bars.  Accordingly, the October 17, 2013 bar imposed by § 108 was tolled by the agreement.

None of Mr. Geringer's cited authority is to the contrary.  His authority emphasizes that § 108 does not pause statutes of limitations, as other tolling provisions do; it simply provides an extension.  In other words, the statutes of limitations and § 108 run concurrently, and the § 108 two-year extension becomes the outer limit of time in which to file suit.  See, e.g., Baker v. Bank of America, N.A., No. 16 Civ. 488 (AKH), 2016 WL 9409022 (S.D.N.Y. Oct. 31, 2016); Aegis Healthcare, P.A. v. Shared Med. Sys. Corp., No. 3:99-cv-2697-X, 2000 WL 819409 (N.D. Tex. June 12, 2000).  If the parties here had executed the tolling agreement after the § 108 extension expired, these cases would apply.  But the parties' agreement was executed before the § 108 extension expired, so these cases are inapplicable.

In sum, so long as Mr. Strong's claims on behalf of CAREIC could be pursued as of the date of the bankruptcy petition (October 16, 2011), Mr. Strong could continue with those claims at the time the complaint was filed because both the § 108 extension and the tolling agreement applied.

B.  Application of Statutes of Limitations to Each Claim

Based on the foregoing, the court concludes that CAREIC's direct claims were timely brought so long as the statutes of limitations had not run as of October 17, 2011, and that the investor claims were timely brought so long as the statutes of limitations had not run as of October 14, 2013.

1. First, Eighth, and Ninth Claims

These claims are for breach of fiduciary duty (the first claim), constructive trust (the eighth claim), and unjust enrichment and disgorgement (the ninth claim). Mr. Strong brought them on behalf of CAREIC.

Mr. Geringer argues that all three claims are subject to a four-year statute of limitations.[24] He then argues that the first claim accrued, at the latest, upon his resignation from CAREIC on July 9, 2009, and that the eighth and ninth claims accrued, at the latest, when the final investment occurred on May 5, 2009.[25]

Using Mr. Geringer's dates, the court concludes the claims are timely. The bankruptcy petition was filed just over two years after the claims accrued, meaning the four-year statute of limitations had not yet run. At that point, the claims fell within the § 108 extension and, later, the tolling agreements, preserving them until the complaint was filed.

Accordingly, Mr. Geringer's motion for summary judgment is denied on the first, eighth, and ninth causes of action.[26]

2. Second Claim

Mr. Strong's second claim, brought on behalf of the investors, is for violation of the securities laws of Arizona, California, Nevada, and Utah, in relation to the CAS, CASDF, and Series E PPMs. These units were sold from approximately June 25, 2007 to September 10,

---

[24] Mr. Geringer reserves the right to assert that some of the claims are actually subject to a three-year statute of limitations at trial, but does not contest this issue for purposes of this motion. (See ECF No. 244 at 19.)

[25] Again, Mr. Geringer reserves the right to argue at trial that these claims may have accrued earlier, but does not press the issue here. (See ECF No. 244 at 20 n.6.) As discussed below, the parties dispute the exact dates upon which the final investment payment was made, but this dispute in no way alters the court's analysis here.

[26] Mr. Strong advances an alternative argument regarding timeliness under the adverse domination theory. The court need not reach this issue, in light of its holding above.

2009.[27]  Mr. Geringer contends that the relevant statutes of limitations and statutes of repose bar all of the alleged violations.

      i.    Statutes of Repose

California, Nevada, and Utah each have a statute of repose that requires that, at the latest, any action for securities fraud be brought within five years of the sale of the securities, regardless of whether the fraud could have been reasonably discovered by that time.  Cal. Corp. Code § 25506(b) (West 2019); Nev. Rev. Stat. Ann. § 90.670 (West 2019); Utah Code Ann. § 61-1-22(7)(a)(i) (West 2019).  Arizona has no statute of repose.

Because § 108 does not apply to this claim, the claim is untimely unless the statutes of repose had not run by October 14, 2013.  To the extent this claim arises from securities sold before October 14, 2008—five years before the entry of the tolling agreement—the claim is barred by the statutes of repose.  Accordingly, Mr. Geringer's motion for summary judgment is

---

[27] The exact dates during which these offerings were sold is disputed throughout the briefs.  Mr. Strong, in support of his motion for summary judgment, submits copies of every securities purchase agreement at issue.  (SAppx. v.3-v.5 (Ex. 58).)  He also compiled this information into a spreadsheet.  (SAppx. v.2 at 578-595 (Ex. 59).)  Based on this evidence, Mr. Strong argues that the CAS units were sold between June 25, 2007, and December 16, 2008; the CASDF units were sold between February 1, 2008, and May 15, 2009; and the Series E units were sold between June 1, 2008, and July 1, 2009.

Mr. Geringer, in support of his motion for summary judgment, used Mr. Strong's spreadsheet to create his own spreadsheet of the data.  (GAppx. at 651-657.)  Based on his spreadsheet, Mr. Geringer makes inconsistent arguments.  For example, in his motion, he asserts that the last purchase for any of the three offerings was June 8, 2009.  (ECF No. 244 at 10.)  But in his opposition to Mr. Strong's motion, and while citing the same spreadsheet, Mr. Geringer asserts that the last purchase occurred on May 4, 2010.  (ECF No. 248 at 23.)

Reviewing Mr. Geringer's spreadsheet, it appears the last CAS units were purchased December 19, 2008; the last CASDF units were purchased June 8, 2009; and the last Series E units were purchased on September 10, 2009.  In each instance, these dates are slightly later than the dates provided by Mr. Strong.  The discrepancy appears to arise from the fact that Mr. Strong cites the date the relevant agreement was signed, while Mr. Geringer uses the date the investor actually made the payments to purchase the units.

Because it is Mr. Geringer's burden to prove either that the statute of limitations has run (to prevail on his own motion) or that there are triable issues of material fact regarding whether the statute of limitations has run (to prevail against Mr. Strong's motion), the court uses these later dates, provided by Mr. Geringer, for purposes of this order.

granted for any security purchased before October 14, 2008, to the extent Mr. Strong asserts violations of California, Nevada, or Utah law.

Because Arizona has no statute of repose, Mr. Strong may still assert pre-October 2008 claims under Arizona law.

ii.     Statutes of Limitations

Arizona, California, Nevada, and Utah each impose a statute of limitations that requires a plaintiff to bring an action for securities fraud within two years of getting actual or reasonable inquiry notice of the alleged misconduct.  Ariz. Rev. Stat. Ann. § 44-2004(b) (2019); Cal. Corp. Code § 25506(b) (West 2019); Nev. Rev. Stat. Ann. § 90.670 (West 2019); Utah Code Ann. § 61-1-22(7)(a)(ii) (West 2019).

Again, because § 108 does not apply to this claim, the statutes of limitations must not have run by October 14, 2013, for the complaint to be timely.  In other words, if any investors had actual or inquiry notice of the alleged fraud before October 14, 2011—two years before the entry of the tolling agreement—their claims would have been barred by the statutes of limitation at the time the tolling agreement was signed.

Mr. Geringer argues that all investors had inquiry notice before October 14, 2011, and so their claims are barred by the statute of limitations.

a.   Burden

As an initial matter, Mr. Geringer argues Mr. Strong cannot meet his burden to oppose the motion, because Mr. Strong's opposition will be based on arguments that were not sufficiently included in the pleadings.  The court has already rejected this argument.  See Strong v. Cochran, 2:14-cv-788-TC, 2017 WL 4620984 at *5 (D. Utah Oct. 13, 2017) ("[E]xpiration of

the statute of limitations is an affirmative defense, and the Trustee does not have the burden to plead compliance with the statute of limitations.").

Mr. Geringer also notes that no discovery of each individual investor's knowledge of the alleged fraud has been permitted. Accordingly, Mr. Geringer asserts that Mr. Strong cannot show that the investors were not actually aware of, or suspicious of, any fraud, and so will be unable to carry his burden in opposing Mr. Geringer's motion for summary judgment.

Mr. Geringer misstates the parties' burdens on the motion. To prevail on his motion, Mr. Geringer must establish that his affirmative defense applies as a matter of law. See Leone v. Owsley, 810 F.3d 1149, 1153 (10th Cir. 2015) ("[W]here the moving party has the burden [of proof]—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.") (internal quotations omitted). Because it is Mr. Geringer who seeks to establish the affirmative defense of statute of limitations, it is Mr. Geringer who must put forward enough evidence demonstrating either that the investors had actual notice of the fraud or that a reasonable investor would have discovered such fraud. If Mr. Geringer fails to submit such evidence, the burden never shifts to Mr. Strong, and his ability, or inability, to put forward contravening evidence is irrelevant.

b.  Existence of Inquiry Notice

Mr. Geringer does not submit evidence that any of the investors had actual knowledge of the alleged fraud. Instead, he argues that a reasonable investor would have been on inquiry notice regarding the alleged fraud more than two years before October 14, 2013. Mr. Geringer then concludes that all claims against him are barred.

In the securities context, there is a "two-part test for determining the limitations period." Caprin v. Simon Transp. Serv., Inc., 99 F. App'x 150, 155 (10th Cir. 2004). "[A] deciding court must determine: (1) the date of inquiry notice; and (2) the period in which a diligent investor should have discovered facts underlying the possible fraud."[28] Id. The Tenth Circuit "has described the facts sufficient to trigger inquiry notice as 'sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale [of the security].'" Id. at 156 (quoting Sterlin v. Biomune Systems, 154 F.3d 1191, 1196 (10th Cir. 1998)). Looking at the second step, the Tenth Circuit "recognize[s] that when the plaintiffs could not have reasonably discovered the facts underlying the alleged fraud until some period after they were put on inquiry notice, the limitations period should not begin to run upon inquiry notice." Sterlin, 154 F.3d at 1199. Rather, the question is whether a "'reasonably diligent plaintiff' would have discovered the fraud," not whether the actual plaintiffs were diligent. Id. at 1202 n.20.

As discussed above, Mr. Strong alleges that Defendants violated the relevant securities fraud statutes in four ways: (1) by misrepresenting the level of real estate experience of its managers; (2) by failing to disclose control concerns identified by an audit; (3) by failing to disclose that Mr. Clawson had previously been sanctioned by the SEC; and (4) by failing to disclose that unregistered broker-dealers were being used to sell securities. Mr. Geringer identifies fourteen pieces of evidence, each predating October 14, 2011 (two years before the start of the tolling agreement), which he maintains gave enough "storm warnings" of these

---

[28] This two-part test was developed for the one-year statute of limitations applicable to federal securities law claims, not the two-year statutes of limitations applicable to the state securities law claims at issue here. See Sterlin v. Biomune Systems, 154 F.3d 1191, 1195 (10th Cir. 1998). But both parties rely primarily on this test, and based on the balancing of policy considerations discussed at length in Sterlin, 154 F.3d at 1202, the court agrees that the two-step process identified there should be applied to these state-law statutes of limitations as well.

allegedly fraudulent misrepresentation and omissions to put investors on inquiry notice. The court addresses each in turn.

First, on April 14, 2008, CAREIC filed its annual SEC Form 10-KSB. On page five, the form warns investors to expect a lower return on investment in light of a possible real estate bubble in the United States. (GAppx. at 006 (Ex. 1).) Additionally, on page seventeen, it discloses that Mr. Austin had received $175,000 in 2007 as part of a bonus. (Id. at 0037 (Ex. 1).) The court fails to see how this information would put investors on inquiry notice of securities fraud. Numerous courts have held that declining profitability alone is insufficient to create inquiry notice of fraud. See, e.g., Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 951 (9th Cir. 2005) ("This court has held that financial problems alone are generally insufficient to suggest fraud.") (internal citations omitted); Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873 (9th Cir. 1984) (same); Genesee Cty. Emp. Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3, 825 F. Supp. 2d 1082, 1166 (D.N.M. 2011) (holding, at the motion to dismiss stage, that publications that "[did] not specifically indicate that the . . . companies engaged in any actionable misconduct or that it engaged in any fraud regarding its lending practices," but focused instead on the companies' "financial troubles based on overall market conditions," were insufficient to demonstrate inquiry notice); Ames v. Uranus, Inc., No. 92-2170-JWL, 1994 WL 482626 *20 (D. Kan. Aug. 24, 1994) ("The failure of an investment does not automatically indicate that fraud has been committed."). Similarly, the fact that one of the managers received a large bonus, while perhaps indicative of a management decision with which investors would disagree, does not in any apparent way suggest to investors that CAREIC made misrepresentations or omissions at the time the securities were first issued.

Second, Mr. Geringer points to an email received by Mr. Clawson on December 22, 2008, from an investor named Steve Ebbensgaard, who accused Mr. Clawson of having misrepresented the time frame in which Mr. Ebbensgaard would receive a distribution from the company.  (GAppx. at 056 (Ex. 5).)  First, assuming Mr. Clawson made a statement about the timeframe that was wrong, this appears to have been a statement made solely to Mr. Ebbensgaard.  There is no evidence any other investors were aware of the statement, or were aware of Mr. Ebbensgaard's complaint regarding the alleged misrepresentation.  Second, Mr. Ebbensgaard is an investor in the CAREIC Series D PPM.  (SAppx. Op. at 480 (Ex. 19).)  As the second claim relates solely to the CAS PPM, CASDF PPM, and Series E PPM, Mr. Ebbensgaard's potential knowledge of a misrepresentation in the Series D PPM is inapplicable.  Finally, the misrepresentation at issue here regards when distributions would be received.  But the one misrepresentation and three omissions identified by Mr. Strong in the second claim are not based on any misrepresentations about the timing of potential distributions.  Accordingly, Mr. Ebbensgaard's email is irrelevant.

Third, Mr. Geringer identifies a draft email from Mr. Clawson, which he apparently intended to send to an investor named "Marcus."  (GAppx. at 052 (Ex. 4).)  It is unclear whether Mr. Clawson ever actually sent the email.  The point of the email is essentially the same as the communication with Mr. Ebbensgaard: Marcus, at some point, complained of misrepresentations regarding profit projections, and Mr. Clawson responded by indicating there had been no such misrepresentations.  For the reasons discussed above regarding Mr. Ebbensgaard's email, "storm warnings" about distribution amounts do not suggest investors had inquiry notice of the types of misrepresentations or omissions alleged in the second claim.  Next, Mr. Strong states in

opposition that he does not know who "Marcus" is, but he does not appear to be an investor on the list of CAS PPM, CASDF PPM, or Series E PPM investors on whose behalf Mr. Strong is suing.  (Id. at 628 (Ex. 46).)  Like Mr. Ebbensgaard, Marcus does not appear to be representative of the investors involved in the second claim.  The email also indicates that Marcus has a friend who has been "digging into" CAREIC's PPMs, but there is no information provided about which PPMs; what made this friend suspicious enough to "dig[] into" the PPMs; or what, if anything, he found by doing so.  Accordingly, this email is also irrelevant.

Fourth, on July 20 and 29, 2009, CAREIC filed SEC Form 8-K, followed by an amendment to that form.  (GAppx. at 109-116 (Exs. 8-9).)  These forms generally describe Mr. Geringer's decision to resign from CAREIC and the reasons for the departure (that Mr. Geringer felt he was being shut out by the board).  There is no apparent reason why Mr. Geringer's resignation would lead a reasonable investor to be concerned that the PPMs contained material misrepresentations or omissions.  Indeed, one of Mr. Geringer's arguments in opposition to Mr. Strong's motion is that Mr. Geringer played no role in creating the PPMs, so it is unclear why investors would connect his resignation with potential fraud in the PPMs.

Fifth, on August 19, 2009, CAREIC filed SEC Form 10-Q.  (GAppx. at 117 (Ex. 10).)  As with the first form, this form primarily relays to investors that CAREIC is struggling financially.  For the reasons stated above, such struggles, without more, would not place investors on inquiry notice.  The only other statement of note was the disclosure that CAREIC had undertaken an investigation into the sufficiency of its disclosure controls and procedures, and had concluded that these procedures "were not effective."  (Id. at 135 (Ex. 10).)  But the form went on to state:

> Since determining that our disclosure controls and procedures were not effective during 2008, we have implemented corrective policies and procedures. As of June 30, 2009, our principal executive officer and our principal financial officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

(Id.) As one court has noted, "'[t]here are occasions where, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management.' Reassurances can dissipate apparent storm warnings 'if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns.'" In re DaimlerChrysler AG Sec. Litig., 269 F. Supp. 2d 508, 515 (quoting LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003). Given the reassuring statements accompanying CAREIC's acknowledgement that its disclosure control system had been insufficient, the court cannot conclude, as a matter of law, that such a statement would put investors on inquiry notice.

Sixth, on November 16, 2009, CAREIC filed SEC Form 10-Q. The form, in discussing Mr. Geringer's resignation, referred to Mr. Geringer as "the one member of our management team with significant experience in large scale land entitlement projects." (GAppx. at 193 (Ex. 12).) Mr. Strong concedes in opposition that this is likely Mr. Geringer's strongest piece of evidence, as it appears to directly contradict one of the alleged misrepresentations identified by Mr. Strong, namely that multiple members of the management team had significant real estate experience. But the court concludes that this statement would not undisputedly place a reasonable investor on inquiry notice. Shortly after making this statement, the form states that CAREIC "believe[s] that the skills and experience of existing management and employees, coupled with new hires at the appropriate time" would allow CAREIC to continue as it had

before Mr. Geringer's termination. Arguably, CAREIC is simultaneously representing that Mr. Geringer had unique experience among management, but that his experience was not actually that unique, because it was easily replaceable by existing managers and new hires. As discussed above, reassuring statements by management can mitigate statements that might otherwise be deemed storm warnings. A trier of fact could reasonably conclude that occurred here.

Moreover, as Mr. Strong notes, this statement relates to only one of the four alleged misrepresentations and omissions raised by Mr. Strong's second claim. The trier of fact could conclude that the statement provided a sufficient storm warning about all of the misrepresentations and omissions, because once a reasonable investor began investigating, the other omissions would also be discovered. But the misrepresentation and omissions are not similar, so it is equally possible that the trier of fact would conclude that storm warnings about one misrepresentation would not provide inquiry notice for the other omissions. For these reasons, the court cannot find as a matter of law that any investors were placed on inquiry notice because of this one document.

Mr. Geringer's seventh, ninth, twelfth, thirteenth, and fourteenth documents all relate to CAREIC's financial condition, including the fact that it was considering declaring bankruptcy, and informing investors that a receiver would have to be appointed. (GAppx. at 206, 214, 222, 229, and 231 (Exs. 13, 15, 18-19).) As with Mr. Geringer's first piece of evidence, none of the statements in these documents were enough to put the investors on inquiry notice, because informing investors of CAREIC's financial problems, without more, is not enough.

Finally, Mr. Geringer's eighth, tenth, and eleventh documents all relate to communications with an investor named Austin Mansur. (Id. at 211, 216, and 219 (Ex. 14, 16-

17).)  In each of the three emails submitted, Mr. Mansur accuses CAREIC of fraud, indicates that other investors feel the same, and threatens legal action.  But as with Mr. Ebbensgaard and Marcus, there is insufficient evidence to conclude these emails are relevant to this lawsuit.  Mr. Mansur was an investor in projects known as CAOP I and CAOP II, not the CAS, CASDF, or Series E PPMs.  (SAppx. Op. at 480 (Ex. 19).)  Additionally, the misrepresentations Mr. Mansur complains of are distinct from the misrepresentations and omissions at issue in Mr. Strong's second claim: Mr. Mansur argues that CAREIC misrepresented the type of real estate it was involved in (purchasing large pieces of raw land, rather than already developed homes), and misrepresented its ability to obtain loans for the land purchases with favorable terms.  (GAppx. at 211, 216, and 219 (Ex. 14, 16-17).)  These are not the types of misrepresentations or omissions identified by Mr. Strong.  It does not appear to the court that Mr. Mansur's belief that certain misrepresentations had been made is evidence that a reasonable investor, in a different investment, would be placed on inquiry notice of very different misrepresentations.

Accordingly, the court concludes Mr. Geringer has not carried his burden to demonstrate, as a matter of law, that the investors had inquiry notice of their securities fraud claims more than two years before the first tolling agreement was signed.  While the court found above that all pre-October 14, 2008, investments were barred by the statutes of repose of California, Nevada, and Utah, the court also finds that triable issues of fact exist about whether any of the post-October 14, 2008, investments are barred by the statutes of limitation of California, Nevada, and Utah.  Similarly, because Arizona has no statute of repose, the court holds that triable issues of fact exist regarding whether any of the claims, regardless of date, are barred by the statute of limitation of Arizona.

3. Fourth Claim

Mr. Strong's fourth claim is for civil conspiracy to violate Arizona, California, Nevada, and Utah's securities fraud laws.  The parties agree that, because the civil conspiracy claim is contingent on the underlying securities fraud claim, Mr. Geringer's motion on this claim must be granted or denied to the same extent the second claim is granted or denied.  Accordingly, Mr. Geringer's motion for summary judgment is granted in part and denied in part, consistent with the ruling on the second claim.

4. Fifth Claim

Mr. Strong's fifth claim is for violation of the RICO laws of Utah and Nevada.

Mr. Geringer fully briefs the applicability of the statute of limitations to these claims. (See ECF No. 244 at 10, 28.)  But in opposition, Mr. Strong responds with a single footnote, which states:

> Geringer contends that the Trustee's Fifth Claim for Relief—violation of state RICO statutes—is also time barred.  The Court has ordered that claim be arbitrated but has stayed the arbitration of that claim until the resolution of the Trustee's other claims.  See May 5, 2015 Order at 7-8, Dkt. 44.  Therefore, the Trustee does not address the timeliness of the RICO claims in this Opposition.

(ECF No. 265 at 3.)

In reply, Mr. Geringer does not address the RICO claims.

It is unclear to the court whether the fifth claim is in fact stayed.  As Mr. Strong correctly notes that on May 5, 2015, the court ordered this claim to arbitration, at least as against Mr. Austin.  Strong v. Cochran, 2:14-cv-788-TC, 2015 WL 12780593 (D. Utah May 05, 2015).  At that time, Mr. Geringer was not yet a Defendant in this action.  Instead, on September 15, 2016, in the other, not-yet-consolidated case to which Mr. Geringer was a party, Mr. Strong's motion

to compel arbitration was granted in part, including the Utah RICO claim. (The order contains no mention of RICO claims arising under Nevada law, although such claims were also asserted in that complaint.) <u>Strong v. Geringer</u>, 2:15-cv-837-TC, 2016 WL 4926175 *3 (D. Utah Sept. 15, 2016).

On January 17, 2017, the court held a status conference to discuss the apparent collapse of all arbitration efforts. (ECF No. 91.) On January 30, 2017, based on that hearing, the court lifted the stay of proceedings in both cases and ordered that the action again proceed before the court, rather than in arbitration. (ECF No. 92.) As of that date, as far as the court can determine, the RICO claims, like all other claims, were no longer stayed.

The cases were subsequently consolidated, and, on May 8, 2017, Mr. Strong filed an amended complaint that combined the complaints from the two cases into a single pleading. (ECF No. 150.) The amended complaint states, in the heading to the fifth claim, that the claim is "stayed pursuant to court order," but it does not disclose what order it is referring to. The record in this case does not disclose any order staying the fifth claim between January 30, 2017 (when the court lifted the stay), and May 8, 2017 (when the amended complaint was filed). On the contrary, the day after the amended complaint was filed, the court denied Mr. Davidson's motion to compel arbitration, reiterating again that the stay had been lifted and the court had "ordered the parties to proceed to regular litigation." (ECF No. 151.)

In sum, the court is unaware of any stay for the Utah and Nevada RICO claims. But Mr. Strong represents that there is such a stay, and Mr. Geringer's reply does nothing to contradict that assertion.

The court orders the parties to file simultaneous supplemental briefs addressing the fifth claim, and in particular addressing why the parties believe that claim is stayed. The parties' briefs shall be filed by October 09, 2019. Neither brief shall exceed ten pages.

The court reserves ruling on Mr. Geringer's motion for summary judgment on the fifth claim until after it has reviewed the supplemental briefs.

**ORDER**

Mr. Strong's motion for summary judgment (ECF No. 221) is DENIED.

Mr. Geringer's motion for summary judgment (ECF No. 244) is DENIED on Claim Nos. 1, 8, and 9, and is GRANTED in part and DENIED in part on Claim Nos. 2 and 4 as detailed above. The court RESERVES ruling on Claim No. 5.

DATED this 23rd day of September, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge